# EXHIBIT A



## CALIFORNIA

# DEPARTMENT OF JUSTICE

**Report on the Investigation into the
Death of Brandon Lopez on September 28, 2021**

Orange County AB 1506

NOVEMBER 2023



# TABLE OF CONTENTS

BACKGROUND – ASSEMBLY BILL 1506 ...................................................................1

PRIVACY STATEMENT ...................................................................................... 2

INTRODUCTION............................................................................................. 2

SUMMARY OF INCIDENT ................................................................................. 3

INVESTIGATION.............................................................................................. 9

    Overview ............................................................................................... 9

    Evidence Reviewed............................................................................... 10

    Incident Scene Description .................................................................... 10

    Incident Scene Evidence Recovery .......................................................... 11

    Brandon Anthony Lopez – Background .....................................................13

    Body-Worn Camera (BWC) and Other Recordings .....................................13

    Interviews of Involved Officers ...............................................................15

    Interviews of Civilian Witnesses............................................................. 25

AUTOPSY ................................................................................................... 26

APPLICABLE LEGAL STANDARDS ....................................................................27

LEGAL ANALYSIS ......................................................................................... 30

    Subjective Element of Self-Defense.........................................................31

    Objective Element of Self-Defense ......................................................... 32

CONCLUSION .............................................................................................. 34

    Lopez Anaheim PD OIS Recommendations .............................................. 34

# INVESTIGATION OF OFFICER INVOLVED SHOOTING



## BACKGROUND – ASSEMBLY BILL 1506

Pursuant to California Assembly Bill 1506 ("AB 1506"), the California Department of Justice ("the Department" or "DOJ") is required to investigate all incidents of an officer-involved shooting resulting in the death of an unarmed civilian in the state. Historically, these critical incidents in California have been handled primarily by local law enforcement agencies and the state's 58 district attorneys.

AB 1506, signed into law on September 30, 2020 and effective July 1, 2021, provides the California Department of Justice with an important tool to directly help build and maintain trust between law enforcement and the communities they serve by creating a mandate for an independent, statewide prosecutor to investigate and review officer-involved shootings of unarmed civilians across California. The DOJ investigates and reviews, for potential criminal liability, all such incidents covered under AB 1506, as enacted in California Government Code section 12525.3. Where criminal charges are not appropriate, the DOJ is required to prepare and make public a written report, like this one, communicating:

- A statement of facts, as discovered by the investigation;
- An analysis of those facts in light of applicable law;
- An explanation of why it was determined that criminal charges were not appropriate; and
- Where applicable, recommendations to modify the policies and practices of the involved law enforcement agency.

Recommendations to modify policies and practices of the involved law enforcement agency will be based on the facts of the incident, any known policies and practices of the relevant law enforcement agency, and the experience and expertise developed by DOJ personnel.

# PRIVACY STATEMENT

This report includes redactions of the names and other identifying information of witnesses and any family members of Mr. Lopez. The public interest in such information is limited as it is not necessary to gain an understanding of the incident. Thus, the interest in nondisclosure clearly outweighs any public interest in disclosure.

For reasons related to privacy, as well as readability of this report, the witnesses and key locations will be indexed as follows:

- Victim 1 ("V-1"), Mr. Lopez's girlfriend.
- Victim 2 ("V-2"), the sister of V-1.
- Witness 1 ("W-1"), Mr. Lopez's family member present at the OIS scene.
- Witness 2 ("W-2"), a witness present at the OIS scene who recorded the incident.

# INTRODUCTION

On September 28, 2021, in Santa Ana, California, Officer Brett Heitmann, Officer Catalin Panov, Officer Kenneth Weber, and Investigator Paul Delgado with the Anaheim Police Department (APD) Special Weapons and Tactics (SWAT) team responded to an individual barricaded in his car.  That individual was identified as Brandon Anthony Lopez.  Mr. Lopez had allegedly stolen a 2021 black Dodge Charger and led law enforcement on a vehicular pursuit through several cities.  The pursuit ended when the Dodge Charger became immobilized at the intersection of North Bristol Street and West Santa Ana Boulevard.

It was reported to police that Mr. Lopez was likely armed and that he had told a family member that he desired to commit "suicide by cop."  Local law enforcement – initially the Santa Ana Police Department and then the Anaheim Police Department – surrounded Mr. Lopez's vehicle and ordered him to surrender.  After more than four hours without Mr. Lopez's surrender, the Anaheim Police Department deployed a chemical agent inside the car.  Mr. Lopez then exited the Charger, first running away from the officers, and then changing course and sprinting towards officers with a black object in one of his hands near his waistband.  Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado of the APD SWAT team fatally shot Mr. Lopez.  It was subsequently determined that Mr. Lopez was unarmed and that the object in his hand was a black "GUESS" drawstring bag containing a water bottle.

The Department of Justice investigated and reviewed the Officer Involved Shooting (OIS) pursuant to Government Code section 12525.3 (enacted by Assembly Bill 1506).  This report is the final step in the DOJ's review of the fatal OIS of Mr. Lopez.  The scope of this report is limited to determining whether criminal charges should be brought against the involved officers, and offering possible policy and practice recommendations.  The review does not encompass or comment on any potential administrative or civil actions.  It does, however, include policy and practice recommendations, as required by Government Code section 12525.3, subdivision (b)(2)(B)(iii).  Based on the criminal investigation, review of evidence, and evaluation of the case, we have determined that there is insufficient evidence to support the filing of criminal charges against Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado.

***CAUTION:  The images and information contained in this report may be graphic and disturbing. Therefore, reader discretion is advised, especially for young children and sensitive individuals.***

# SUMMARY OF INCIDENT

On September 28, 2021, at approximately 3:00 PM, Anaheim Police Department (APD) Officer Joseph Gross responded to a call from V-2 reporting that her 2021 black Dodge Charger had been allegedly stolen by Mr. Lopez.  V-2 told APD Officer Gross that her sister, V-1, had gotten into an argument with her boyfriend, Mr. Lopez, that morning around 3:00 AM.  Mr. Lopez took V-1's cell phone, the vehicle keys, and the Dodge Charger, without V-1 or V-2's permission.

The Dodge Charger was equipped with tracking software that allowed V-2 to locate the vehicle using a cell phone application: Sirius XM U-Connect ("U-Connect").  At around 1:26 PM, V-1 went to the City of Orange where the application located the vehicle.  V-1 saw Mr. Lopez in the vehicle and approached him. V-1 asked Mr. Lopez to return the keys and the Dodge Charger, but he refused and drove away erratically.

At about 3:41 PM, V-2 informed Officer Gross that the vehicle was near 678 South Breezy Way in the City of Orange, according to U-Connect application.  When Orange Police Department officers arrived, however, they were unable to locate the vehicle.

APD Officer Joseph Gross conducted a wants and warrants check, which revealed that Mr. Lopez had four outstanding arrest warrants, including warrants for domestic violence and robbery.

At approximately 4:45 PM, APD officers in uniforms and marked patrol cars conducted surveillance at 2151 1st Street in the City of Santa Ana.  They had been led to the location by the U-Connect application. They observed the reportedly stolen Dodge Charger at that location, but Mr. Lopez was not with the car. At approximately 5:15 PM, Mr. Lopez entered the Dodge Charger and the APD officers attempted a traffic enforcement stop.  Mr. Lopez did not comply and a vehicle pursuit ensued.

APD's helicopter, nicknamed "Angel," was on scene and assisted officers with pursuit of Mr. Lopez in the reportedly stolen Dodge Charger.  Law enforcement pursued Mr. Lopez though the Cities of Tustin, Irvine, and Santa Ana.  Due to the reckless driving exhibited by Mr. Lopez during the pursuit, including a hit-and-run encounter with two other motorists, marked police units pulled back while Angel followed the vehicle from the air.

At approximately 5:49 PM, Mr. Lopez drove into a construction zone located at North Bristol Street and West Santa Ana Boulevard in Santa Ana, California.  The Dodge Charger became stuck on exposed trolley tracks in the construction zone.



Location of the OIS near the intersection of W. Santa Ana Blvd. and N. Bristol Street

 

The Dodge Charger stuck on exposed trolley tracks

As Mr. Lopez tried to dislodge the Dodge Charger, Santa Ana Police Department ("SAPD") police officers in a marked patrol car drove into position behind the Charger ("Mr. Lopez's vehicle") to prevent his escape.  Although SAPD officers exited the marked patrol car, it remained in position behind Mr. Lopez's vehicle during the OIS incident.

Over the next few hours, SAPD officers attempted to contact, negotiate, and request Mr. Lopez's cooperation to peacefully surrender by exiting the vehicle.  Mr. Lopez did not respond to these efforts.  Starting at approximately 6:00 PM, SAPD Corporal Luis Galena was positioned in the Terradyne armored vehicle and made numerous attempts using the loud speaker, both in English and in Spanish, to contact and negotiate with Mr. Lopez.  Corporal Galena later told investigators that

Mr. Lopez made facial expressions that led Corporal Galena to believe that he understood the commands being given.  During this time, Mr. Lopez was observed smoking what officers believed to be narcotics with a pipe and tinfoil, and talking on a cell phone.  Specifically, an SAPD aerial unit captured video of Mr. Lopez using a lighter to heat the contents of an unidentified substance in tinfoil.

In addition to the SAPD patrol car, other police vehicles moved near Mr. Lopez's vehicle.  An SAPD armored vehicle manufactured by Terradyne Armoured Vehicles, Inc. ("Terradyne") parked directly in front of Mr. Lopez's vehicle with the front bumpers touching.  A BearCat armored vehicle manufactured by Lenco Industries ("BearCat"), parked facing south near the northeast corner of the intersection.  The BearCat's rear bumper rested against the passenger side of the SAPD armored vehicle.  An APD Terradyne vehicle was moved into a position that prevented any exit through the passenger side doors of the Dodge Charger.  Lastly, an APD undercover vehicle, a grey Chevrolet Silverado, was parked near the southeast corner of the intersection facing northeast.



Layout of the OIS scene including the involved APD & SAPD armored vehicles

SAPD negotiators arrived on scene and initiated communications with Mr. Lopez at approximately 5:50 PM.  Detectives attempted to gather information on Mr. Lopez in attempts to further negotiate his surrender, including a phone number for the cell phone he had in his possession.  Additionally, several attempts were made to contact Mr. Lopez via loud speaker, but he refused to answer or communicate with the SAPD officers on scene.

Officer Nelson Menendez was located in the SAPD armored vehicle positioned directly in front of Mr. Lopez's vehicle, and he could see into Mr. Lopez's vehicle through the front windshield.  At approximately 6:09 PM, Officer Menendez reported over the police radio that Mr. Lopez had a gun in his right hand; this was based upon the observations relayed to him by Officer Aguilar.  Mr. Lopez later took the floor mats and placed them on the vehicle windshield to partially obstruct the officers' view of the interior of the Dodge Charger.

During the roughly four-hour standoff, it was reported by SAPD officers on scene over the police radio that Mr. Lopez was seen moving around, and reaching around under the seats and other parts of the vehicle's interior.

At approximately 9:03 PM, SAPD Officers Arleen Sanudo, Jose Arias, and Joanna Hatziefstratiou were working crowd control on the outer perimeter on Santa Ana Boulevard.  W-1 approached the officers. W-1 wanted to know what was going on, and the officers explained that there was an ongoing investigation so no details could be provided.  W-1 stated that Mr. Lopez was his family member and Mr. Lopez needed help due to childhood trauma and mental illness.  W-1 stated that Mr. Lopez was family and would listen to him.

W-1 was accompanied by an unidentified male who stated that he was "pretty sure [Mr. Lopez] is armed."  During the interaction, W-1 asked if Mr. Lopez was "trying suicide by cop."[1]

At approximately 9:00 PM, APD negotiators arrived on scene to replace APD negotiators and initiated communications with Mr. Lopez.  At approximately 9:12 PM, the APD SWAT team assumed command and control of the incident's inner perimeter and relieved all SAPD personnel except for three SAPD officers assigned to their armored vehicle.  APD SWAT continued their attempts to negotiate with Mr. Lopez via loudspeaker, in both English and Spanish, and unsuccessfully to contact Mr. Lopez on the cell phone that was with him in the vehicle.  The officers told Mr. Lopez to surrender and come out of the vehicle, they talked about Mr. Lopez's mother and children, and they told Mr. Lopez to show his hands ("Let me just make sure you don't have anything in your hands.").

At approximately 9:27 PM, according to the footage from a Body Worn Camera ("BWC") carried by SAPD Officer Abelardo Oropeza, W-1 approached a different side of the perimeter and spoke to Officer Oropeza. W-1 told Officer Oropeza that the last conversation Mr. Lopez had with an unidentified family member was at approximately 7:00 PM.  During this conversation, Mr. Lopez apparently told the unidentified family member that he wanted to commit "suicide by cop."  W-1 later clarified to Officer Oropeza that Mr. Lopez had told a family member that he "wants the cops to kill him."  At approximately 9:34 PM, SAPD Officer Oropeza "informed Anaheim PD personnel" of the conversation he had with W-1.

Meanwhile, at the intersection of West Santa Ana Boulevard and North Bristol Street, the windows of Mr. Lopez's vehicle began to fog up, which caused officers to lose some visibility of him.  Mr. Lopez occasionally made motions inside the car, cleared up the foggy windows, and looked out at officers. He eventually moved to the backseat of the vehicle.

At approximately 9:52 PM, APD SWAT gave several warning announcements, using the loud speaker attached to the SAPD Terradyne, that they would deploy a less-lethal aerosol chemical agent if he did not surrender, but Mr. Lopez failed to respond.

---

1   SAPD Officer Hatziefstratiou's report notes that W-1 made a definitive statement that Mr. Lopez was trying to commit "suicide by cop," but the audio from the body worn camera video suggests that W-1 asked a question.

Before deploying the chemical agent, the APD SWAT team members had assembled in a line or "stack" near the front of the BearCat.  The officers were lined up in a stack from front to back in the following order: Officer Heitmann, Investigator Delgado, Investigator Rickey Reynoso, Officer Panov, Officer Weber, and Officer Mullins.[2]  Officer Reynoso was assigned to carry a 40-millimeter less-lethal weapon, and Officer Mullins was the assigned K-9 officer.

At approximately 10:00:33 PM, APD SWAT threw a diversionary device (a flash bang) on the hood of the Dodge Charger.  APD SWAT also broke the vehicle's rear windshield with a tactical utility pole and deployed an aerosol oleoresin capsicum chemical agent into the vehicle.



Mr. Lopez exits the vehicle after the flash bang and chemical agent are utilized

At approximately 10:00:37 PM, Mr. Lopez exited the vehicle from the rear driver's side door.  He maneuvered over the exposed trolley tracks directly outside and underneath the vehicle.  After clearing the tracks, Mr. Lopez initially moved east away from the vehicle and the officers on scene.  APD SWAT team officers located at the front of the BearCat yelled at Mr. Lopez to put his hands up.

---

2   The term "stack" refers to SWAT team members lining up behind one another, but not in linear fashion.  Rather, Officer A will stand in front of Officer B, who is positioned slightly to the right of Officer A by a half body length.  This allows both of the officers to discharge their firearms, if necessary.



Lopez changing directions to run towards officers

Mr. Lopez stopped, turned to look at the officers, and then suddenly changed directions to run west towards Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado.  According to Officers Heitmann, Panov, Delgado, and Weber, they saw a dark object in one of Mr. Lopez's hands near his waistband, which they believed to be a gun.  Officer Panov shouted "gun, gun, gun!"

In response, Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado fired their firearms at approximately 10:00:40 PM.  An estimated 2.2 seconds elapsed from the moment the first round was fired at Mr. Lopez to when the last round was fired.

Officer Heitmann fired his rifle approximately four to five times.  Officer Panov fired his handgun ten times.  Officer Weber fired his handgun five times. Investigator Delgado fired his rifle four times.  Neither Officer Reynoso nor Officer Mullins discharged their firearms.

Mr. Lopez sustained multiple gunshot wounds and fell on the ground with his hands concealed under his body.  Officer Panov initially believed Mr. Lopez may have fallen on top of a gun that he was carrying.  The APD SWAT team momentarily retreated back behind cover to form a plan to see if Mr. Lopez was still conscious and/or capable of moving.

At approximately 10:02:24 PM, Officer Reynoso fired one 40-millimeter less-lethal foam round at Mr. Lopez's lower body to confirm he was no longer a threat.  Mr. Lopez did not move, and the APD SWAT team approached and handcuffed Mr. Lopez.

Orange County Fire Authority paramedics, who had been on the scene since approximately 6:02 PM, were dispatched to render aid to Mr. Lopez after the OIS at approximately 10:05 PM.  Mr. Lopez was pronounced dead at approximately 10:06 PM.  There was no handgun located on or around Mr. Lopez, but a black "GUESS" drawstring bag, containing a water bottle, was found underneath his body.

A canvass for civilian witnesses was conducted.  A news-video stringer[3] posted various portions of the incident on social media platforms.  The stringer, later identified as W-2, was contacted the following day for an interview, and a copy of the footage was obtained.

# INVESTIGATION

## Overview

On September 29, 2021, at approximately 9:00 AM, the DOJ Division of Law Enforcement ("DLE") California Police Shooting Investigation Team ("CaPSIT") received notification of the OIS.  The incident was determined to be a qualifying event under AB 1506.[4]

CaPSIT responded to the incident scene to initiate a criminal investigation on behalf of the DOJ.  A Deputy Attorney General (DAG) from the Attorney General's Special Prosecutions Section also responded.  When CaPSIT agents arrived, the incident location was secured by APD and SAPD personnel, with the entire surrounding area blocked off with crime scene tape to preserve evidence.

The DOJ team observed the locations where key items of evidence were collected, while paying particular attention to the area where the shooting had taken place.  The Orange County Crime Lab ("OCCL") had already been on scene to collect evidence and document findings.  CaPSIT personnel arrived on scene after all of the evidence had been collected by the OCCL, with the exception of Mr. Lopez's vehicle.

After walking the incident scene and reviewing evidence, CaPSIT and Orange County District Attorney ("OCDA") personnel conducted a joint briefing to provide an overview of the OIS incident so that investigators had the same information before further steps were taken.  After the briefing, CaPSIT special agents were assigned investigative tasks.

The APD SWAT officers involved in the incident were later sequestered after the shooting, and ultimately all four involved officers provided voluntary statements.  Statements were also taken from civilian percipient witnesses.  The DOJ team reviewed BWC footage and video footage taken by a percipient witness, later identified as W-2, who captured the OIS incident.

The DOJ Victim Services Unit was notified of the incident and provided contact information regarding the family of Mr. Lopez.  Mr. Lopez's next of kin was contacted and provided information and resources.

The DOJ investigation into the death of Mr. Lopez was comprehensive, thorough, objective, and independent.  In total, thirteen law enforcement officers with APD and SAPD, and two civilian witnesses[5] were interviewed as part of this OIS investigation, and one incident scene was processed for evidence. This report represents hundreds of hours of investigation conducted by the DOJ, OCDA, and OCCL.

---

3  A "stringer" is a freelance journalist, photographer, or videographer who takes reports, photos, or videos and provides them to news organizations on an ongoing basis, but is paid individually for each piece of published or broadcast work.

4  APD initially called for the Orange County District Attorney's Office (OCDA) to respond to the scene.  Once on scene, the OCDA and the Coroner's office confirmed that the decedent was unarmed.  At that point, the OCDA contacted DLE, and CaPSIT was dispatched to the OIS scene.

5  W-1 was not interviewed by the OCDA or DOJ at the scene.  W-1 was not a percipient witness of the OIS; however, his statements to law enforcement were memorialized in several written reports and partially captured on BWC.

## Evidence Reviewed

The DOJ received and reviewed extensive investigation materials regarding this incident, including: numerous reports from investigating officers; supplemental reports from the on scene investigation; the Coroner's report; surveillance footage from buildings surrounding the OIS location; interview transcripts and audio recordings from the interviews conducted by the DOJ of the APD SWAT team members involved in the OIS (Heitmann, Panov, Weber, and Delgado) and from witnesses and victims; BWC footage from nine officers at the OIS scene; police radio channel recordings; two videos taken from the APD air support unit "Angel"; Mr. Lopez's prior criminal history; a video taken by a stringer; 474 crime scene photos; 270 autopsy photos; 43 drone photos; and data from the cell phone found in the vehicle that Mr. Lopez was driving.

## Incident Scene Description

There is only one crime scene location associated with this incident.  The OIS took place at a construction zone located on the northeast corner of the intersection of North Bristol Street and West Santa Ana Boulevard in Santa Ana, California.

Bristol Street runs north and south and is a two-way divided asphalt road.  There are train tracks that run east and west across Bristol Street along West Santa Ana Boulevard.  West Santa Ana Boulevard runs east and west and is a two-way divided asphalt road.  At the time of the incident, the north lanes of traffic on West Santa Ana Boulevard were under construction for a light rail project.  The northern half of the roadway had been removed and there was only dirt and gravel underneath the tracks. There were bright orange traffic cones, barriers, plastic chains, erected traffic signs, and construction zone warning signs throughout that area of the road.  The construction zone was made up of loose dirt, exposed trolley tracks, and rebar.

Mr. Lopez's vehicle was parked on top of the exposed trolley tracks in the northeast corner of the North Bristol Street and West Santa Ana Boulevard intersection.  The vehicle faced northwest.  The rear driver's side tire was on the exposed trolley tracks, while the remaining tires were not.  The rear passenger's side tire was stuck in the gravel and dirt.

As noted above, the SAPD Terradyne armored vehicle was parked directly in front of Mr. Lopez's vehicle.  Additionally, a SAPD patrol car was parked directly behind Mr. Lopez's vehicle.  The BearCat and Terradyne armored vehicles were parked adjacent to the SAPD Terradyne to further limit Mr. Lopez's escape routes if he chose to exit the vehicle on foot.



Rebar tracks, shallow ditch, and small hill left of Mr. Lopez's vehicle

On the other side of the train tracks was a shallow ditch underneath a small dirt hill.  Construction cones and blocks were placed on the other end of the hill.  A large construction sign stood near the front of the BearCat, in between it and a civilian vehicle.

Two civilian vehicles were on scene at the time of the OIS.  One was a silver Nissan Murano parked in the westbound lane of Santa Ana Boulevard east of Bristol Street.  The Nissan Murano was located to the south of the Dodge Charger on the other train tracks.  The passenger side tire of the Nissan Murano was flat with an apparent bullet fragment protruding from the forward facing tread area.  A grey Honda Accord was also parked in the westbound lane of Santa Ana Boulevard east of the inner perimeter crime scene tape.

## Incident Scene Evidence Recovery

The evidence at the crime scene was located at Bristol Street and Santa Ana Boulevard.  The collected items were processed by criminalists from the OCCL.  Evidence recovery, scene documentation, and photographs were completed by the OCCL.

An expended aerosol OC gas canister attached to a deployment "bang pole" was found resting against the interior driver side door of the Dodge Charger.  The pole extended in a northeastern direction through the vehicle's rear window and rested on the front hood of the APD Terradyne adjacent to the Dodge Charger.  There was also an expended flash bang device on the ground adjacent to the right front passenger side tire of the Dodge Charger.

A black "GUESS" drawstring bag holding an empty plastic water bottle, both of which had bullet holes, was located in the intersection underneath Mr. Lopez's body.  There was no firearm recovered on or near Mr. Lopez.



The water bottle and black "GUESS" bag found underneath Mr. Lopez

Also found inside the Dodge Charger was a black Samsung smartphone cell phone located in the rear pocket of the front passenger seat.  Two pieces of aluminum foil with burnt, black residue were located in the vehicle, along with one expended aerosol OC gas canister recovered from the vehicle's backseat.

Additionally, there was also a folded piece of white paper with a note written with a black pen that was recovered within the vehicle.  It read "I love you kids don't ever forget that never forget me Love Dad." The initials "M J B S" were written vertically on the left side of the paper.

Twenty-three cartridge casings were recovered from the OIS scene, on the roadway in the intersection, near Mr. Lopez's body, including: sixteen nine-millimeter casings; one 5.56-millimeter casing; six .223 caliber brass casings; and one blue 40-millimeter less-lethal round.  Three bullet cores were also recovered.  One blue less-lethal projectile was located on the east side of the intersection.



Photograph of the numbered markers used to identify evidence (shell casings, projectiles, etc.) recovered from the OIS scene

## Brandon Anthony Lopez – Background

Mr. Lopez was born on December 2, 1987.  At the time of the OIS incident, he was six feet tall and weighed 180 pounds.

Between December 2000 and June 2021, Mr. Lopez had several separate law enforcement contacts.  In May 2020, Mr. Lopez was arrested for robbery with a gun.  Mr. Lopez was also identified as the suspect in the June 2021 armed robbery of a convenience store, and an arrest warrant was issued.

## Body-Worn Camera (BWC) and Other Recordings

BWC and a witness "stringer" video captured key portions of the OIS incident.  Each captured part of the incident from a different angle.  Freeze frame images from the videos were used to summarize the incident for this report.  Aerial footage captured: (1) the vehicular pursuit between Mr. Lopez and SAPD; and (2) Mr. Lopez's vehicle getting stuck in the exposed rebar.

BWC footage was turned over for review by the OCDA and later CaPSIT.  Three of the four shooting officers (Officers Panov, Weber, and Delgado) were all wearing active BWCs at the time of the incident.  Officer Heitmann was wearing his BWC, but it malfunctioned when he tried to record the incident and, consequently, the BWC did not record the OIS.  The BWCs were worn on top of the officers' ballistic helmets as the OIS developed.

The relevant footage captured:  The conversation between W-1 and SAPD Officer Oropeza; the conversation between W-1 and SAPD Officers Arleen Sanudo, Jose Arias, and Joanna Hatziefstratiou; an APD officer throwing the flash bang onto the hood of the Dodge Charger; an APD officer using a "bang

pole" to break the rear windshield to introduce gas into the vehicle; Mr. Lopez exiting his vehicle and his exit path; the OIS; and the handcuffing of Mr. Lopez after the OIS.

The four officers who discharged their firearms, and two other officers at the OIS scene (Officers Reynoso and Mullins), were assigned to the APD SWAT team.  Several of the BWCs show that the APD SWAT officers were positioned near the front hood of the BearCat using it for cover.  Additionally, APD Officer Valdiserri was positioned near the hood of Mr. Lopez's vehicle and later tossed a diversionary device (i.e., flash bang) onto Mr. Lopez's car.  APD Officer Ungureanu broke a rear window with a bang pole and, consequently, the window was shattered.  Gas from the flash bang accumulated in the rear seats of the vehicle.  As such, Mr. Lopez exited the vehicle through the driver's side rear door a second later.

The BWC footage shows that Mr. Lopez ran over the exposed trolley tracks in a direction initially away from the officers.  The BWC footage also shows Mr. Lopez carrying an unidentified dark object, and both hands were near his waistband.  Officers shouted, "he's out" and "hands up" several times.  Mr. Lopez tripped over something at the end of the tracks.  The BWC cameras did not capture Mr. Lopez at this point because the view was blocked by a large construction sign.

The BWC then shows Mr. Lopez changed directions and began running towards the officers.  Officer Panov yelled "gun" several times after Mr. Lopez is seen with a dark object in one of his hands.  Mr. Lopez sprinted towards the arrest team from behind the construction sign, and once he became visible officers shot at him.  Mr. Lopez fell to the ground with his hands beneath him.

The stringer video showed the following shortly before the OIS: an APD officer, later identified as Officer Valdiserri, standing near the front of Mr. Lopez's vehicle and tossing a diversionary device (i.e., flash bang) onto the hood of Mr. Lopez's vehicle.  The flash bang went off twice.  Meanwhile, another APD officer, later identified as Officer Ungureanu, utilized a pole to break the rear windshield of the Dodge Charger of the suspect's vehicle.

Officer Panov stated that, shortly before Mr. Lopez exited the vehicle, what he believed to be a "hole" appeared in the middle of the rear driver-side window.  He stated that he believed the "hole" had been caused by a gun fired from inside the vehicle.  The available video does show a clear circular spot appearing in the center of the otherwise foggy rear driver-side window shortly before Mr. Lopez exited the vehicle.  Later investigation determined that  condensation had gathered on the inside of the rear-driver side window and Mr. Lopez may have brushed or touched the window shortly before exiting; the contrast of the clear spot on the otherwise foggy window created the false impression that a hole had been created.  While the rear windshield had been shattered, the rear driver-side door window remained intact.

As Mr. Lopez exited he initially ran east, but then turned and suddenly ran west towards SWAT officers.  Multiple shots were fired and Mr. Lopez fell to the ground with his hands underneath his body.  Officer's fired a less lethal round at Mr. Lopez's body to confirm that he was not feigning his injuries.  When he did not move after being struck by the less lethal round, at least four SWAT officers approached Mr. Lopez's body and checked his hands.  Paramedics, who had been on scene for several hours, then attempted to render aid to Mr. Lopez.

One BWC belonging to Officer Aguilar was placed on the dashboard of the SAPD Terradyne positioned directly in front of Mr. Lopez's vehicle.  It also captured many of the above-described events during this OIS.

## Interviews of Involved Officers

During the course of the investigation, an officer has the right to be represented by an attorney and may choose to provide a voluntary statement, physical evidence, and other relevant information. It is important to note that neither an officer nor a civilian can be compelled to provide a statement or any other evidence in a criminal investigation.

There were four sworn law enforcement officers involved in this incident who discharged their firearms: Brett Heitmann, Catalin Panov, Paul Delgado, and Kenneth Weber. Each of these officers was interviewed. In addition, two other officers on the scene at the time of the OIS, Rickey Reynoso and Kenney Aguilar, were also interviewed.

The following statements are summaries of their interviews, which describe the incident from the point of view of the individual officers. Please note that the interviews contain facts relayed by the officers that may be inaccurate or inconsistent with the facts of this incident as they are currently understood.

### Officer Brett Heitmann

On October 6, 2021, Officer Brett Heitmann was interviewed by DOJ Special Agent Patrick Estrada and Special Agent Supervisor Craig Black. Officer Heitmann's legal counsel, Christopher Koharski and Russell Perry, were also present, along with APD Detective Mark Gale. The following is a summary of the relevant portions of his interview:

Officer Heitmann had been assigned to the training unit in APD for six years. He joined the APD SWAT team eleven years prior to this OIS incident. As a member of the APD SWAT team, Officer Heitmann had worked the long-rifle or sniper position and started doing entry work for entering buildings and searching four years prior to the interview. He also served as one of the primary firearms instructors for his team and was an assistant team leader. He has been trained in de-escalation techniques, barricaded suspect situations, barricaded vehicle situations, and deploying gas. Prior to becoming a police officer, Officer Heitmann served in the Marine Corps from 2003 to 2009.

At the time of the shooting, Officer Heitmann was wearing a gas mask, a ballistic vest marked "police," a helmet, and BWC. When Officer Heitmann attempted to activate his BWC, however, it did not turn on. Officer Heitmann carried a department-issued AR-15 rifle, which was used in the shooting, as well as his personal Staccato 2011 handgun.[6]

On September 28, 2021, Officer Heitmann was ordered to respond for a requested APD SWAT call. He drove to the command post located about a block away from the Dodge Charger, which was immobilized at the intersection of North Bristol Street and West Santa Ana Boulevard. Officer Heitmann was informed by APD Command when he was dispatched that the situation involved an "armed 211 suspect barricaded in a vehicle."[7] Upon arrival at the command post, Officer Heitmann was briefed on the situation.

APD officers Ungaranu, Song, Panov, Delgado, Weber, and Lopez and Sergeant Leest were also at the briefing. They were informed that Mr. Lopez was a "211 suspect" whom the officers had attempted to arrest, but a vehicle pursuit ensued across several jurisdictions. Mr. Lopez's name and photo were

---

6   California law and APD policies and procedures both allow an officer to carry a personal firearm while on duty. Officer Heitmann's possession of a personal firearm was in compliance with state law and APD policies and procedures.

7   The term "211" refers to California Penal Code section 211, which defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

provided to the officers.  Officer Heitmann said that he had never encountered Mr. Lopez in his prior service calls.

The officers were informed that Mr. Lopez was armed and that negotiations had taken place for several hours.  Officer Heitmann was informed that Mr. Lopez was not cooperative, and that APD would be replacing SAPD to continue the operation.  The APD SWAT team, including Officer Heitmann, was informed that Mr. Lopez had told a family member that his plan was to commit "suicide by cop," or otherwise force officers to use lethal force against him.

At the scene, APD's Terradyne armored vehicle was positioned next to the passenger side of the Dodge Charger.  It was placed there for the purpose of limiting his exit so that Mr. Lopez could only exit through the driver's side.  SAPD's Terradyne armored vehicle was positioned directly at the front of Mr. Lopez's vehicle.  A third armored vehicle, APD's BearCat, was positioned with its rear bumper against the passenger side door of SAPD's armored vehicle.

The scene had good visibility from the lights on the armored vehicles and stand-alone worker's flood lights.  Upon Officer Heitmann's request, one of the stand-alone lights was placed in front of him at the front of the BearCat so that he and the officers behind him could have even better visibility of Mr. Lopez.  The light ran out of battery before Mr. Lopez exited the vehicle.

At the time of the shooting, Officer Heitmann was part of the arrest team with Officers Panov, Weber, Delgado, Reynoso, and Mullins.  They were positioned at the front of APD's BearCat armored vehicle at a left-facing angle with most of the other officers behind him.

Officer Heitmann heard negotiators speaking to Mr. Lopez over the loudspeaker saying "Hey, think of your kids," "You want to see his next football game," and "There's no reason that anybody needs to get hurt.  You won't be hurt if you just exit."  Officer Heitmann did not see Mr. Lopez communicate or otherwise respond to the attempted negotiations.  He believed that Mr. Lopez was actively ignoring them given that the announcements could be heard clearly from a loudspeaker.  APD negotiators were informed by incident command staff that negotiations would continue for another fifteen minutes after taking over responsibility for the scene from SAPD, but that absent a change in circumstances the officers would deploy a chemical agent to force Mr. Lopez to exit the vehicle through the rear driver's side door.

Multiple contingency plans were developed by the APD SWAT team members to address the different ways that Mr. Lopez could react upon exiting the vehicle.  The initial plan was for the officers to give Mr. Lopez verbal commands to help get him clear of the rebar and other construction obstacles right outside his vehicle.  If Mr. Lopez was cooperative and officers were able to get Mr. Lopez past the construction zone, the plan was to have Mr. Lopez get down in the dirt and then crawl until he reached a position where he could be taken into custody.  Alternatively, if Mr. Lopez exited the vehicle, but did not cooperate, then less-lethal force (e.g., K-9 dog or 40-millimeter less-lethal rounds) would possibly be deployed.

On the police radio tactical channel, Officer Heitmann heard that the plan to get Mr. Lopez out of his vehicle was to utilize the gas team, who would deploy a diversionary device (i.e., flash bang) at the hood of Dodge Charger and insert a chemical agent through the rear windshield using a bang pole.  The bang pole was utilized out of concern that Mr. Lopez was armed and thus, might otherwise turn around and shoot at an officer trying to deploy the gas.  The gas used was an aerosol known as "Clear Out," which does not burn or produce smoke.

Officer Heitmann observed Mr. Lopez moving around within the vehicle and was concerned that Mr. Lopez might mount an attack.  Officer Heitmann observed an officer at the back of the APD Terradyne toss the flash bang on the hood of Mr. Lopez's car, while another officer at the hood of the same Terradyne jammed the bang pole with the chemical agent attached through the rear window of Mr. Lopez's vehicle.

The rear driver's side door of Mr. Lopez's vehicle opened and Mr. Lopez emerged.  There were approximately fifteen yards between Officer Heitmann and Mr. Lopez's vehicle.  Officer Heitmann used his rifle light to place a spotlight on Mr. Lopez as he exited the vehicle.  Officer Heitmann observed one of Mr. Lopez's hands go towards his waistband.  Officer Heitmann and other officers yelled at Mr. Lopez to keep his hands up.  Mr. Lopez did not react.

After clearing the construction, Mr. Lopez placed both hands back on his waistband.  At first, Mr. Lopez ran towards an area where there were generally no obstacles, but then turned, looked at the ADP SWAT team, and ran directly towards them.

As Mr. Lopez ran towards officers, a large construction sign temporarily blocked the officers' visual on Mr. Lopez.  Officer Heitmann believed Mr. Lopez would use that time to fire off several rounds at the officers and close the distance between them.  When Mr. Lopez reappeared on the other side of the sign, both his hands were still at his waistband and he had a dark object in one of his hands.

Officer Heitmann observed Mr. Lopez make a tugging motion and believed whatever Mr. Lopez was trying to access in his waistband got stuck.  Officer Heitmann also heard a gunshot on his right.  Officer Heitmann believed that he "heard a shot or two to my right, first, and that's right about the time that I again saw [Mr. Lopez] tugging at it."  Officer Heitmann used his AR-15 rifle and believed he shot at Mr. Lopez approximately three to six times from about five yards away "in an effort to stop [Mr. Lopez] from getting shots off at me and my partners."[8]

Mr. Lopez fell with his hands beneath him.  The officers took cover to confirm that Mr. Lopez was no longer a threat, and he did not move.  The SWAT team developed a plan to arrest Mr. Lopez and provide him with medical aid.  There was some brief discussion about using a dog to approach Mr. Lopez first in case Mr. Lopez was "playing possum."  Ultimately, a 40-millimeter less-lethal projectile round was shot at Mr. Lopez's buttocks to elicit a response.  When there was no movement, the SWAT team approached Mr. Lopez behind a shield.

A shield was placed on top of Mr. Lopez to keep him in position.  Officers Panov and Weber pinned his arms to the ground before pulling his hands out from underneath him.  Officer Heitmann did not know whether Mr. Lopez was placed in restraints because he began walking towards the medics once Mr. Lopez's hands were revealed.  Officer Heitmann informed the medics that Mr. Lopez was being secured and they approached Mr. Lopez to render medical aid.

Officer Heitmann described Mr. Lopez's "button hook" path as he exited the vehicle.  Officer Heitmann mentioned that Mr. Lopez could have taken any route, but chose to run directly at the line of officers, which led to his belief that Mr. Lopez was going to attack them.  Officer Heitmann's belief was also based on the information that Mr. Lopez was armed, wanted to commit "suicide by cop," and was wanted for a serious offense.  In summary, Officer Heitmann "believed 100 percent [Mr. Lopez] had a firearm in his waistband, and he's going to charge us and try to shoot as many of us as he could.  Officer Heitmann

---

8    DOJ special agents later concluded that he fired four or five rounds at Mr. Lopez, based on Officer Heitmann's report of the number of rounds loaded in the firearm and counting the rounds remaining after the shooting.

elaborated that "it was my fear that he did that on purpose so that he could shoot as many of us as possible, and force us to shoot him."

## Officer Catalin Panov

On October 6, 2021, Officer Panov was interviewed by DOJ Special Agent Patrick Estrada and Special Agent Eric Cryar.  Officer Panov's legal counsel, Christopher Koharski and Russell Perry, were also present, along with APD Detective Mark Gale.  The following is a summary of the relevant portions of his interview:

At the time of his interview, Officer Panov had been employed with APD for twenty-one years.  Officer Panov had been assigned to the APD SWAT team for the last eleven years, and he was concurrently assigned to the training detail as well.  He had assisted with firearms training, range training, combat or tactics training, and de-escalation training for the department.  During his time with APD, Officer Panov had worked as a gang investigator, street narcotic investigator, vice investigator, Orange County human trafficking task force investigator, and crime task force investigator.  He had also been trained in de-escalation techniques, barricaded suspect situations, barricaded vehicle situations, and deploying gas.

On September 28, 2021, Officer Panov was dispatched to the incident location.  At the time of the incident, Officer Panov was wearing a gas mask, a ballistic vest marked "police" on the front and back, a ballistic helmet, and a BWC on top of the helmet.  Officer Panov was also carrying his personal nine-millimeter Shadow Systems handgun.

Before arriving at the scene, Officer Panov listened to the vehicle pursuit over the police radio.  At the briefing, Officer Panov received the same information as Officer Heitmann.[9]  When officers were shown a photo of Mr. Lopez, Officer Panov recognized him based on a prior investigation.  Officer Panov had surveilled Mr. Lopez over several days because Mr. Lopez was suspected of a string of armed robberies at gas stations.  When Mr. Lopez was arrested on the prior occasion, Officer Panov spoke with Mr. Lopez about his heroin addiction.

After the briefing, the APD officers were dispatched to the scene.  Officer Panov recalled that it was difficult to visually observe Mr. Lopez because the Charger windows were foggy and Mr. Lopez had taken the floor mats and placed them up on the front dashboard to obstruct the officers' view of the vehicle interior through the front windshield.

Officer Panov stated that he had been on "high alert" since he heard the announcement over the police radio about Mr. Lopez's intent to commit "suicide by cop." Officer Panov had dealt with armed/barricaded suspects twice in his career and those suspects attempted to use lethal force towards him.

Officers Panov and Weber were assigned to be the arresting officers.  At approximately 9:30 PM, he and Officer Weber were positioned near the front of the BearCat behind Officer Heitmann, Investigator Delgado, and Investigator Reynoso.  Officer Heitmann and Investigator Delgado were positioned at the front of the stack to provide "lethal cover."  Two other officers were assigned as the less-lethal alternatives:  Officer Ricky Reynoso had a 40-millimeter less-lethal sponge round and he stood behind the "lethal cover" officers; Officer Mullins had a K-9 and was placed at the back of the group.  Officers Panov and Weber were behind Officer Reynoso, but in front of Officer Mullins, and were tasked with going "hands-on"[10] once Mr. Lopez exited the vehicle and their job was to arrest him.

---

9   Please refer to Officer Heitmann's interview summary for further information.

10  A "hands-on" scenario is where a suspect exits the vehicle, lays down on the ground, and surrenders, and officers subsequently use their hands to arrest the suspect.

After the arrest team was in place, a diversionary device (i.e., flash bang) was deployed and a gas canister was dropped into Mr. Lopez's vehicle using a bang pole to break the rear windshield.  As the gas cleared, Officer Panov saw what he described as a "hole" in the rear driver's side window where Mr. Lopez was sitting.  Officer Panov believed that Mr. Lopez was shooting at them since a hole in car windows is consistent with people shooting through car windows, based upon his training and experience.[11]

Mr. Lopez exited his vehicle with a black object in one of his hands.  Officer Panov believed that Mr. Lopez possessed a handgun based upon: Mr. Lopez's close proximity to the officers, Mr. Lopez was carrying the object near his waistband, and Mr. Lopez was running directly towards the SWAT officers.[12]  Officer Panov believed that Mr. Lopez was about thirty feet away from where the SWAT officers were positioned.  There were several directions Mr. Lopez could have run to escape.  However, Mr. Lopez, with a black object in his hand, sprinted directly towards the officers.  Due to the angle that Mr. Lopez approached the officers from, Officer Panov believed that the officers were exposed to potential gunfire.

Officer Panov yelled "gun" approximately seven times.  After Mr. Lopez reappeared on the other side of a construction sign, which temporarily obstructed his view of Mr. Lopez, Officer Panov observed that Mr. Lopez had the black object in his right hand and was quickly approaching.  Officer Panov believed Mr. Lopez "was an imminent threat to me, I felt he was an imminent threat to my partners, and I fired my handgun at him."  Consequently, Officer Panov believed he fired his handgun at Mr. Lopez approximately six to eight times.[13]

Mr. Lopez landed on the ground about ten feet from officers.  The APD SWAT team returned to get behind cover.  To ensure that Mr. Lopez was not feigning the extent of his injuries, Officer Panov suggested that utilizing a 40-millimeter less-lethal round.

Officer Reynoso deployed the less-lethal round and hit Mr. Lopez on the right buttocks.  Mr. Lopez did not move, so an immediate plan was made to provide Mr. Lopez with medical attention.  Officer Weber pinned down Mr. Lopez's right arm and Officer Panov pinned down his left arm.  The two slowly pulled his arms out.  There was no handgun when they pulled his hands out.  As they were about to handcuff him, however, Officer Panov saw a black object near Mr. Lopez's waistband where his arms were.  It was later determined to be a black GUESS bag.

During the encounter, Officer Panov was concerned that Mr. Lopez would engage in "point shooting" (i.e., pointing and shooting from a short distance and being able to hit your target) when he came out from behind the construction sign.  Officer Panov believed that Mr. Lopez could have run in any direction, but instead chose to run towards the officers, which to him, demonstrated Mr. Lopez's intent to shoot at the officers.  Officer Panov was in fear for his own safety and the safety of his partners.  Based on the totality of the circumstances, Officer Panov believed that the force he utilized was necessary.

### Investigator Paul Delgado

On October 6, 2021, Investigator Paul Delgado was interviewed by DOJ Special Agent Ugo Carlos and Special Agent Eric Cryar.  Investigator Delgado's legal counsel, Christopher Koharski and Russell Perry,

---

11  From BWC it appears that Mr. Lopez brushed against the rear driver's side window before he exited the vehicle. The window was fogged up from moisture and the OC gas entering the vehicle.  Mr. Lopez brushed the moisture off that spot, thereby causing the appearance of a hole in the window.

12  As noted above, the BWC shows that Mr. Lopez first ran away from the SWAT officers, and then turned and ran toward the officers.

13  DOJ special agents later concluded that he fired ten rounds at Mr. Lopez.

were also present, along with APD Detective Mark Gale.  The following is a summary of the relevant portions of his interview:

At the time of his interview, Investigator Delgado had been in law enforcement for 26 years.  He worked primarily as a major narcotics investigator, as well as part-time on the APD SWAT team.  He started working for APD in June 2000.  Prior to working for APD, he worked for the California Highway Patrol (CHP) from 1995 to 1999 on the cargo theft interdiction team.  Investigator Delgado had also worked for the APD gang unit, community policing team, and field training officer program.  He had had rifle and handgun training, de-escalation training, and was a handgun firearm instructor.  Prior to joining law enforcement, Investigator Delgado served in the Marines for two years active duty and thirteen years on reserve and active duty.

At the time of the incident, Investigator Delgado was wearing a ballistic vest with "police" on the front and back, shoulder pads with "police" on each shoulder, ear protection, a helmet, and a BWC on top of the helmet.  Investigator Delgado was also carrying his 2011 Staccato nine-millimeter handgun and a department-issued LWRC 5.56-millimeter collapsible rifle, which he used in the shooting.

On September 28, 2021, at approximately 7:30 PM, Investigator Delgado was notified about a barricaded individual in a car that was stopped at an intersection in Santa Ana.  Investigator Delgado arrived on scene at approximately 8:00 PM and received the same briefing as Officers Heitmann and Panov.[14]  After the briefing, the officers drove to the scene.

From his position in the APD SWAT stack behind Officer Heitmann, Investigator Delgado had a clear view of Mr. Lopez inside the vehicle and heard several announcements from negotiators asking Mr. Lopez to cooperate and come out.  Specifically, Investigator Delgado overhead the negotiator mention Mr. Lopez's family as they tried to entice him to come out to meet his family.  The negotiator stated Mr. Lopez would not be harmed if he cooperated.  Negotiations were attempted in both English and Spanish.  However, Mr. Lopez did not comply.

Investigator Delgado observed Mr. Lopez moving around inside the vehicle (e.g., going through the center console, moving his hands to his waist area) and placing the floor mats on the front windshield to obstruct the officers' view into the Dodge Charger.  Investigator Delgado also observed Mr. Lopez clearing the foggy side windows to better see the officers' specific positions from the Dodge Charger.  Investigator Delgado made eye contact with Mr. Lopez at one point and saw him look to the right, towards the Bearcat, look left, and then moved out of view.

A plan was developed by the APD SWAT team to get Mr. Lopez out of the vehicle.[15]  After the diversionary device (i.e., flash bang) was deployed and the gas was released, Investigator Delgado saw the rear driver's side door of Mr. Lopez's vehicle open.  Mr. Lopez sprinted out and looked to his left as if surveilling and "getting the lay of the land."  The area where Mr. Lopez initially ran towards was an open space with no officers or construction obstacles.

Investigator Delgado opined that if Mr. Lopez continued running in that direction, he would have had minimal law enforcement intervention.  As Mr. Lopez ran in that direction, however, Investigator Delgado saw him look in the officers' direction and then tuck his right hand into his waistband.  Investigator Delgado saw Mr. Lopez clutching something dark in one of his hands or in his waistband.

---

14  Please refer to Officer Heitmann's interview for information given at the briefing.

15  Please refer to Officers Heitmann and Panov's interviews for the information conveyed to Investigator Delgado with regards to the plans to extract Mr. Lopez from the Dodge Charger.

Investigator Delgado shouted, "get your hands up, hands up" multiple times.  Mr. Lopez did not comply.  Rather, Mr. Lopez turned, changed directions, and ran directly towards the officers.  The officers were initially positioned partially behind the BearCat for cover against potential gunfire from Mr. Lopez.  Based upon Mr. Lopez's exit route from the vehicle, the officers were no longer covered by the armored vehicle and were exposed to potential gunfire as Mr. Lopez ran towards them.  Investigator Delgado turned the safety off of his rifle, switched to semi-automatic, and believed he fired three rounds at Mr. Lopez's center mass.[16]

Mr. Lopez fell with his right hand at his waist.  The officers returned to safety behind cover and then shot Mr. Lopez with a 40-millimeter less-lethal round to check his alertness level.  After seeing no reaction, the officers approached Mr. Lopez and handcuffed him.  The tactical medics who were at the scene were then called to provide medical attention to Mr. Lopez.  After Mr. Lopez was shot, Investigator Delgado saw a slender pouch with a fold-over button-up snap on the ground next to Mr. Lopez.

When asked what he thought Mr. Lopez would do when he changed directions after exiting the vehicle, Investigator Delgado stated he believed Mr. Lopez would pull out a handgun and shoot him or his partners; therefore, Investigator Delgado "deliberately fired three rounds from my rifle in his direction, at him, center mass."  He felt that his "partner's lives were in danger, my life was in danger, and I needed to stop the imminent threat."  Investigator Delgado believed that there were many opportunities for Mr. Lopez to flee, but he instead chose to run towards officers.

### Officer Kenneth Weber

On October 6, 2021, Officer Kenneth Weber was interviewed by DOJ by Special Agent Ugo Carlos and Special Agent Patrick Estrada.  Officer Weber's legal counsel, Christopher Koharski and Russell Perry, were also present, along with APD Detective Mark Gale.  The following is a summary of the relevant portions of his interview:

At the time of his interview, Officer Weber had been an officer with APD for approximately 23 years.  His current full-time assignment was the training unit, which he had done for approximately five years.  Officer Weber's part-time assignment was the SWAT team, which he had done for a total of thirteen years.  Officer Weber had responded to dozens of barricaded subject calls, of which two or three involved suspects using lethal force against him, another officer, or a member of the public.

His prior assignments included patrol, field training officer in patrol, community policing, street narcotics, major narcotics, special investigations, and training.  Prior to working for APD, he worked at the Los Angeles Sheriff's Department for approximately four years starting in December 1994.  He had received rifle and handgun training, de-escalation training, and he was a handgun firearm instructor.  He was also one of the department's arrest-and-control technique trainers.  Prior to joining law enforcement, Officer Weber served in the Marines for four years.

At the time of the incident, Officer Weber wore a gas mask, tactical vest, and helmet with a BWC on top.  He also carried a nine-millimeter Glock 17 sidearm with a red dot sighting system and a flashlight attached to the front.

On September 28, 2021, at approximately 7:28 PM, Officer Weber was notified about the incident and arrived on scene at approximately at 8:00 PM.  Prior to arriving, Officer Weber learned that law enforcement had been in pursuit of an allegedly stolen vehicle driven by a suspect who was wanted for armed robbery.  The pursuit resulted in the suspect barricading himself in his vehicle in Santa Ana.

---

16  DOJ special agents later concluded that he fired four rounds at Mr. Lopez.

At the command post, Officer Weber initially met with Officer Eric Song for a briefing.  Officer Song informed him that APD would be taking over for SAPD to handle a barricaded suspect in a car.  Officer Song informed Officer Weber that Mr. Lopez led officers on a high-speed pursuit and that Mr. Lopez had a firearm in the car.

The initial plan was for APD SWAT members to relieve SAPD SWAT team members on scene. Meanwhile, Officer Weber overheard SAPD attempting to negotiate with Mr. Lopez over the loud speaker system.

While positioned behind the SAPD Terradyne, Officer Weber was able to look directly into the passenger side of Mr. Lopez's vehicle and observed Mr. Lopez moving around in the backseat, but was unable to tell what he was doing because the windows of the vehicle were foggy.  Mr. Lopez would occasionally wipe at the rear driver's side window and look around.  Officer Weber believed he was taking note of where the officers' positions were.

At approximately 9:00 PM, APD took over the scene and replaced SAPD personnel.  APD's Terradyne and BearCat armored vehicles arrived on scene.  Officer Weber heard APD negotiators warn Mr. Lopez via loud speaker that if he did not surrender, a canine would be used.

After the switch, Officer Weber was positioned at the front corner of the BearCat, which was facing Mr. Lopez's vehicle at a 45-degree angle.  The BearCat provided cover from Mr. Lopez's vehicle and potential gunfire.  Officer Weber was in charge of the APD SWAT team, which was comprised of himself and Heitmann, Delgado, Panov, Reynoso, and Mullins.  Officer Weber estimated that they were about forty feet from Mr. Lopez's vehicle.

A plan was developed by the APD SWAT team members, including Officer Weber, to extract Mr. Lopez from the vehicle, along with multiple contingency plans.[17]  The plan was executed when a diversionary device (i.e., flash bang) was thrown onto the hood of the Dodge Charger and a "bang pole" with an attached gas canister was used to break the rear window to deploy the gas into the vehicle.  About one second after the window was broken, Mr. Lopez exited the vehicle through the rear driver's side door with both arms out and jumped over the exposed trolley tracks.

After clearing the rebar, Mr. Lopez was in the officers' clear line of sight.  Mr. Lopez turned and began running directly at the officers.  As he ran, his right hand reached down into his waistband with a fist before his left hand moved downwards.  From his training and experience, Officer Weber knew that suspects kept weapons in their waistband for easy deployment and concealability.  Officer Weber observed Mr. Lopez moving an object around his waistband area.  Officer Weber heard another officer say "gun, gun, gun."  Mr. Lopez's right hand, which was in his waistband, began to come out.

Officer Weber's visual on Mr. Lopez was temporarily blocked by a wooden construction sign directly in front of the officers.  After Mr. Lopez cleared the sign, there was no cover between Mr. Lopez and the officers.  Officer Weber believed that Mr. Lopez was "definitely mounting an attack on us."  He was afraid for his safety and felt "that one of our officers over here, myself or officers, [were] about to get shot or even killed."  As such, Officer Weber believed he fired his Glock nine-millimeter handgun at Mr. Lopez, "center mass, in order to suppress the threat," for what he believed to be four to five shots.[18]

---

17  Please refer to Officer Heitmann's interview for details regarding these plans.

18  DOJ special agents later concluded that he fired five rounds at Mr. Lopez.

Mr. Lopez fell to the ground with both his hands underneath him.  Officer Weber told the other officers that Mr. Lopez likely had the gun underneath him.  The officers were ordered to return for cover behind the BearCat.  A plan was developed to approach and arrest Mr. Lopez.

Officer Reynoso "fired one round with a 40-millimeter less-lethal.  There was no movement from Mr. Lopez.  So, then [APD SWAT] formulated our plan to come up and take him into custody."  Officers Weber and Panov approached and a shield was placed on top of Mr. Lopez.  Officer Weber took Mr. Lopez's left arm and Officer Panov took Mr. Lopez's right arm to arrest him.

Officer Weber noted that Mr. Lopez could have gone in any other direction after exiting the vehicle, but instead charged directly at the officers.  This caused Officer Weber "to believe that [Mr. Lopez] definitely had a gun in his waistband, was mounting an attack, and attempting to kill me and my partners."  At the time of the shooting, Officer Weber was aware that Officers Panov had also fired shots.  After seeing Officer Panov's gun was moving, Officer Weber began firing.  However, Officer Weber was not aware until later that Officers Heitmann and Delgado had also fired at Mr. Lopez.

### Officer Ricky Reynoso

Officer Reynoso was interviewed on September 29, 2021.  Officer Reynoso was interviewed by Detective Gus Moroyoqui and Orange County District Attorney Investigators T. Hernandez and C. Brower.  Officer Reynoso's legal counsel, Christopher Koharski, was also present for the interview.  The following is a summary of the relevant portions of his interview:

At the time of his interview, Officer Reynoso worked part-time as a member of the APD SWAT team.  On September 28, 2021, Officer Reynoso and his team responded to Santa Ana after receiving a phone call requesting assistance for a suspect, later identified as Mr. Lopez, who allegedly stole a vehicle.  Officer Reynoso was assigned to provide less-lethal cover and, consequently, held a 40-millimeter launcher loaded with sponge rounds.  He was positioned towards the front of the BearCat armored vehicle and was the third officer in the arrest team stack behind Officers Heitmann and Delgado.

A plan was developed by the APD SWAT team to extract Mr. Lopez from the Dodge Charger.  Officer Reynoso overhead the negotiations, including the commands and directions given to Mr. Lopez via loud speaker.  Ultimately, a diversionary device (i.e., flash bang) and gas were deployed to force Mr. Lopez to exit through the driver's side of his vehicle.

After the gas was deployed, Mr. Lopez exited and immediately ran in the direction of Officer Reynoso and the other officers.[19]  Officer Reynoso observed Mr. Lopez reach into his waistband as if grabbing something.  Four officers discharged their firearms, but Officer Reynoso did not remember how many gunshots he heard.  Officer Reynoso did not discharge his 40-millimeter launcher because Officers Heitmann and Delgado stepped out of the SWAT stack formation and stood in front of him as they discharged their weapons, thereby preventing a clear shot of Mr. Lopez.

Mr. Lopez fell with his hands underneath him.  Officer Reynoso and the other officers were not sure if Mr. Lopez was feigning the extent of his injuries.  So, Officer Reynoso utilized the 40-millimeter launcher and shot a sponge round at Mr. Lopez's right buttocks, but Mr. Lopez did not respond.  The APD SWAT team approached Mr. Lopez and handcuffed his hands.

---

19  Again, the BWC shows that Mr. Lopez first ran away from the SWAT officers, and then turned and ran toward the officers.

When asked what he thought Mr. Lopez was reaching for in his waistband, Officer Reynoso stated he believed Mr. Lopez was reaching for a handgun based on all of the information he received prior to the OIS incident, as part of the APD SWAT team briefing.

## Officer Kenney Aguilar

On September 29, 2021, Officer Kenney Aguilar was interviewed by Orange County District Attorney (OCDA) Investigators T. Hernandez, C. Brower, and Gus Moroyoqui.  The following is a summary of the relevant portions of his interview:

On September 28, 2021, Officer Aguilar responded to SAPD for a request for assistance with a wanted suspect, later identified as Mr. Lopez.  Officers Aguilar, Menendez, Martinez, Coleman, and Captain Galeana all entered the SAPD Terradyne armored vehicle and proceeded to the scene.  Once on scene, the SAPD armored vehicle was positioned in front of the Dodge Charger with their front bumpers facing each other.

Corporal Galeana controlled the public announcement system and initiated communication with Mr. Lopez.  Officer Martinez manned the turret.  Officer Aguilar sat in the passenger seat and relayed what he saw Mr. Lopez doing to Officer Menendez.  Officer Menendez sat behind Officer Aguilar and broadcasted Officer Martinez and Aguilar's observations over the police radio.  Officer Coleman sat in the rear cargo area.

Corporal Galeana attempted to communicate with Mr. Lopez.  He and Officer Martinez had a partial visual on Mr. Lopez because they were in an elevated position that enabled them to look down into the front windshield area of Mr. Lopez's vehicle.  Officer Aguilar noticed that when Captain Galeana would communicate with him, Mr. Lopez would look up and react.  Specifically, Mr. Lopez would either shake or nod his head or look in their direction.

Mr. Lopez was asked several times to surrender, place his hands in the air, and exit the vehicle with his hands up.  Mr. Lopez did not comply.  Captain Galeana attempted to communicate with Mr. Lopez for several hours.

Officer Aguilar observed Mr. Lopez ingest what appeared to be narcotics and continuously move within the vehicle.  Officer Aguilar placed his BWC on the dashboard of the armored vehicle to try and capture Mr. Lopez's movements.

Notably, Officer Aguilar observed Mr. Lopez move an object that he had at chest level from right to left. It appeared like Mr. Lopez had a grip on something.  Officer Aguilar believed it was the butt of a handgun and believed Mr. Lopez was holding the handgun by the pistol grip.  He told the other SAPD officers in the armored vehicle about his observations, including that he saw Mr. Lopez moving from his right to left and had a grip on something that Officer Aguilar believed to be the "butt of a gun."

Among the officers in the armored vehicle was Officer Menendez, who Officer Aguilar believed was responsible for relaying this information over the police radio.  This information was shared with SAPD command staff and later relayed to APD command staff when they took over the OIS scene.

## Interviews of Civilian Witnesses

### Witness 2 ("W-2")

Witness 2 ("W-2") was interviewed on September 29, 2021.  W-2 was interviewed by SAPD Detective Matt McLeod and OCDA Investigator Carlos Gonzales.  The following is a summary of the relevant portions of his interview:

W-2 owned his own company, but subcontracted with OnScene TV to obtain footage of breaking news, including active crime scenes.

On September 28, 2021, at approximately 5:00 PM, W-2 and his colleagues received information through the OnScene TV tip line that an "incident" was occurring at the intersection of Bristol Street and Santa Ana Boulevard.  W-2 went to the scene and positioned himself south of the intersection on Bristol Street and within the crime scene tape, which was set around the perimeter of the intersection.

Once in a clear position, W-2 began to record law enforcement's encounter with Mr. Lopez.  W-2 observed several armored vehicles and police personnel surround a dark-colored four-door sedan.  While recording, W-2 observed decedent moving around inside the suspect vehicle.  W-2 overheard several announcements made by police asking Mr. Lopez to exit the vehicle and bring a peaceful end to the situation.  Mr. Lopez did not comply.

Later that evening, W-2 observed a "flash bang" type explosive device thrown onto the suspect vehicle and saw Mr. Lopez exit the backseat of the vehicle.  W-2 saw Mr. Lopez reach toward his waistband for an unknown object.  Mr. Lopez ran southbound for a short distance.  W-2 saw and heard more than ten gunshots.  Immediately after the shooting, W-2 saw several officers and medical personnel rush to Mr. Lopez's fallen location to provide aid.  W-2 left the scene at approximately 10:15 PM.

### Victim 1 ("V-1")

Victim 1 ("V-1") was interviewed on October 21, 2021, and again on October 28, 2021, by SAPD Detective Gus Moroyoqui.  The following is a summary of the relevant portions of her interviews:

At the time of the incident, V-1 and Mr. Lopez had been dating for approximately four-and-a-half years.  Mr. Lopez lived with her and her son, but they did not have any children together.

On September 28, 2021, at approximately 3:00 AM, she and Mr. Lopez argued.  Mr. Lopez wanted to leave the apartment while under the influence of drugs.  During the argument, Mr. Lopez took the keys to the 2021 black Dodge Charger belonging to her sister and V-1's cell phone.  Mr. Lopez left the apartment in the Dodge Charger.

V-1 called Mr. Lopez several times and pled with him to return home.  Mr. Lopez stated he was on his way back, but did not return.  V-1 stated that Mr. Lopez was high on drugs on the date of the incident.  At approximately 5:00 AM, V-1 walked to the area where her mother lived in Anaheim because Mr. Lopez stated he would be there.  But Mr. Lopez was not there.

At approximately 10:00 AM, V-1 asked her sister, Victim 2 ("V-2"), to check the car's location using the GPS application, which placed Mr. Lopez in the City of Orange.  At approximately 12:00 or 1:00 PM, V-1 picked up V-2 in her vehicle and they drove to Orange where they located the Dodge Charger.  As V-1 approached the vehicle, she noticed the driver's side door was open and the engine was running.  She noticed one of Mr. Lopez's friends waving at him from outside of the Dodge Charger and then Mr. Lopez appeared and entered the vehicle.  V-1 said Mr. Lopez looked "out of it" and was more under the influence of drugs than he was when he had left earlier in the morning.

V-1 was able to get the key fob for the vehicle and kept asking Mr. Lopez to go home.  She wanted to drive him home, but Mr. Lopez refused and asked her to get in the passenger side of the Dodge Charger.  V-1 obliged and Mr. Lopez drove away with V-2 following them in her vehicle.

V-1 asked Mr. Lopez for her cell phone and Mr. Lopez stated he threw it away.  While talking, Mr. Lopez grabbed the key fob back and, while stopped at an intersection, ordered her out of the vehicle.  V-1 "[knew] how Mr. Lopez could get while…under the influence" and exited the Dodge Charger as he began to accelerate.  She got into V-2's car and the two attempted to follow Mr. Lopez, but were unable keep up with his fast driving.  V-1 told V-2 what happened in the car, and V-2 called the police to report the vehicle as stolen.

V-1 stated that when Mr. Lopez was under the influence of drugs, he often believed people were following him and that glass would be "coming out of his skin."  V-1 described Mr. Lopez's drug "addiction was heroin but he relapsed on fentanyl."  However, V-1 reported that on the day of the incident, Mr. Lopez had been using methamphetamine and fentanyl.  V-1 stated that Mr. Lopez had not slept for approximately two days prior to taking the vehicle.  On September 27, 2021, Mr. Lopez had smoked methamphetamine.  V-1 believed that when Mr. Lopez left the apartment on September 28, 2021, he had gone to get more drugs.

V-1 shared that the defendant had confided to her that he was tired, and he did not know why he could not go back to being sober.  He described his struggle with addiction and strained familial relationships.  V-1 stated that a few days prior to the incident Mr. Lopez attempted to overdose on drugs.

Mr. Lopez had previously spoken to a therapist for depression and stress.  While previously in jail, Mr. Lopez was prescribed Suboxone to help him end his heroin addiction.  Three days before the incident, Mr. Lopez and V-1 purchased Kratom at a smoke shop to also help Mr. Lopez with his drug addictions.  V-1 showed law enforcement the medications that Mr. Lopez was taking prior to his death, which included: Fluoxetine (both 10mg and 40mg); Suboxone (both 2mg and 8mg); Narcal NasaSpray; Clonidine (0.1mg); and Kratom.

## AUTOPSY

On September 28, 2021, Orange County Fire Authority Paramedics Matthew Compton, Jereme Lazar, and Christopher Jaime, as well as EMT Captain Jeremy Quinn, were dispatched to the OIS scene at North Bristol Street and West Santa Ana Boulevard.  Mr. Lopez was pronounced dead at approximately 10:06 PM.

Dr. Young-Son Kim conducted an autopsy at 9:00 AM on September 30, 2021, at the Orange County Sheriff-Coroner Forensic Science Center.  Dr. Kim determined that the cause of death was multiple gunshot wounds to the thorax and right arm, although Dr. Kim was unable to determine which gunshot was the proximate cause of Mr. Lopez's death.

Dr. Kim identified eighteen gunshot wounds, with thirty entry/exit points.  However, Dr. Kim was not able to determine the sequencing of the gunshot wounds or which officer's firearm was responsible for a specific gunshot wound.  In total, fifteen projectiles were recovered from various parts of the body.

  **Gunshot wound #1** – There was a gunshot wound to the upper right shoulder.

  **Gunshot wound #2** – There was a gunshot wound to the upper right hip.

**Gunshot wound #3** – There was a gunshot wound to the upper right hip.

**Gunshot wound #4** – There was a gunshot wound to the lower right side abdomen.

**Gunshot wound #5** – There was a gunshot wound to the lower right side abdomen.

**Gunshot wound #6** – There was gunshot wound to the upper right side flank.

**Gunshot wound #7** – There was gunshot wound to the upper right side flank.

**Gunshot wound #8** – There was gunshot wound to the upper right side flank under the shoulder.

**Gunshot wound #9** – There was a gunshot wound to the upper back.

**Gunshot wound #10** – There was a gunshot wound to the right butt cheek.

**Gunshot wound #11** – There was a gunshot wound to the right butt cheek

**Gunshot wound #12** – There was a gunshot wound to the right rear thigh.

**Gunshot wound #13** – There was a gunshot wound to the left upper butt cheek.

**Gunshot wound #14** – There was a gunshot wound to the upper left shoulder.

**Gunshot wound #15** – There was a gunshot wound to the left upper chest.

**Gunshot wound #16** – There was a gunshot wound to the abdomen.

**Gunshot wound #17** – There was a gunshot wound to the abdomen.

**Gunshot wound #18** – There was a gunshot wound to the right lower abdomen.

The blood toxicology was positive for the presence of despropionyl fentanyl, acetaldehyde, beta-Hydroxyl fentanyl, methoxyacetyl fentanyl, and norfentanyl.

## APPLICABLE LEGAL STANDARDS

Homicide is the killing of one human being by another.  (People v. Beltran (2013) 56 Cal.4th 935, 941.) There are two types of criminal homicide, murder and manslaughter.

### Murder

Murder is the unlawful killing of a human being with malice aforethought.  (Cal. Pen. Code, § 187, subd. (a).)  Murder is divided into first and second degrees.  A willful, deliberate, and premeditated killing is murder of the first degree.  (Cal. Pen. Code, § 189; *People v. Hernandez* (2010) 183 Cal. App.4th 1327, 1332.)

Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements of willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.  (*People v. Knoller* (2007) 41 Cal.4th 139, 151.)  The malice required for second degree murder may be express or implied.  (Pen. Code, § 188; *People v. Hernandez, supra*, 183 Cal.App.4th at p. 1332.)  Malice is express when there is an "intent to kill." (Pen. Code, § 188; *People v. Delgado* (2017) 2 Cal.4th 544, 571.)  Malice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who

knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1215.)

A homicide may also be reduced to second degree murder if premeditation and deliberation are negated by heat of passion arising from subjective provocation.  If the provocation precludes a person from deliberating or premeditating, even if it would not cause an average person to experience deadly passion, the crime is second degree murder.  (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

## Self-Defense

A homicide is justified and lawful if committed in self-defense.  Self-defense is a complete defense to a homicide offense, and, if found, the killing is not criminal.  (*People v. Sotelo-Urena* (2016) 4 Cal. App.5th 732, 744.)  When a person is charged with a homicide-related crime and claims self-defense, the prosecution must prove beyond a reasonable doubt that the homicide was not committed in self-defense.  (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1167.)

Penal Code sections 196 et. seq. set forth the law of self-defense in homicide cases.  Penal Code section 196 provides that a homicide committed by a peace officer is justified when the use of force complies with Penal Code section 835a.  (Cf. Pen. Code, § 197 [listing circumstances where homicide committed by "any person" is justifiable, which includes self-defense or the defense of others].)

Under Penal Code section 835a, an officer may use deadly force only when the officer "reasonably believes, based on the totality of the circumstances, that such force is necessary": (1) "to defend against an imminent threat of death or serious bodily injury to the officer or to another person"; or (2) to apprehend a fleeing person who has committed a felony "that threatened or resulted in death or serious bodily injury," and the officer "reasonably believes that the person will cause death or serious bodily injury" if not immediately apprehended.  (Pen. Code, § 835a, subd. (c)(1); see Pen. Code, § 835a, subd. (a)(2) [peace officers may lawfully use deadly force "only when necessary in defense of human life"]; see *People v. Randle* (2005) 35 Cal.4th 987, 994 [self-defense arises when a person actually and reasonably believes in the necessity of defending against imminent danger of death or great bodily injury], overruled on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172.)

To determine whether deadly force is necessary, "officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer."  (Pen. Code, § 835a, subd. (a)(2); *People v. Hardin* (2000) 85 Cal.App.4th 625, 629-630 ["only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified" and "deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury"].)

A threat of death or serious bodily injury is "imminent" when, based on the "totality of the circumstances," a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or to another person.  (Pen. Code, § 835a, subd. (e)(2); see *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305-1306 [imminent peril is "immediate and present" and "must be instantly dealt with"; it is not prospective or even in the near future].)

"Totality of the circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.  (Pen. Code, § 835a, subd. (e)(3).)  De-escalation methods, tactics, the availability of less than lethal force, and department policies may be used when evaluating the conduct of the officer.  However, when an officer's use of

force is evaluated, it must be considered "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force."  (Pen. Code, § 835a, subd. (a)(4); accord, *Graham v. Connor* (1989) 490 U.S. 386, 396-397 ["The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083 [to determine whether use of force is objectively reasonable for self-defense, trier of fact must consider all the circumstances that were known or appeared to the officer as well as consideration for what a reasonable person in a similar situation with similar knowledge would have believed]; *People v. Bates* (2019) 35 Cal. App.5th 1, 9-10 [knowledge of another person's prior threatening or violent conduct or reputation for dangerousness may provide evidence to support a reasonable belief in imminent harm].)

Self-defense also has a subjective component.  (*Humphrey*, *supra*, 13 Cal.4th at p. 1082.)  The subjective element of self-defense requires that a person actually believes in the need to defend against imminent peril or great bodily injury.  (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)

## Burden of Proof

A prosecutor bears the burden of proving a criminal defendant's guilt beyond a reasonable doubt. (Pen. Code, § 1096.)  Where an investigation is complete and all of the evidence is available for review, prosecutors should file charges only if they believe there is sufficient admissible evidence to prove the charges beyond a reasonable doubt at trial.  (See, e.g., Nat. Dist. Attys. Assn., National Prosecution Standards (3d ed. 2009) Part IV, § 2 pp. 52-53; United States Department of Justice Manual § 9-27.220; Melilli, Prosecutorial Discretion in an Adversary System (1992) B.Y.U. L.Rev. 669, 684-685 [surveying ethical standards used in the exercise of charging discretion by prosecutors]; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 109 ["A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt," quotation and internal quotation marks omitted]; *People v. Spicer* (2015) 235 Cal.App.4th 1359, 1374 [explaining that a prosecutor may have probable cause to charge a crime but reasonably decline to do so if they believe there is a lack of sufficient evidence to prove the charge beyond a reasonable doubt at trial]; cf. Rules Prof. Conduct, Rule 3.8(a) [prosecutor should not initiate or continue prosecution of charge that is not supported by probable cause].)

Further, the prosecution has the burden of proving beyond a reasonable doubt that a killing is not justified.  It is not a criminal defendant's burden to prove that the force was necessary or reasonable. (*People v. Banks* (1976) 67 Cal.App.3d 379, 383-384; see *People v. Breverman* (1998) 19 Cal.4th 142, 156 [when defendant claims self-defense or defense of others, or there is substantial evidence supportive of defense, the jury will be instructed that prosecutor bears the burden of disproving this defense beyond a reasonable doubt].)  Thus, in an officer-involved shooting, the prosecution must prove beyond a reasonable doubt that the officer did not have an actual or reasonable belief in the need for self-defense or the defense of others.

# LEGAL ANALYSIS

The DOJ has completed an independent investigation and review of the facts and circumstances that lead to the death of Mr. Lopez.  This review and analysis is based on the totality of evidence provided to the DOJ in this matter, including voluntary statements from the officers involved in the shooting (Heitmann, Panov, Weber, and Delgado), witness statements, forensic evidence, coroner's report, autopsy photographs, BWC footage, drone photos, police reports, and helicopter video footage.

Because a prosecuting agency would need to affirmatively prove beyond a reasonable doubt that Officer Brett Heitmann, Officer Catalin Panov, Officer Kenneth Weber, and Investigator Paul Delgado did not act in lawful defense of themselves or others, this is the primary issue in determining whether their actions should subject them to criminal prosecution.

A detailed analysis of the evidence surrounding the conduct of the officers demonstrates that a prosecuting agency would not be able to establish that Officer Brett Heitmann, Officer Catalin Panov, Officer Kenneth Weber, or Investigator Paul Delgado were objectively unreasonable in their determination that lethal force was necessary to protect themselves or others, or that they did not actually hold this view.  Accordingly, the examined evidence does not support the contention that the shooting of Mr. Lopez violated any criminal law.

On September 28, 2021, Mr. Lopez allegedly stole a vehicle and led officers on a vehicular pursuit through several cities, before his vehicle became lodged in exposed trolley tracks in Santa Ana, California.  Mr. Lopez barricaded himself within his vehicle for more than four hours.  Both SAPD and APD attempted negotiations with trained crisis negotiators onsite immediately and over the course of the next four hours to convince Mr. Lopez to exit his vehicle peacefully, but those negotiations were unsuccessful.[20]  The negotiators attempted telephone calls and communication with Mr. Lopez over loud speaker.  Negotiators tried to talk to Mr. Lopez about his family, kids, and girlfriend, and even told him that his girlfriend was willing to drop the stolen vehicle charges if he surrendered.

Both APD and SAPD utilized numerous tools and techniques to de-escalate the situation, issuing verbal commands and announcements, and attempting negotiations involving Mr. Lopez's family.  APD also developed contingency plans for the use of non-lethal force, including the deployment of less lethal rounds and/or a K-9 unit.  Mr. Lopez was given more than four hours to peacefully surrender to lawful commands issued by uniformed law enforcement.  Communication attempts were made by negotiators to attempt to gain Mr. Lopez's cooperation.  Law enforcement surrounded Mr. Lopez's vehicle from a position of cover, and at distance which offered Mr. Lopez sufficient means to exit his vehicle and surrender without physically engaging law enforcement.  Law enforcement utilized the cover of armored vehicles, which provided physical protection to the officers, thereby allowing additional time for them to react to Mr. Lopez's actions.

The APD SWAT officers were briefed regarding the facts and circumstances of the incident before arriving on scene.  Importantly, at the time of the OIS the involved officers were aware that Mr. Lopez was an armed robbery suspect who led police on a vehicular pursuit through three cities in a reportedly stolen vehicle and was now barricaded in his vehicle.  They were informed that Mr. Lopez was seen moving around inside the vehicle and was non-responsive to requests that he surrender.  Moreover, the involved officers were informed that Mr. Lopez had a firearm in the vehicle based upon the observations of SAPD Officer Aguilar.  While this information proved to be inaccurate, at the time of the

---

20  Mr. Lopez's vehicle became disabled at approximately 5:49 PM.  Officers began attempts to contact Mr. Lopez by loudspeaker at approximately 5:50 PM, and the last communication was at approximately 9:52 PM.  The flash-bang was deployed at 10:00 PM.

shooting the officers believed it to be true.  The officers were also informed via radio broadcast that Mr. Lopez was armed and intended to commit "suicide by cop."  Thus, at the point of contact, the officers had been informed, on several occasions, that Mr. Lopez was armed and potentially dangerous.

As described above, Officer Panov exclaimed "gun, gun, gun" as Mr. Lopez exited the vehicle, which is evidence from which an observer could infer that he believed Mr. Lopez had a firearm in his possession. This evidence is supported by his later statement that, at the time of the shooting, he believed he saw Mr. Lopez carrying a handgun.  No available evidence disproves the conclusion that Officer Panov honestly held this belief at the time he fired his weapon.

Officer Heitmann stated in his interview that, as Mr. Lopez passed the sign, Officer Heitmann saw a dark object in one of Mr. Lopez's hands; he thought it was Mr. Lopez's left hand.  Inspector Delgado stated that he thought he saw something dark in Mr. Lopez's right hand.  Officer Weber stated that he saw Mr. Lopez reach toward his waistband. Mr. Lopez exited the car and approached the APD SWAT members. While none of these three officers stated that they initially saw a firearm, they all indicated that they saw Mr. Lopez holding something or taking actions consistent with someone holding or retrieving a firearm.  Coupled with the fact that they had all been previously informed Mr. Lopez possessed a firearm, it was reasonable for them to actually believe that Mr. Lopez was holding a firearm and that force was necessary to defend themselves.  Additionally, Officer Hietmann and Inspector Delgado heard Officer Panov shout "gun, gun, gun," which further underscores their belief that Mr. Lopez possessed a firearm.  Accordingly, the totality of the evidence shows that the officers believed they were acting in self-defense or defense of others.

## Subjective Element of Self-Defense

Officer Heitmann's interview revealed that he feared Mr. Lopez was mounting an attack against the officers because he suddenly changed directions while running, even though his original path away from the officers was unobstructed, while holding an object near his waistband.  Based on the prior information that Mr. Lopez was seen with a firearm, Officer Heitmann was concerned that the other officers he was with would be shot.  Mr. Lopez also ran towards officers from behind a construction sign where the officers were unable to see him for a short period of time.  The evidence demonstrates that Officer Heitmann actually believed that Mr. Lopez posed an imminent threat of death or great bodily injury towards himself and the other officers.

Officer Panov's interview revealed that he had previously interacted with Mr. Lopez regarding suspicion of an armed robbery.  In that prior case, Mr. Lopez had a firearm, but discarded it prior to arrest. Officer Panov described what he viewed as a "hole" in the rear driver's side window, which he believed to be the result of Mr. Lopez shooting at the officers from his car; while this was later determined to be inaccurate, the available video evidence supports Officer Panov's inference and there is no evidence demonstrating this belief was not reasonable based on the information known to him at the time. Officer Panov also saw Mr. Lopez exit the vehicle with a black object in his hand and later stated that, at the time of the shooting, he believed the object was a handgun.  Officer Panov stated that he believed that because Mr. Lopez could have run in any direction, but chose to run towards the officers, Mr. Lopez had the intent to shoot them.  The evidence demonstrates that Officer Panov actually believed that Mr. Lopez posed an imminent threat of death or great bodily injury towards himself and the other officers.

Investigator Delgado's interview revealed that he observed Mr. Lopez's changes in positioning inside the vehicle and intermittent viewings of the officers.  Based upon these observations, Investigator Delgado believed that Mr. Lopez was taking note of all the officers' locations which, combined with the belief

that Mr. Lopez was armed, led Investigator Delgado to conclude that Mr. Lopez was planning an attack. After Mr. Lopez exited the vehicle, he started to run in an open space with no obstacles.  When Mr. Lopez turned and looked in the officer's direction, however, Investigator Delgado saw Mr. Lopez tuck his right hand into his waistband and clutch something dark.  The evidence demonstrates that Investigator Delgado actually believed that Mr. Lopez posed an imminent threat of death or great bodily injury towards himself and the other officers.

Officer Weber's interview revealed that he observed Mr. Lopez clearing the foggy windows to look around and purportedly take note of the officers' positions.  After Mr. Lopez exited the vehicle, Officer Weber saw Mr. Lopez reach down into his waistband with a fist-like hand, as if he was grabbing something, and move an object around his waistband area.  Believing that Mr. Lopez had a gun based on his briefing prior to the incident, along with his observations of Mr. Lopez inside and outside of the vehicle including a sudden change in direction towards the officers, Officer Weber actually believed Mr. Lopez posed an imminent threat of death or great bodily injury towards himself and the other officers.

## Objective Element of Self-Defense

Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado held several beliefs which later proved to be inaccurate.  Mr. Lopez was not armed.  He carried a water bottle in a bag, not a firearm.  As he had nothing to attack the officers with, it is unlikely that he was planning an attack of any kind—though he may have intended to appear as though he were attacking so as to draw the officers' fire.  Nevertheless, these beliefs, while incorrect, were not objectively unreasonable given the information relayed to the officers and the facts known to them at the time.

The evidence shows that Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado objectively and reasonably believed, based on the totality of the circumstances, that the threat of death was imminent given that Mr. Lopez appeared to have the present ability, opportunity, and intent to cause death or great bodily injury to them.  The officers were informed prior to the OIS incident that Mr. Lopez was armed and non-responsive to repeated requests to peacefully surrender.  They were also informed, based upon information provided by a family member near the scene, that Mr. Lopez intended to commit "suicide by cop."

When Mr. Lopez exited the vehicle, he changed directions to run directly at officers with his hands holding a black object near his waistband.  The officers were aware that Mr. Lopez had barricaded himself in his vehicle for several hours while appearing to ingest narcotics.

Therefore, the evidence demonstrates that a reasonable officer in the same situation as Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado would reasonably have believed that that Mr. Lopez was armed and posed an imminent threat of great bodily injury or death.

As noted above, the officers initially planned to force Mr. Lopez out of the vehicle with the hope that he would run away from the officers on an unobstructed path so that they could deploy non-lethal force.  The APD SWAT team also tasked Officers Mullins and Reynoso with less lethal force options.  And no force, lethal or non-lethal, was deployed until Mr. Lopez turned in the direction of the officers and ran toward them.  Mr. Lopez's subsequent actions after exiting the vehicle could reasonably lead the officers to believe that lethal force was necessary to prevent what they perceived to be imminent harm from decedent, who appeared to demonstrate the present ability, opportunity, and apparent intent to use deadly force.

Although there were contingency plans for non-lethal force, including the deployment of less lethal rounds and/or a K-9 unit, all of the officers in their interviews noted that less-lethal methods were not used due to the lack of time to deploy these measures.  From the moment Mr. Lopez exited his vehicle to the time he was shot, about four to six seconds had elapsed in total.  Moreover, Mr. Lopez refused to put his hands up despite verbal commands and kept them holding an object near his waistband.  The use of lethal force as opposed to less-lethal options was not unreasonable given the totality of the fast-moving circumstances in this situation.

As discussed below in our Policy and Practice Recommendations, APD's use of a flash bang device and an aerosol oleoresin capsicum chemical agent resulted in Mr. Lopez exiting the car.  He may have been confused and disoriented before he started running towards the shooting officers.  Rather than helping to avoid a forceful confrontation, APD's tactics arguably created the conditions for one to occur.   The deployment of the flash bang—a device specifically designed to disorient and confuse its target—and a chemical agent near Mr. Lopez when there was no apparent immediate threat to the public or officer safety did not avoid a forceful confrontation.  Rather, the use of the flash bang created a situation in which Mr. Lopez was forcibly extracted from the vehicle and prompted to either surrender or to engage in a confrontation with APD SWAT officers.  The non-lethal tactics used by APD did not, however, compel Mr. Lopez to ignore commands to surrender, to ignore commands to show his hands, to change directions and run toward the officers, and to carry the black bag by his waist.

Notwithstanding the concerns raised about the tactics utilized by APD SWAT, however, the totality of the circumstances establishes that the shooting officers could reasonably have believed that Mr. Lopez had the present ability, opportunity, and intent to cause death or great bodily injury to them.  The evidence gathered in the course of this investigation shows the facts known to the officers at the time were as follows: (1) the officers had information that Mr. Lopez was armed and intended to commit "suicide by cop," (2) Mr. Lopez had been non-responsive to repeated requests to peacefully surrender over the course of more than four hours, (3) when Mr. Lopez exited the vehicle, he still failed to surrender or raise his hands and instead began running, (4) after running away from the officers he appeared from the vantage point of the officers to make a conscious decision to change directions and run toward the officers, and (5) while he did this, he held in his hands a black object near his waistband.  While different tactics may have resulted in a different outcome, given the totality of the circumstances, it cannot be proven beyond a reasonable doubt that the officers lacked an actual and objectively reasonable belief in the need to use deadly force at the moment that they did.  (Pen. Code, § 835a, subd. (e)(3).)

All four officers fired their firearms based on their belief that they needed to stop Mr. Lopez from shooting his firearm and potentially killing or injuring police officers or bystanders.  Given the totality of the circumstances, the involved officers' use of deadly force to defend against what they believed to be an imminent threat of death from Mr. Lopez was reasonable and justified.

# CONCLUSION

The evidence does not show, beyond a reasonable doubt, that Officer Heitmann, Officer Panov, Officer Weber, and Investigator Delgado acted without the intent to defend themselves and others from what they reasonably believed to be imminent death or serious bodily injury.  Therefore, there is insufficient evidence to support a criminal prosecution of the officers.  As such, no further action will be taken in this case.

## Lopez Anaheim PD OIS Recommendations

The Attorney General is required to include "[r]ecommendations to modify the policies and practices of the law enforcement agency, as applicable" as a component of this report.  (Gov. Code, § 12525.3 subd. (b)(2)(B)(iii).)  To that end, the DOJ conducts an additional review of the information obtained through the criminal investigation (for example, body-worn camera footage, interview recordings, video recordings, witness statements and other records) as well as the publicly-available policies of the agency employing the officer(s) who are subject to the criminal investigation.  The DOJ uses the review process to identify "applicable" recommendations, including any recommendation to modify policy and practices that may reduce the likelihood that officers use deadly force as well as recommendation to address any other deficiency or concern related to the officers' conduct or the agency's response that the DOJ observes.  Because of the nature of this process, the DOJ does not generally obtain additional information from the employing law enforcement agency or conduct independent investigation of the agency's practices outside of the single incident under review, which makes this process different from the DOJ's formal Civil Code section 52.3 investigations and oversight reviews of local law enforcement agencies.  DOJ's goal is that these recommendations will assist the agency and the officer(s) involved in the incident in understanding, from an independent perspective, improvements that could be made to address what we have observed through this incident.

Pursuant its obligations under Government Code section 12525.3, subdivision (b)(2)(B)(iii), the DOJ offers the following recommendations:

## 1.  De-escalation and Use of Flash Bangs and Chemical Agents

Anaheim Police Department (APD) policy at the time of the incident (as well as today) states that "officers handling a barricade situation should attempt to avoid a forceful confrontation in favor of stabilizing the incident by establishing and maintaining lines of communication while awaiting the arrival of specialized personnel and trained negotiators."  (Sept. 22, 2021 and Jan. 24, 2023 APD Policy Manuals, § 408.4.1.)[21]  Santa Ana Police Department (SAPD) officers attempted to negotiate with Mr. Lopez for nearly three-and-a-half hours after the car he was driving became disabled and requested that he cooperate and peacefully surrender over loudspeaker.  Once APD took command and control of the scene, they continued their attempts to contact Mr. Lopez for roughly 40 minutes before Mr. Lopez exited the vehicle through the use of a flash bang device and an aerosol oleoresin capsicum chemical agent that was inserted into the vehicle.

At the time APD deployed the flash bang and chemical agent, Mr. Lopez had been in the vehicle for almost four hours and the perimeter around the vehicle had been secure for the duration of that time.  The scene appeared to be sufficiently controlled so as to allow the transfer of command and control from SAPD to APD.  During that four-hour period, Mr. Lopez occasionally moved around in the vehicle

---

21   DOJ reviewed the APD policy manuals dated September 22, 2021 and January 24, 2023.

and was seen ingesting narcotics.  Also during that period, officers were informed that Mr. Lopez was armed and was potentially hoping to commit "suicide by cop."

Based on the reports provided to DOJ, however, it is unclear why the APD Command Post chose to deploy the flash bang and the chemical agent.  There is nothing in the reports or statements that reflect a change in threat at the time APD took command of the scene.  APD should therefore consider whether additional de-escalation measures were feasible given the facts and circumstances in this incident.  (Gov. Code § 7286, subd. (b)(1); see also Commission on Peace Officers Standards and Training, POST Use of Force Standards and Guidelines (2021) pp. 12-13 https://post.ca.gov/Portals/0/post_docs/publications/Use_Of_Force_Standards_Guidelines.pdf (as of August 30, 2023) (describing de-escalation and crisis intervention techniques that officers should consider when safe and feasible to employ).)

APD, and in particular its SWAT unit, should further examine whether, under the circumstances of this incident, it is necessary to create further guidelines, criteria, and training regarding whether and when steps to potentially initiate a confrontation, in what may be an otherwise controlled scene, are appropriate and permitted.

## 2.  Body Worn Cameras:

APD provides body-worn cameras (BWC) to both uniformed and non-uniformed personnel for use while on duty.  In this instance, Investigator Delgado, Officer Panov, Officer Weber, and Officer Heitmann were all wearing their BWC devices.  The first three all recorded footage of the shooting.  However, when Officer Heitman attempted to activate his BWC before the incident, it reportedly did not activate, and he later stated that the camera was dead at the time.  Under Section 425.2 of the 2021 and 2023 Anaheim Police Department Manuals, "[p]rior to going into service, each employee issued a BWC is responsible for making sure the BWC is in proper working order…. The BWC is designed to be powered on and left on during the entirety of a shift for ease of activation.  All personnel wearing a BWC shall have their BWC powered on at all times while in public."

In this particular instance, there were multiple other officers who were able to capture the incident on the BWC devices; nevertheless, DOJ recommends APD ensure that personnel adhere to APD policy and, specifically, require that BWC devices are in good working order prior to personnel going into service.  DOJ also recommends that APD include a contingency plan for how officers should proceed as soon as they realize their BWC equipment may be malfunctioning in the field.

## 3.  Use of Force: "Less-Lethal" Munitions

After Mr. Lopez was shot, the officers took one minute and 44 seconds to determine how best to determine whether he was feigning unresponsiveness given he fell with his arms under his body.  They chose to shoot him in the buttocks with a 40-millimeter less-lethal round.  Under Penal Code section 835a, officers are authorized to use "objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance."  Here, Mr. Lopez was no longer offering any resistance.  To the extent officers believed that Mr. Lopez had fallen with a weapon beneath him and still might present a possible threat, APD should have first assessed whether he was able to respond to commands before deploying further force.  Given the facts of this incident and the length of time that passed, prior to shooting Mr. Lopez with the 40-millimeter projectile, officers should have considered, among other options, announcing to Mr. Lopez that they were going to employ the projectile to determine whether Mr. Lopez might still be conscious or responsive by using verbal commands.

Moreover, the September 22, 2021 and January 24, 2023, APD manuals discuss situations where "kinetic energy munitions" such as the 40-millimeter projectile are appropriate for deployment,

stating that these include, but are not limited to, situations where: (1) the suspect is armed and the tactical circumstances allow for safe application of the munitions; (2) the suspect has made credible threats to harm himself or others; (3) the subject is engaged in riotous behavior or throwing dangerous projectiles; or (4) there is probable cause to believe the suspect has already committed a crime of violence and is refusing to comply with lawful orders.  The APD manual does not, however, specify use of kinetic energy munitions to test the responsiveness or threat level of a downed individual who has already been shot multiple times by officers.

DOJ recommends that APD review the evidence, take appropriate personnel action (if warranted) towards the officers involved in authorizing and deploying additional force towards Mr. Lopez, and provide guidance and training on whether and when the use of such munitions is an acceptable use of force.

## 4.  Duty to Render Aid

APD's policy requires that, "[o]nce it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident."  (Sept. 22, 2021 APD Policy Manual, § 300.6; Jan. 24, 2023 APD Policy Manual, § 300.8.) California law requires that all law enforcement policies include a provision for officers who are properly trained to provide medical assistance for a person injured in a use of force, or if not trained, to otherwise promptly procure medical assistance for persons injured in a use of force incident, when reasonable and safe to do so.  (Gov. Code, § 7286, subd. (b)(14).)

The DOJ further recommends that APD evaluate their training on this requirement to render aid, or develop any necessary training to provide officers specific guidance on how to determine when officer safety is no longer a concern so that officers can more promptly provide medical care.  This specific incident could serve as an example scenario on how to determine the extent of any risk to officer safety.

In this incident, the video footage provided shows that three minutes and five seconds passed from the time the four officers deployed their firearms and when they started handcuffing Mr. Lopez. Officer Weber's BWC footage shows that the officers involved waited at least two and a half minutes to approach Mr. Lopez following deployment of the 40-millimeter less-lethal round.  At that time, Mr. Lopez was prone, visibly bleeding, and unresponsive after receiving 18 gunshot wounds.  Ultimately, approximately five minutes elapsed between the time Mr. Lopez was first shot and when APD began to render aid.

The law requires that officers render medical aid when safe to do so.  (Gov. Code, § 7286, subd. (b) (15).)  Based on the number of times that Mr. Lopez was shot, APD should examine how it could have coordinated medical aid to Mr. Lopez more effectively, especially given that he was a barricaded suspect who had been in the same location for over four hours, paramedics were standing by, and, as noted above, officers were put on notice that he might attempt self-harm or "suicide by cop."  DOJ recommends that APD review its policies and training of officers to address this issue and to ensure that officers in similar incidents develop a coordinated, effective plan to approach and render aid to the injured person.

## 5.  Officer Training and Tactics

Based on the evidence, it appears that the officers properly followed policy when developing and communicating a tactical plan to intercept and apprehend Mr. Lopez.  Setting aside the timing and propriety of the deployment of the flash bang and chemical agent (discussed above), once that decision was made by the command post, the officers had clearly-defined roles for what should follow:  Officer

Heitmann and Investigator Delgado were armed with rifles to provide lethal cover; Officer Panov and Officer Weber were armed with handguns, but would be the ones to approach and arrest Mr. Lopez if it seemed safe and feasible, and Officer Reynoso and Officer Mullins were responsible for less-lethal measures in the form of the 40-millimeter projectile weapon and K9, respectively.

One complicating factor that officers failed to account for in their plan, was the position of a large construction sign between the officers and Mr. Lopez.  As noted above, Officers Heitman, Weber, and Panov all indicated that a factor in their decision to use deadly force was how their view of Mr. Lopez was obstructed by this sign when he started moving in their direction.  Based on the interviews with the officers, it seems the sign hindered their ability to fully ascertain whether Mr. Lopez was holding or reaching for a weapon and that Mr. Lopez's reappearance into view at a closer distance increased their concern that he might be about to imminently fire a weapon at them.  If the officers had a clearer, unobstructed view of Mr. Lopez as he came toward them, they may have had more time to possibly ascertain the circumstances as they developed.  In light of the foregoing, DOJ recommends that APD review this incident and determine whether additional training on establishing clearer sight lines when confronting barricaded suspects is necessary.