# EXHIBIT 19

**Orange County District Attorney**
**Bureau of Investigation**
300 North Flower Street, Santa Ana CA 92701
(714) 834-3600

## TRANSCRIPT

SUBJECT: LOPEZ, BRANDON

CLASSIFICATION: OFFICER INVOLVED SHOOTING (FATAL)

INTERVIEW OF: INVESTIGATOR RICKY REYNOSO
ANAHEIM POLICE DEPARTMENT

DATE & TIME: SEPTEMBER 29, 2021 @ 5:14 AM

LOCATION: ANAHEIM POLICE DEPARTMENT

On Wednesday, September 29, 2021, at approximately 0514, I conducted a digital audio recorded interview of Anaheim Police Investigator RICKY REYNOSO. The interview took place at the Anaheim Police Department, 425 South Harbor Blvd, Anaheim.

The following individuals were present in the interview:

- Investigator CRAIG BROWER        OCDA
- Detective GUS MOROYOQUI        Santa Ana Police Department
- CHRISTOPHER KUCHARSKI        Attorney

The following is a transcript of that interview:

LEGEND:    …    Denotes pauses between words, phrases, incomplete sentences, stammering etc. (does not indicate missing words)
    ***    Denotes unintelligible conversation
    **(SIC)**    Denotes precisely reproduced word

[BEGINNING OF INTERVIEW]

HERNANDEZ:    Date is September 29, 2021 the time is 5:14 AM. This is SA case 21 dash

004162. Present is Investigator TROY HERNANDEZ, that's T-R-O-Y last name is

H-E-R-N-A-N-D-E-Z. To my right?

BROWER:    Investigator CRAIG BROWER, spelled C-R-A-I-G last name B-R-O-W-E-R.

KUCHARSKI:    Ah, CHRISTOPHER KUCHARSKI Attorney Rep. K-U-C-H-A-R-S-K-I.

| MOROYOQUI: | Detective GUS MOROYOQUI with the Santa Ana Police Department, last name spelled M-O-R-O-Y-O-Q-U-I. |
|---|---|
| UNKNOWN: | Go ahead. |
| HERNANDEZ: | Officer are you here today to give a free and voluntary statement? |
| REYNOSO: | Yes. |
| HERNANDEZ: | Has anyone from your agency ordered you to give a statement? |
| REYNOSO: | No. |
| HERNANDEZ: | Okay, do you feel compel to give a statement because the DA's off-, office is here? |
| REYNOSO: | No. |
| HERNANDEZ: | Okay. |
| BROWER: | State your full name and spell it. |
| REYNOSO: | Yes ah, current-, my position is Investigator REYNOSO, first name RICKY, R-I-C-K-Y last name R-E-Y-N-O-S-O. |
| HERNANDEZ: | And how long have you been a police officer? |
| REYNOSO: | Approximately 13 years. |
| HERNANDEZ: | And has the entire career been here at Anaheim PD? |
| REYNOSO: | No sir. |
| HERNANDEZ: | Okay, where did you start? |
| REYNOSO: | At Fullerton PD. |
| HERNANDEZ: | How long were you at Fullerton? |

Case No.
21-004162

REYNOSO:            Approximately 9 years.

HERNANDEZ:          Okay, and the remaining time has been here at…?

REYNOSO:            Yes, sir.

HERNANDEZ:          ...Anaheim PD, okay.  What's your ah, current shift that you work?

REYNOSO:            Ah, I'm currently assigned to our CTF unit our Crime Task Force unit, as an

                    Investigator.

HERNANDEZ:          And how long have you been in that task force?

REYNOSO:            Two years.

HERNANDEZ:          And what are your duties in that task force?

REYNOSO:            Ah, part of our duties are fugitive apprehension we work ah, we liasion on with

                    different units about the department.  Whether its Homicide, Family Crimes, Sex

                    Crimes, Burg, Gangs stuff like that.  Um *** and were also part of a ah, FBI task

                    force that we also assist with, so is just the majority of it is fugitive

                    apprehension or um, surveillance um, of outstanding people.

HERNANDEZ:          Okay.  Um, let's talk about your background training and experience.

REYNOSO:            Uh-huh.

HERNANDEZ:          Background starting with the academy.

REYNOSO:            Yes sir.

HERNANDEZ:          Which academy did you go to?

REYNOSO:            Ah, Fullerton College.

HERNANDEZ:          And when was that?

REYNOSO:            Ah, it was back in 20… Graduated 2007.

HERNANDEZ:          Okay.  Ah, any advance Officer training?

REYNOSO:            Ah, went through the SWAT academy.  Um, I been through um, FTO program,

                    um, I've been through A Ride which is the prerequisite of DRE…

HERNANDEZ:          Okay.

REYNOSO:            …expert, um, I've done ah, I been to instructor course for ACT um, I've been to

                    an instructive course for ah, *** which is ah, fighting ah, close quarter combats

                    with *** and outside of vehicles.  Um, and there's a couple other things that I

                    just can't think off the top of my head but-.

HERNANDEZ:          So safe to say you've, you've gone through use of, of force training de-

                    escalation, lethal force etc?

REYNOSO:            Absolutely.

HERNANDEZ:          Okay, alright um, I'm gonna bring your attention back to yesterday ah, the 28th.

                    There's an incident that occurred um, and can you tell me about the incident

                    that we're-, the reason why we're here today.

REYNOSO:            Absolutely…

HERNANDEZ:          Okay.

REYNOSO:            Um, so were actually the primary unit um, we were my partner um, MIKE

                    WILIAMS actually got a phone call from a, patrol officer regarding a stolen

                    vehicle um, and what a name suspect um, and the information that he was

                    provided was that this vehicle wa-, had been stolen um, that yesterday.  Um,

                    and had been reported and was entered into the stolen vehicle system as a

stolen vehicle with the name suspect in that it was possibly in the area of in
Santa Ana and or somewhere in our city in Anaheim.

HERNANDEZ:          What other information did your partner provide you as far as a name suspect?

REYNOSO:            Ah, first name was BRANDON um I can't I don't remember the last name off the
top of my head but I know the first name was BRANDON.  Um, and then with
the date of birth as well.  Ah, we conducted a as we gathered as the information
started to come it was kind of quick, as the information was coming um, ah, the
vehicle that was at the-, outstanding was a newer Dodge Challenger and p-, ah,
part of the reason how we knew kind of where it was at some point was
because of ah, it had some sort of GPS device inside whether-.  I wanna say
maybe through um, Sirus radio or what-, it had some sort of, which would go on
and off um, so momentarily it would kind of indicate where the vehicle was at
um, so we kind a float that way.  As we were headed that way um, from Orange
when were, where doing a prior ah, surveillance were headed to Santa Ana we
started kin-.  Doing some background, we ah, we found out that he the vehicle
was actually stolen.  I ran it got ah, a couple hits through our the-, our um,
system indicating that it was a stolen vehicle um, that had been entered into the
system.  In addition to that a ah, we found out that he had a warrant for a,
robbery for I believe, the warrant for, for $200,000 thousand.  So, and then ah,
so as that information is coming um, the GPS system kind of kicks up and gives
us a general area in Santa Ana off of First and near the 55.  And as, as were on
the way there we ask for assistance from ANGEL our which is our helicopter.
They get there, kind of simultaneously as were landing in the area.  And ah,
they're able to locate the vehicle in a parking lot.

HERNANDEZ:          Okay, go.

REYNOSO: And then ah, so from there they locate the vehicle they see a male driver and a female at th, at the front passenger door.  Um, I don't remember if they, if she gets in or out, but um, eventually she doesn't get in um, and the vehicle leaves the area.  As we ah, as that's kind of happening I do a back-, I run his rap sheet really quick to see what his criminal history-, what is like and um, part of the stuff that we found on there was he had priors for ah, 245, ah, aggravated assault, um, a disturbance, ah felony domestic violence um, robbery ah, and ah, narcotics stuff um, for possession and sales.  As that's evolving the vehicle leaves that ah, parking lot and we start to conduct multiple surveillance with the assistance of our helicopter.  Um, freeway being so close he ends up getting in freeway, um, and goes 55 South and *** sorry… 55… Ah… (PAUSE 0:08:13 – 0:08:26) I'm trying remember ah, actually it was… Yeah 55, gets on the 55 ah, gets on the 55 South ends up sta-, ah, merging on to the 5 South um, as he where he b-, as he passes the 5 South he continues on the 55, gets off in Santa Ana, not to far from there, just a little bit ah, south of there.  Gets off ah, I believe on McFadden, gets off on McFadden, at the same time we have two marked units that are coming to assist us two K9 units and then ah, so they, they get there he gets off the freeway th-.  And the plan at that time is to conduct a felony car stop, and with the mark units and we would assist.

HERNANDEZ: Okay.

REYNOSO: Um, as they initiate the felony car stop, um, he takes off and our units ah, start pursuing him.  Um, and I don't know the exact route but um, what he ends up doing he goes through, through Santa Ana goes ah, by John Wayne into Irvine, he's in Irvine for a little bit.  Goes back through Tustin, Santauni-, Santa Ana area, eventually ends up back into Santa Ana and as were continue to follow ah,

were, were thinking okay, he's maybe going back to his residence ah, in Santa Ana. 'cause we had um, identify that he had an address um, off of Second street in Santa Ana. And as were going as well um, I, I believe it was red, ah, red channel control ah, County Dispatch gets on *** and advises that *** did some investigation and um, in the, the 211 warrant that he was involved with, is a robbery where a fire arm was used. And um, so that information came ah, gets to us and ah, at that point he's kind of looping around circles and were kind of loosing track of him. So, um, we-, my Sergent decides to go into a tracking type surveillance with ah, with ANGEL and we kind of back off um, and ask Santa Ana into assist us with the apprehension once he either you know flees on foot from the vehicle or maybe goes into a house and we can surround it or, or what not. So, he ends up ah, doing a bunch of circles ah, Santa Ana ends up getting behind the vehicle um, and then eventually he, he's going westbound on Santa Ana street and its, their, right now heavy construction and it appears that he goes into an area where to dirt road. Um, and then eventually hits ah, some railroad tracks where he kind-, he disable-, he gets his vehicle stuck, stuck and is in, unable to, to operate it at that moment. Um, we tried to conduct a um, basically a felony car stop at that point the vehicle is not going anywhere we start giving commands. Um, those aren't working ah, we request Santa Ana's armor they get there they put it to the front of the vehicle and we start, we continue to give-. They continue to give commands for him to surrender come out give up um, they do that for about an hour an a half to two hours. Um, at-, prior, prior to the two and a half hours um, probably maybe 30 minutes into, into ah, to-, when the vehicle gets tuck once the armor is there probably maybe 30 minutes into that ah, Santa Ana ha-, has an officer up on the turret, and over the, over the radio um, he puts out a radio code 417 which is um, fire arm. Um,

so at that moment um, that information gets transmitted to everybody over the radio that hey, this guy has a gun or that they saw a gun and ah, it changes our tactics and ah, commands continue to given um, throughout that whole time for him to surrender and to give up, and to come out.  And ah, ultimately the decisions made that a tactical team is gonna be used to, to ah, come in and replace the patrol units um, with, with armor and ah, try to continue to see if um, BRANDON would, would come out.  Um, ultimately a plan is um, conducted um, that were gonna use certain armor to um, put up against the vehicle to protect us and to give ah, the suspect the opportunity to exit the vehicle from the driver side where there's ah, more space for us to be able to have him exit and give him commands and to take him into custody.  Um, so the, the tactical plan at the time was to use a ah, a gas type of airsoft, aerosol um, canister in the back window um, along with a diversionary device a bang to the front.  Which would that is just a ah, a noise diversion.  And then aerosol would go in it's a mixture of *** CS gas um, and to the plan was for-, to introduce that into the vehicle.  To in order to get him to come out of the vehicle to extract him from the vehicle.  Um, so part of that. I was part of the arrest team, so I was to the front of the BearCat um, I was with two ah, two of my partners that had lethal cover, I had the 40 mike mike which is the less lethal sponge gun.  It's a multi-launcher and then there's two additional ah, partners of mine that were gonna be the arrest team and then we had the K9 behind us.  So, the plan was once we introduce the, the, the gas, the CS stimulant into the vehicle and got him out of the vehicle ah, that we would give him commands and have him come to us and take him into custody.  The CS stimulant was introduced um, an-, as we were ready to ah, to um, to give him commands um, he comes out and immediately runs towards our direction.  And um, at that point the-, my, my two lethal

covers in front of me step out in front of me he starting to run in our direction.
And as he's running in towards our direction he, I could see him reaching into
his waistband as if he's trying, if he's grabbing something from his waistband
and shortly after that the, the shots are fired.

HERNANDEZ:          What do you think he was reaching for his waist band?

REYNOSO:            Ah, I would, I was assuming a handgun.  Based on the information of him of him
ah, of, the officers on the turret in-, indicating that they saw a gun um, through
the entire ah, two hours three hours of commands that were given.  He would
verbalize and or make queues to the officers that he wasn't coming out, he was
smoking um, what they believe ah, being narcotics.  He was indicating that he
was not gonna come out and ah, he, he would constantly be making furtive
movements whether it was to the floor board, to the passenger side he moved
from the passenger-, from the driver side back to the passenger side.  Was
moving the, the back seats of, pushing the, the driver seat all the way forward,
was just acting very erratic very suspicious um-.

HERNANDEZ:          So, based on your training and experience when you have an individual in a car
that has, its been pursuit and now their stop, and this individual basically going
from seat to seat going down to the floorboard.  What do you think that person
um, might be doing?

REYNOSO:            I think he's couple things um, I think he's not *** and I left out a couple things
where he-.  During the negotiations or their giving him commands in addition to
those movements he was ah, the officers were putting that he was checking his
mirrors looking at the rear-view mirrors ah, driver side mirror you know.  Ah,
based on all that stuff I think he was sizing us up in the sense of trying to see an
opportunity for him to maybe um, assault us with, with a handgun come out

with something.  Um, based on his, his furtive movements um, all that and then leading up to his actions when he came out of the vehicle and sprinted towards our direction um, reaching into his waistband.  Um, the mindset at that point for me was he, he was still in p-, he was in possession of that handgun and he, he was trying to assault us trying to assault someone else um, and that that was the mindset that I had based on the totality of all the information that I first hand saw and heard.

HERNANDEZ:        What would you say based on um, where you were at the distance from his vehicle and the SWAT vehicle…?  As he exited the vehicle and he began to, run…

REYNOSO:          Two car maybe, maybe ah…  Car and a half-length two car lanes.

HERNANDEZ:        And did he close the distance the gap relatively quick as he was running?

REYNOSO:          Yes, sir.

HERNANDEZ:        Okay…  As he ran towards the operators the SWAT…

REYNOSO:          Uh-huh.

HERNANDEZ:        …personnel um, what happened?

REYNOSO:          Um, he, he came out of that car faster and quicker than what you were-, anticipating.  The reason being because the way the vehicle was positioned it was slightly tilted up the rear tires were, were stuck on these tracks and to the left where he would-, were he exited it, there was like ah, foot to two-foot drop.  There was rebar there was, it was ah, gravel so, in our mind set was okay, he's gonna come out jump down there's rebar he's not, its not like he's it's a flat surface where he's gonna you know *** he, he has the opportunity to just-.  But

the way he came out of the car completely surprise us and the how fast he

closed that gap surprised us even more.  And ah, where he got out of that

vehicle and he just ske-, he sprinted, I mean it was literally less than a second by

the time he closed that gap.  Um, and he was right up on us, and then that's

when the shots were fired.

HERNANDEZ:        And how many shots do you recall?

REYNOSO:          Ah, I can't say-, I, I don't recall ah, to be honest um, I was the third in the stack.

There's four shooters um, I just my focus was on him and then I just I heard the,

the volley of the shots I can't say how many to be honest.

HERNANDEZ:        What happened after the volley of shots?

REYNOSO:          Ah, shooting stopped we, we moved back to the f-, ah, right front portion of the

Bear to get covered.  To reassess um, we at that point um, our supervisor the

decision was because the way he landed it, and his head was facing away from

us and his hands were undeath him.  Ah, it was unsure if he was you know

playing possum or what you know we were giving him commands *** we

weren't getting any responds.  Um a plan was formulated to instead of sending

the K9 up there to see if there's any compliance um, we decided to shoot him

am and I shot him in the buttocks with ah, the less lethal with the sponge round,

to see if it was get us any, any sort of responds.  Um, that's how-, again a less

lethal which is not a deadly weapon um, to see what we respond we would get

um, I shot him ah, again in the right buttocks area and we had no response.

Once we had no response um, we moved up um, the arrest team we, we moved

up and ah, took him into custody.

HERNANDEZ:          Do you remember what distance you were when you shot him with the less

lethal?

REYNOSO:            Ah…  Ah, probably about 15 to 20 feet.

HERNANDEZ:          Okay.

BROWER:             You said that you got ran his criminal history and you were also, later learned

that a, his arm, his robbery was involving a firearm, was that significant to you?

REYNOSO:            Yes sir.

BROWER:             Why?

REYNOSO:            Um, because now, knowing that this person could possibly be in possession of a

firearm um, people that *** typically or people that had used firearms in the

past to commit crimes um, have continued or will use firearms frequently um,

to commit other crimes.

BROWER:             You said that there's a radio broadcasted he wou-, that there was 417 in the

vehicle, did they, did that broadcast indicate where the, the weapon was or give

any type of description of the weapon?

REYNOSO:            *** it wasn't ah, there was not a description um, it they just ah, it was a

broadcast that we see we see a 417 um, and, and that was it.

BROWER:             Okay.  You said that that broadcast caused you to change your tactics?

REYNOSO:            Yes.

BROWER:             How and why?

REYNOSO:            Um, because at that point um, its already a barricaded suspect but now knowing

okay, he has a firearm um, now were gonna need more were gonna need armor

um, were gonna need um, a little bit more resources um, to assist us um, because of this person having a firearm.  Um, not only for our safety but the safety of the public um, because using armor, conceals, um, its able to conceal and limit the damage that an individual in a barricaded situation could do.  Um, tools that we would be able to use um, in order to like administer ah, that CS gas um, that all comes with a ah, tactical plan um, and at that point we didn't have that so that's when um, it changed and the decisions were made through the higher ups to make it ah, a SWAT call out.  And get the proper resources in there as they continued to make announcements um, again, announcements were made for over three hours um, giving this individual the opportunity to come out um, freely and ah-.  So that's why it changed after we discovered and um, that he, he had a firearm or an officer stated that he had a firearm.  We believed that he had a firearm in there, and that's why our plan at that moment changed um, into a, into a tactical ah, operation.

BROWER:          The commands the negotiators were getting directions the conversation to characterize how could-, would you characterize those, conversations they were having?

REYNOSO:         They were very clear um, they had um, the individuals name um, they had ah, they tried to *** initially they tried to contact ah, family members of BRANDON to um, to be able to get a hold of him, to contact him ah, via phone.  I, I'm not sure if it was successful or not um, but we were-, they were trying different things to ah, convince him and explain to him that whatever was going on it wasn't worth you know, it wasn't worth it that we weren't there to, to hurt him we were there to help him.  Um, that they were very clear and concise um, and I

would, I believe any rational person hearing those commands, would agree and understand the commands that were being given to him.  And…

BROWER:    What, what would you believe the objective of those commands were?

REYNOSO:    What were the objectives, to get him to comply with our orders and to get him to give up um, and not resist and to come out.

BROWER:    Okay.  You talk about him coming out of the car and you being, I think you said fourth in the stack?

REYNOSO:    Ah, third.

BROWER:    Third and you had the 40-mike mike?

REYNOSO:    Yes sir.

BROWER:    When he comes out ah, why don't you fire?

REYNOSO:    Ah, because my um, the two lethal covers sl-, ah, slightly stepped in front of me um, and at that point I didn't have a clear shot at him.  And ah, again that gap was closed so quick.  That by the time he made it to us um, the officers had shot and I didn't have a clear shot to take at him and as I heard the shots to go off, I took my finger off the trigger and that-, there's no reason, if lethal force is being used for me to, to use the less lethal.

BROWER:    You said when he open the door and he came out you, you estimated that he was one and a half to two cars *** way?

REYNOSO:    Yes sir.

BROWER:    And then he closed rapidly.  How close did he get before shots were fired?

REYNOSO:    Maybe five feet, five to 10 feet, approximately.

BROWER:            And that was, in mere seconds?

REYNOSO:           Yes sir.

BROWER:            Did you hear any discussion about suicide by cop?

REYNOSO:           Ah, we did, yes sir.

BROWER:            And does that have any significant to you?

REYNOSO:           Ah, it does um, in the sense that um, in my 13 years um, in the last maybe five
to six years its been something that ah, has become more of I don't want to say
norm but more of ah, you hear it more often.  Were ah, individuals tell their
families or um, that they for whatever reason, whatever their going through um,
tell them or write letters ah, that they want um, their gonna make, do actions
um, in order because they know were gonna have to make a split-second
decision and they know that those split-second decision could cause us to fi-,
use deadly force and ultimately hurt them.  Um, as a matter fact I have a
personal experience where we were aft-, going after a individual um, and we
jammed him and he told us personally that he had a toy gun in the car, that
looked like a real gun a replica.  And that he was gonna come out with it and
point it at us and have 'em, have us shoot him and we asked him why would he
do that and he said he thought about it 'cause he knew we would shoot.  But
then he, he wouldn't want to put through that situation, so I know and that was
about a year and a half ago.  So, I know its something that individuals will state
but that can't-, that doesn't change our, our tactics because we don't know how
true that information is.  Um, and we still have to maintain our tactics and ah,
and our discipline?

BROWER:            Can you wait to find out if it's a replica?

Case No.
21-004162

REYNOSO:              We cannot.

BROWER:               Why not?

REYNOSO:              Because um, it, if we wait um, that could-, it could be the difference by us um,

                      being shot being killed someone else being hurt.  Um, the, its too quick and our

                      minds can't process that.

BROWER:               You said that when he came out he put his hand into his waistband, did you

                      ever see a weapon that he reached for?

REYNOSO:              I did not.

BROWER:               So, what you can say is that you saw the hand go towards the waistband, is that

                      correct?

REYNOSO:              Ah, his hands, he was grabbing towards the front of his waist band, with both

                      hands.

BROWER:               And based on your training experience you believed what?

REYNOSO:              That he was concealing something or holding on to something in that

                      waistband.

BROWER:               Something?

REYNOSO:              Something.

BROWER:               What was that something?

REYNOSO:              I don't know.

BROWER:               Okay, did you have any suspicions?

REYNOSO:              Ah yes, um, I, I believe that that he was holding that the, the hand gun that the

                      officer said that they saw in there.

Case No.
21-004162

BROWER:        Okay, so based on ah, the reports that he had a handgun and then he came out
               with his hands like that you believed that it was a gun?

REYNOSO:       Yes sir.

BROWER:        Based on your 13 years as a Law Enforcement *** are there places where you
               found.  Where are the most common places where criminals conceal guns on
               their person?

REYNOSO:       In their waistbands.

BROWER:        Okay.  When he fell and his hands were under him um, why was that significant?

REYNOSO:       Because it, in our mind set it was that he was still holding-.  That the firearm
               that we believed that he was holding on to was still under his body and still in
               his possession.

BROWER:        And so why didn't you just walk up and turn him over?

REYNOSO:       Because ah, we believed again, that he was still in possession of the hand, of the
               firearm um, under his body he was not responding to our commands and his-.
               We didn't have direct eye contact of him and it was unsafe for us to approach at
               the time and so the decision was to shoot him with the, the less lethal to see if
               we, if we got any compliance um, and ah, that's why we, we ah, ended up using
               the…

BROWER:        So is the less lethal when shot in the *** is that going to ah-.  Is painful, is that
               right?

REYNOSO:       Yes sir.

BROWER:        And you're hoping the pain will cause him if he is playing possum, cause him to
               react?

REYNOSO:            Yes.

BROWER:             And that once that didn't happen, then the decision was made to tactically

                    approach and handcuff him?

REYNOSO:            Yes.

BROWER:             Okay.

MOROYOQUI:          Sir, so being a part of C-, CTF right?

REYNOSO:            Yes sir.

MOROYOQUI:          You usually under *** capacity wearing civilian clothes?

REYNOSO:            Yes.

MOROYOQUI:          As we sit here today, I see that your wearing ah, like a SWAT uniform…

REYNOSO:            Yeah.

MOROYOQUI:          …does that role change from CTF and now your part of the SWAT element when

                    everybody got called out?

REYNOSO:            Yes sir.

MOROYOQUI:          Is that the reason why your part of the stack?

REYNOSO:            Yes.

MOROYOQUI:          And you were, you know as an operator, um, dealing with this situation?

REYNOSO:            That is correct.

MOROYOQUI:          Okay. ***.

UNKNOWN:            I got nothing.

| HERNANDEZ: | End of interview 5:49. |
|---|---|

| TRANSCRIBED BY: | MAYRA JARAMILLO |
|---|---|
| | ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE |
| | OCTOBER 04, 2021 |

| REVISED BY: | TROY HERNANDEZ, INVESTIGATOR |
|---|---|
| | ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE |
| | OCTOBER 05, 2021 |

# EXHIBIT 20

**Orange County District Attorney**
**Bureau of Investigation**

300 North Flower Street, Santa Ana CA 92701
(714) 834-3600

# TRANSCRIPT

---

SUBJECT:      LOPEZ, BRANDON

CLASSIFICATION:   OFFICER INVOLVED SHOOTING (FATAL)

INTERVIEW OF:   OFFICER KENNY AGUILAR
SANTA ANA POLICE DEPARTMENT

DATE & TIME:    SEPTEMBER 29, 2021 @ 3:18 PM

LOCATION:      SANTA ANA POLICE DEPARTMENT

---

On Wednesday, September 29, 2021, at approximately 1518 hours, I conducted a digital audio recorded interview of Santa Ana Police Officer KENNY AGUILAR.   The interview took place at the Santa Ana Police Department, 60 Civic Center Plaza, Santa Ana.

The following individuals were present in the interview:

- Investigator CRAIG BROWER         OCDA
- Detective GUS MOROYOQUI       Santa Ana Police Department

The following is a transcript of that interview:

LEGEND:    …    Denotes pauses between words, phrases, incomplete sentences, stammering etc. (does not indicate missing words)
***    Denotes unintelligible conversation
(SIC)   Denotes precisely reproduced word

[BEGINNING OF INTERVIEW]

HERNANDEZ:      The day is, uh, September 29th, 2021, the time is 3:18 P.M.  This is case number 21-004162, Investigator TROY HERNANDEZ, T-R-O-Y H-E-R-N-A-N-D-E-Z.

BROWER:      Investigator CRAIG BROWER, Orange County District Attorney's Office.  Last name is spelled B-R-O-W-E-R.

MOROYOQUI:      Detective MOROYOQUI, Santa Ana Police Department, M-O-R-O-Y-O-Q-U-I.

AGUILAR:      Officer KENNY AGUILAR, first initial K as in kilo, last name AGUILAR A-G-U-I-L-A-R, badge 3024.

AGUILAR:         …the hotel area.  Um, I'm sorry, hotel…motel area, they requested Santa Ana

                 because they were going through various, um, commercial streets down there,

                 and then they left to Irvine, 'cause obviously Irvine was, I think I heard Irvine on

                 the radio.  Um, so they didn't request assistance when they came back into our

                 city.

HERNANDEZ:       Okay.  During…during the, uh, tracking or trailing of the pursuit, um, and then

                 when the pursuit came back into Santa Ana…

AGUILAR:         Uh-huh.

HERNANDEZ:       …did you hear anything broadcasted from, um, the agency or communications

                 about the vehicle and or the subject?

AGUILAR:         Yes, I heard…So again, I…The initial information was that it was a stolen vehicle,

                 and I re-…I remember there being a…a…a radio transmission updating, uh, that

                 it was a known suspect.  Um, and that he was involved…or they were

                 investigating him as, uh, being involved in an armed robbery.

HERNANDEZ:       Did they provide he suspect's name?

AGUILAR:         Yes, I believe it was BRANDON LOPEZ.

HERNANDEZ:       And what else did they say about BRANDON LOPEZ?

AGUILAR:         That he was a suspect in a robbery, uh, using a firearm.

HERNANDEZ:       Okay.  Did they say anything else in regard to, um, the firearm and or Mister

                 LOPEZ intelligence wise?

AGUILAR:         Yes.

HERNANDEZ:       What did they say?

we responded to the scene.  So we arrived on scene, uh, MENENDEZ positioned the vehicle from, uh, we were southbound, because traffic and everything were shut down.  We approached southbound and then northbound lanes are Bristol, and MENENDEZ positioned the vehicle, um,…Correction, I'm sorry, when GALEANA entered, um, MENENDEZ got pushed back, I'm sorry.  GALEANA was driving the vehicle, so we arrived there at the suspect's vehicle, he positioned it right at the front end, um, of the vehicle.  So after that, we, uh, um, GALEANA assumed the audible microphone from the vehicle, uh, he assumed control of that and initiated, um, communication with the suspect.  Uh, I was in the front passenger seat, uh, maintaining observation, we were trying to figure out the different controls of the vehicle, to see if there were cameras, uh, lights, um, and, you know, it's a newer vehicle, so we're not all familiar with it, we've had a rudimentary…you know, we had a very basic, I should say, introduction of the vehicle one time, so it's all new to us.  Um, Officer MARTINEZ got into the, uh, turret position, which is, uh, be at the center of the vehicle and above the rooftop.  Uh, I believe MENENDEZ was behind me and then the trainee officer COLEMAN was in the back, uh, bench area.

HERNANDEZ:      The communication that was, um, being relayed to the, uh, suspect's vehicle,…

AGUILAR:      Yeah.

HERNANDEZ:      …can you tell me about that?  What did you hear?

AGUILAR:      Yeah, GALEANA, um, was just trying to make sure that he could communicate with the suspect.  Um, we were, you know, through visual observation, we're…excuse me, we were able to see that the suspect was…hearing him, uh, I couldn't hear it through the…the pit-…the p-…the, um,…the ballistic glass and the ballistic, uh, body armor…or I'm sorry, not body armor, but armor of the

vehicle, ah, I was just…you know, I think MENENDEZ said, uh, at some point that the ve-…the suspect had turned up his radio, I'll be honest, I couldn't hear it from where we were at the front end of the vehicle.  Um, it was very…I couldn't hear anything, so…But yeah, we established…it kinda worked out naturally where GALEANA was communicating directly with the suspect, and then myself and MARTINEZ were maintaining visual, um, observation to the best of our ability.  We had a, uh,…that hood protrudes out, so as we're in an elevated position, the suspect was down in the dirt, uh, we were really high to the point where there was a little bit of an obstruction with the, uh,…the hood.  But we could basically see the steering wheel, um, area and up inside the cabin of the vehicle.

HERNANDEZ:          How could you tell that the suspect was, um, listening?

AGUILAR:               So GALEANA would say thing, uh, you know we would start receiving information about the suspect's families, children, I believe, um, so I was taking notes of that, um, just for names, you know, so that GALEANA wouldn't, you know, he asked me to, you know, jot down names so he wouldn't forget 'em, and, um, when he would say certain things, the suspect would look up and react.  Um, and we put that out on the radio, I mean he would say…he would say something and there would be a…a form of response, where he would shake his head no, um, you know, it was like GALEANA would say something and he would be looking up toward us, uh, looking at the steering wheel, and he would shake his head no, or he would just, uh,…it seemed like he was also verbalized…he was saying something with his…to himself perhaps.

HERNANDEZ:          Okay.  Any other communication that was told to the suspect?

AGUILAR:     Yeah, I mean…I remember GALEANA ask-…uh, telling him to surrender.  Um, to tell him that, you know, that, uh, we didn't any…that we didn't want anybody to get hurt, we wanted him to exit the vehicle with hands up, put his hands on the steering wheel.  We were trying to get some sort of, uh,…he was just trying, I'd say we… it's just 'cause we were trying to work together, um, with providing information to GALEANA, here you wanna try this or to say this.   Um, but…yeah, there were…he…he told him several, you know, several times to surrender, that he didn't want anybody get hurt, to think of his family.  Um, I thought he said that his father was watching, um, that his mother was…he mentioned his mother at some point.  Um, doing it for his family, to come out of this in a pu-…in a…you know, peacefully, so nobody got hurt.  Um, but the suspect wasn't cooperative.  He got *** place his hands on the steering wheel, and he didn't do it.

HERNANDEZ:   Was that part of a plan that you had with your fellow officers, um, when you either were on route to the scene or you arrived on the scene?

AGUILAR:     I-…Initially the plan was just to get the vehicle there, um, it was just myself and MENENDEZ, so, um, and when we grabbed the other…when the other officers jumped in, it made sense that we had others to help each other out.  So again it kinda worked out naturally when we were there on scene, that GALEANA assumed the radio communication, do the microphone with the suspect.  Uh, I had the…I was trying to maintain visual and report that to everybody in the vehicle.  Um, MARTINEZ was up on the turret, so he was, um, maintaining visual observation of the suspect.  Um, the plan was really just once we were there was lo-…uh, GALEANA was receiving information from, uh, I believe it was out of Corporal NGUYEN, who is a, uh, crisis nego-…he's on the crisis negotiations

team, um, on what to say, things that he could do to keep...maintain a dialogue

with the suspect.  Keep him occupy, keep him focus, um, since he wasn't

listening to our commands, um, for safety reason, you know, the...the ones por-

...to show us his hands, to come out, to...to...to end the situation peacefully.

HERNANDEZ:     Okay, in your experience 15 years on the job, have you dealt with some type of

situation that significant with say a person who's wanted as an armed suspect,

um, have you encountered that type of situation and if you had similar situation,

what...how did you handle that or how did you go about that?

AGUILAR:     Um, yes, um, we've had several scenarios large scale and smaller, I mean, even

the smaller interactions can be very, uh, volatile.  We try and de-escalate, um,

talk, um, establish a rapport with the suspect, uh, or with the people that you're

engaging, um, suspect and victim alike, and you want to establish a positive

rapport so that they, you know, you can obtain some sort of cooperation with

them, and then you're working together, um, toward...toward...toward a

positive resolution so, um, you know, I thought the communication was

effective.  I was talking to GALEANA and, um, you know, we would, ah, checking

on each other, are you okay, do we really...so everybody was ready to step in to

either roll at any time, to help each other out.

HERNANDEZ:     But communication with the suspect, was...was that effective?...Talking over the

P.A. (Public Adress)

AGUILAR:     I believe so...I believe so, yeah, 'cause you could see him using drugs, he was

smoking cigarettes,...

HERNANDEZ:     Okay.

AGUILAR:        …okay, although I didn't see it, MARTINEZ was reporting that he was smoking a

                pipe…

HERNANDEZ:      Okay.

AGUILAR:        …uh, from a pipe.  I could see his cigarette usage, I did not see the usage of a…of

                the pipe.  Um, but you could see him taking hits, when he would lower his head

                down toward the steering wheel.  Um, so I believe it was effective because we

                were able to communicate with him, and I think de-escalate things, because at

                times you could see his, um…he would take deep breaths, he would be

                puffing…huffing and puffing with his, you know, just taking deep breaths and

                blowing it out to where his cheeks were expanding out, you know, like holding

                air and exhaling, uh, profoundly.  Um, he's sweating profusely, um, I couldn't tell

                if he was crying or if it was just a sweat, but you could tell the vehicle was

                getting really hot, 'cause it was steaming up inside, um, throughout, you know,

                towards the en-…during the inter-…during the incident, so…

HERNANDEZ:      Did you remain inside the, uh, BearCat until the conclusion?

AGUILAR:        Uh, no…no.

HERNANDEZ:      There was a point where you were relieved?

AGUILAR:        Yes.

HERNANDEZ:      And when was that point?

AGUILAR:        Uh, it was…when it was determined, uh, I don't remember the time, I'm sorry,

                but, uh, later on during the incident, uh, it was decided that, uh, Anaheim s-

                …Anaheim Police Department SWAT Team was gonna come out and respond to

                our location, they were gonna, um,…they were cord-…uh, our…our supervision

was coordinating, uh, getting us out of there safely on a safe vehicle.  Um, so

when Anaheim PD arrived with their SWAT Team, they had initial, I believe, five,

uh, officers from the SWAT Team arrived.  They were in the vehicle with us until

their entire SWAT Team arrived, or the entire team that was assigned showed

up in a…I think it was also a Terradyne vehicle, so we weren't in the Bearcat, we

were in the…the…the Terradyne Gurkha, I believe, is what it's called or how it's

referred to.  So we were inside of that vehicle, not the BearCat.  And then they

arrived in one of their Terradynes, and we, um, essentially swapped position.

We jumped into theirs, and then they escorted us back to the station.

HERNANDEZ:         Okay.

BROWER:            When you're in patrol unit, you were a single person unit?

AGUILAR:           Yes, currently, uh, yes.

BROWER:            So what was your call sign?

AGUILAR:           My call sign was two-six-three.

BROWER:            Two-six-three…And when you get in the Terradyne, um, how many total off-

                   …officers leave the station in the Terradyne with you?

AGUILAR:           There were five of us.

BROWER:            That…They all remained inside or did they deploy once you're on scene.

AGUILAR:           Once we're on scene, everyone remained inside.

BROWER:            Okay.  Um, you said it's GALEANA, who's doing the broadcasting…the

                   communication with LOPEZ?

AGUILAR:           Yes.

BROWER:          Uh, how long do you think that communication between GALEANA and LOPEZ went on, from start to finish?

AGUILAR:         I believe it was a couple hours.

BROWER:          Do you carry a BWC?

AGUILAR:         Yes.

BROWER:          Was it activated throughout the incident?

AGUILAR:         Yes.

BROWER:          Was it on your, um, chest…

AGUILAR:         No.

BROWER:          …getting the dashboard, or did you put it some place where it was visible to the…the cars ***

AGUILAR:         Yeah, we determined because of battery life, um, GALEANA works dayshift, so his battery had been used, we figured…well, he asked me, can you use yours. So we used my, uh, BWC, my Body Worn Camera, and we placed it on top of the center…the monitor that's in the vehicle, it's mounted on the…on the dashboard.  We placed it on top as best we could, to see if we can capture the suspect's movements.

BROWER:          And you…you talked about because the hood and height and the depth of his car and the hole in yours above him, you could see his head and shoulders area?

AGUILAR:         Yes.

BROWER:          Could…could you see his hands?

AGUILAR:         No,…

BROWER:          ***

AGUILAR:         …he kept his hands down a lot…

BROWER:          Okay.

AGUILAR:         …throughout the ***

BROWER:          So you couldn't see the seat of the car?

AGUILAR:         No.

BROWER:          You couldn't see the…the dashboard, uh,…glove compartment or anything like

                 that, so you could see his facial expression when he responded to commands or

                 discussions with GALEANA, but you couldn't…you could see he brought a

                 cigarette up to his lips or drugs up to…but you could not see what he was doing

                 with his hands inside the car?

AGUILAR:         Correct.

BROWER:          And you could not see any weapons…if there were any weapons on the…on the

                 floorboard or on the seats?

AGUILAR:         No.

BROWER:          Okay.  You said that, um, he…he thought he's * and at one point he asks him put

                 his hands…he was asked to put his hands on his head, but…or hands on steering

                 wheel, but he wouldn't comply.  Was he ever asked to get…exit out the vehicle?

AGUILAR:         I…Yeah, I think so.  I think, uh, GALEANA asked him to ***

BROWER:          Was he asked to surrender?

AGUILAR:         Yeah, surrender and, uh, just, uh, you know, just come out of the car peacefully

                 with your hands up.

BROWER:          And he didn't comply?

AGUILAR:          No.

BROWER:          So he was giving verbal cues that he was understanding the conversations that del-…d-…the comments that GALEANA was making to him, but he was in compliance with any of them?

AGUILAR:          I would say he was giving more physical cues, not verbal, *** can hear…can hear him.

BROWER:          Ah…eh…visual cues is what I meant.

AGUILAR:          Yeah.

BROWER:          Starts with a V.

AGUILAR:          Yeah, it starts…Um, yeah, I would say, yeah, there were some, um, visual cues.

BROWER:          Now so GALEANA was talking to him, you're seeing everything, you're scrib-…you're saying you're scribing down names, are you also broadcasting over the radio what's happening?  Are you…Who…who's doing the radio broadcasting to the surrounding units?

AGUILAR:          The radio broadcasting to surrounding units was MENENDEZ.

BROWER:          Okay.  So…and he's in the…Where's he inside the…in the Terradyne?

AGUILAR:          Ah, he was, uh, positioned behind me.

BROWER:          Okay.  And who was in the turret?

AGUILAR:          That was MARTINEZ.

BROWER:          Did…Who had the…Do you know who had the best view?

Case No.
21-004162

AGUILAR:        No.

BROWER:         Okay.  Um, was there a broadcast made by somebody in there that they…that they saw a gun?

AGUILAR:        Yes.

BROWER:         Who made that broadcast?

AGUILAR:        Well, uh, the broadcast was that there was a gun.  That there was a…a…a gun that had possibly been, uh, but he did not see it.  So it was MENENDEZ, 'cause he was on the radio communication, but my understand-…

BROWER:         So what…what did he broadcast, as…as detailed as possible?

AGUILAR:        Yeah, um, I had seen the suspect, uh, moving object from his per-…from his right to left.  He had a grip on something.  And, uh,…and to me it looked like the butt of a gun.

BROWER:         Okay.  So you could see the steer-…top steering wheel?

AGUILAR:        Yes.

BROWER:         So is this object that you see that you believed is a gun, is it chest-height that he was moving from right to left?

AGUILAR:        Yes.

BROWER:         Okay, and so…because it's at chest-height, that's why you're able to see it, because if it was lower, you couldn't see it, right?

AGUILAR:        Correct.

BROWER:         What's the duration of time that you saw that, going from right to left, how long do you think you saw it?

AGUILAR:          Oh, it was a split second.

BROWER:           And that was from looking down in the Terradyne onto his vehicle?

AGUILAR:          Yes.

BROWER:           Was it light outside or dark outside at this point?

AGUILAR:          Light.

BROWER:           Okay.  And in the short time that you see it, you believed it as what?

AGUILAR:          I believed it to be gun.

BROWER:           And why do you think that?

AGUILAR:          Uh, he had…he had been making several movements, this is early on in the,

                  uh,…after our arrival, um, he had been moving a lot in the vehicle.  Uh, digging

                  under his seat, digging across the passenger seat,…

BROWER:           Let me interrupt you, when you say "digging under the seat," that's just because

                  his shoulders go forward, his head go forward, you can't see what he's doing

                  though, right?

AGUILAR:          Yes.

BROWER:           And when you say "digging under the passenger seat," that's because he leans

                  that way and down, but you can't see what he's doing?

AGUILAR:          Yes.

BROWER:           D-…Just so based on his upper body movement, you believed that he's reaching

                  or moving things around inside the vehicle?

AGUILAR:          Yes.

**BROWER:** The only you could actually see his hands, other than when he's smoking cigarettes or I think you said a pipe, you could see when that black object you believe is a gun is going from right to left?

**AGUILAR:** Yes.

**BROWER:** And that is for a brief moment…a second?

**AGUILAR:** Yes.

**BROWER:** And during that time, you believe it's gun, did you see the barrel?

**AGUILAR:** I did not see the barrel.

BROWER: Did you see the grips? Uh, the…the…*** Did you see the…the pistol grip?

AGUILAR: No.

BROWER: Does it look like he…In this brief moment you see it, does it look like he's holding it by the barrel? By the pistol grip? Or can you tell how he's holding the gun?

AGUILAR: To me it appeared he was holding a, uh,…by…by pistol grip.

BROWER: Okay. And then once it moved right to left, you never saw it again?

AGUILAR: Correct.

**BROWER:** But when you saw it, you told your partners he's got a gun?

**AGUILAR:** I said he's had…I…I remember saying that I saw something in his hand, looked like a gun, um, and again he was moving, so I put it out immediately in case he jumped out, um, that I saw a gun.

**BROWER:** Did you broadcast over the radio?

AGUILAR:              No.

BROWER:               You told your partner, and he broadcasts it over the radio?

AGUILAR:              I said it to the team,…

BROWER:               Okay.

AGUILAR:              …MENENDEZ, I believe, broadcasted it.

BROWER:               Okay.

AGUILAR:              Yeah.

BROWER:               That's all I have.

MOROYOQUI:            Based on the totalities of the information you had at that time, for example, the

                      red channel, maybe green channel, or the…the communication on two-Orange-

                      three, of you mentioned before that he was possibly wanted for armed, uh, 211.

                      At the time of your arrival and your observations, and where you just explained

                      to us, um, as far as moving something from, I believe, right to left or left to right.

AGUILAR:              Our left to our right, dri-…

MOROYOQUI:            Oh…

AGUILAR:              …the driver's right to left.

MOROYOQUI:            Okay.  Um, what were you think-…what was going through your mind, I think

                      you were explaining it's like, uh, was it that you…your…you believe that your job

                      at the time was to broadcast that people know for…for safety reasons, for

                      officers' safety, for the public's, because obviously there was a lot of

                      communications that you heard that they wanted, um, the public pushed back

                      because they were getting too close.

AGUILAR:        Yes.

MOROYOQUI:      Uh, what was going through your mind of your thought of was…was gonna
                happen or could have happened, um, 'cause you believe that he might have had
                a gun.

AGUILAR:        So again, hearing it from the very beginning, it was escalated from,
                uh…uh…stakeout on a stolen vehicle, um, and they're pursuing it, to all of a
                sudden he's back in our city, and it's updated that he's an armed sus-…uh, he's
                an armed s-…uh, he's a suspect wanted for, uh, in an armed robbery.  Um, I
                think we were all thinking…I was thinking that he was armed, um, we always
                treat that as armed and dangerous, so…in those cases.  Um, I believed he was a
                danger to the public, to ourselves, even though we were in a armored vehicle, I
                mean obviously we had concern because he might be armed, we're looking right
                at him, we had a…we got a new armored vehicle that hasn't been tested, and
                we have riffles pointed downrange at us, um, you know, and we're…we're in
                the…we're in the direct line of fire, so I'm trying to see the best to my ability,
                and observe his actions in addition to what's going on at the scene.  Um,
                obviously we had supervisors, we had everybody who had downrange visual of,
                you know, what we treat as a 9-60 X-ray, a felony car stop.  Um, but for us, we
                had the unique perspective of seeing left, right, um, and we're able to point out
                to our partners also, the people that were around.  There were safety concern
                on the north side of us, behind us, the south side of us to our right, behind us to
                the southwest, and as well as behind the officers that were pointing their guns
                at the suspect, who were positioned behind him.  So we had that unique
                perspective of having five sets of eyes to see all that, report that back, so again,
                thinking about his potential actions, I was concerned he…if he came out

shooting, that he could shoot back at the officers, of course, at us, as well as the
people that were behind the officers and they were…that were observing in the
surrounding streets, so, um,…

MOROYOQUI:       You say people, you're talking about the public?

AGUILAR:         The public, I mean, uh, you can see children out there, uh, people walking,
bystanders, um, vehicles that were still driving through the scene, so there was
great concern for…on all our parts, and mine…mine as well, speaking from my
own, I believed he was armed and that, based on his actions, he was moving
around, um, and then seeing what I believed was the butt of a gun, uh, in his
grip, I mean seeing that grip is unique, I think, to people who carry firearms, and
I recognized it and I've seen it, um, in training scenarios, in training simulations,
as well as in, um, you know, personal experience as an officer, um, that looked
like a pistol grip to me, so I reported it out immediately, we tran-…we
transmitted that information, but I did ask for secondary assistance, because I
knew, uh, MARTINEZ's had direct visual down, so when I shared what I
observed, I asked MARTINEZ to confirm if he saw the same thing.  Uh, obviously
MENENDEZ put it out immediately, um, we probably could've waited on to
broadcasting it, um, and good on GALEANA, you know, he, um, ah, you know, he
kinda led us in backing off, let's communicate what did we see.  So I asked
MARTINEZ, did, you know, can you s-…did you see what I saw, because I saw a
grip, um, some-…somebody carrying firearm cross his body and I heard
MARTINEZ acknowledged that he saw.  And for me it was peace of mind that
confirmed, okay, you know what, there's a…there's a gun…there's a firearm in
the car.  So that was the concern, public safety as well as officer safety alike.
Um, we were in a dangerous situation and that's the mindset is does this guy

have a gun, does this suspect have a gun, and I saw that he potentially did, and I asked my partner to confirm it, to see if he saw what I saw, and he… I believe MARTINEZ said that, uh, you know, 'cause he was thinking, uh,…

HERNANDEZ:  (SNEEZED) Excuse me.

AGUILAR:  …bless you, I remember he was, uh,…'cause he was up there and we were all talking and GALEANA saying, hey, we need to confirm it.  Um, and I remember MARTINEZ saying, okay, I can't see it now, but I saw it.  So that was like okay, and that was when GALEANA proceeded with telling the suspect, okay, whatever you have in your hand, I think he said to just put it down or drop whatever you have in your hand.  Um, so it became more instead of a surrender, it was more like again giving commands to, uh, for safety reasons, show us your hands, put 'em on the steering wheel, um, drop whatever you have, which I believed was a gun.

MOROYOQUI:  Okay.  I'm good.

HERNANDEZ:  Okay.  End of interview, 3:56 P.M.

TRANSCRIBED BY:          ANN CAO

                        ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                        OCTOBER 1, 2021


REVISED BY:             TROY HERNANDEZ, INVESTIGATOR

                        ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                        OCTOBER 6, 2021

# EXHIBIT 21

1

2

3

4

5

6

7

8

9

10

11

12

13    Case Number: BI-RI2021-00030

14    Interview with: Paul Delgado

15

16

17

18

19

20

21

22

23

24

25

Page 1

```
 1              SPECIAL AGENT CARLOS:  Hello, my name
 2    is Special Agent Carlos, with the California
 3    Department of Justice, and today is October 6th,
 4    2021.  And this is an interview for an incident
 5    that occurred on September 28th, 2021, at the
 6    intersection of Santa Ana Boulevard and Bristol
 7    in the City of Santa Ana.  If everybody can
 8    introduce themselves, going (indiscernible).
 9              SPECIAL AGENT ERIC PRIOR:  I am Special
10    Agent Eric Prior from the California Department
11    of Justice.
12              DETECTIVE MARK GALE:  Detective Mark
13    Gale, Anaheim Police Department.
14              RUSSELL PERRY:  Russell Perry, attorney
15    rep.
16              INVESTIGATOR PAUL DELGADO:
17    Investigator Paul Delgado.  Anaheim PD, sorry.
18              CHRISTOPHER KOHARSKI:  Christopher
19    Koharski, attorney rep.
20              SPECIAL AGENT CARLOS:  Paul -- or Mr.
21    Delgado --
22              INVESTIGATOR PAUL DELGADO:  Paul's
23    fine.
24              SPECIAL AGENT CARLOS:  Okay.  I go by
25    Carlos if you have any (indiscernible) questions.
```

                                              Page 2

```
 1                 INVESTIGATOR PAUL DELGADO:  Yes.
 2                 SPECIAL AGENT CARLOS:  Okay.  Were you
 3    wearing that body-worn camera?
 4                 INVESTIGATOR PAUL DELGADO:  Yes.
 5                 SPECIAL AGENT CARLOS:  And where was it
 6    located in your uniform?
 7                 INVESTIGATOR PAUL DELGADO:  The actual
 8    camera is attached to the top of my helmet, along
 9    with the camera pack, I guess you want to call
10    it, right behind it.
11                 SPECIAL AGENT CARLOS:  Battery?
12                 INVESTIGATOR PAUL DELGADO:  Yeah, the
13    battery.
14                 SPECIAL AGENT CARLOS:  And we mentioned
15    the uniform.  Could you describe to me what you
16    were wearing?  And just to make it easier for
17    everybody, can you start with your helmet going
18    down, please?
19                 INVESTIGATOR PAUL DELGADO:  Sure.
20    Okay.  Yeah, wearing a green-colored ballistic
21    helmet, with ear suppression, active listening,
22    hearing protection attached.  I wear a
23    bulletproof Kevlar vest with a rifle-plated
24    protection plate to the front.  Attached to my
25    ballistic vest are my shoulder protection,
```

Page 7

```
 1   The fore-stock has a SureFire light attached to
 2   it.  There's also an NMR holographic aiming point
 3   system attached to the top rail.
 4            SPECIAL AGENT CARLOS:  Aside from the
 5   attachments you have to your rifle, is there
 6   anything internal that was done to it, to modify
 7   the shooting ratio?  (indiscernible), so on and
 8   so forth.
 9            INVESTIGATOR PAUL DELGADO:  No, sir.
10            SPECIAL AGENT CARLOS:  Okay, and are
11   these two weapon systems personally-owned or
12   issued by the department?
13            INVESTIGATOR PAUL DELGADO:  The rifle
14   is issued by the department, and the handgun is
15   my personal one.
16            SPECIAL AGENT CARLOS:  Okay.  And I'm
17   going to go back just a little bit, on your SWAT
18   officer training.  Let's just go three months or
19   two -- we're going to go with two months before
20   the incident that we're speaking about here.
21   What kind of training have you had, to continue
22   your training as a SWAT officer?
23            INVESTIGATOR PAUL DELGADO:  I had
24   monthly training, two times a month to sometimes
25   one day a month.  Those training days include
```

Page 10

1    range, a full day of the range training.  That
2    will include rifle training, rifle qualifying,
3    handgun training, qualifying with a handgun as
4    well; shooting from distances, anywhere from 20
5    yards or 50 yards to 20 to 15 to 7 to 3 yards,
6    shooting at paper targets.  In relationship to
7    the training, do you only want to know about
8    weapons?
9            SPECIAL AGENT CARLOS:  Yes, because
10   you're on it already.
11           INVESTIGATOR PAUL DELGADO:  Okay, and
12   additionally, I am a handgun firearm instructor.
13   I received the training from the FBI academy in
14   El Toro.
15           SPECIAL AGENT CARLOS:  Do you remember
16   the last time you qualified with the weapons that
17   you mentioned earlier?
18           INVESTIGATOR PAUL DELGADO:  No.
19           SPECIAL AGENT CARLOS:  Okay.  Do you
20   happen to have any weaponless defense, or
21   defensive tactics training in regards to SWAT
22   team and how to respond to incidents like this?
23           INVESTIGATOR PAUL DELGADO:  Weaponless?
24           SPECIAL AGENT CARLOS:  Yeah, like
25   hands.

<div align="right">Page 11</div>

```
 1              INVESTIGATOR PAUL DELGADO:  Hand-to-

 2   hand?

 3              SPECIAL AGENT CARLOS:  Yeah, hand-to-

 4   hand.

 5              INVESTIGATOR PAUL DELGADO:  No.

 6              SPECIAL AGENT CARLOS:  Okay.  Have you

 7   had any recent gang training, or anything like

 8   that?

 9              INVESTIGATOR PAUL DELGADO:  Gang

10   training?

11              SPECIAL AGENT CARLOS:  Gang updates --

12   disregard that question.  Do you have any prior

13   military experience?

14              INVESTIGATOR PAUL DELGADO:  Yes.

15              SPECIAL AGENT CARLOS:  Where was that

16   at?

17              INVESTIGATOR PAUL DELGADO:  Camp

18   Pendleton, in the Marines.

19              SPECIAL AGENT CARLOS:  Okay, how many

20   years did you serve?

21              INVESTIGATOR PAUL DELGADO:  Two years

22   full-time, and then 13 total as far as reserve

23   and active.

24              SPECIAL AGENT CARLOS:  During your SWAT

25   training, and your time in law enforcement -- and
```

Page 12

1    I'm sure you have, but -- have you had any recent

2    de-escalation training techniques that you've

3    updated yourself with?

4              INVESTIGATOR PAUL DELGADO:  So, our

5    departmental training conducted some training in

6    de-escalation.  I know we attended the Orange

7    County Sheriff's Academy, where they gave us

8    instruction on de-escalating as opposed to

9    escalating in certain scenarios.

10             SPECIAL AGENT CARLOS:  I'm not sure if

11   (indiscernible) quickly here.  Do you have any

12   collateral duties aside from SWAT?  Are you on

13   FTO and stuff like that --

14             INVESTIGATOR PAUL DELGADO:  No, no.

15             SPECIAL AGENT CARLOS:  -- I think you

16   mentioned that earlier.

17             INVESTIGATOR PAUL DELGADO:  Well, my

18   (indiscernible) duty is SWAT.  My primary duty is

19   investigator, as a major narcotic investigator.

20             SPECIAL AGENT ERIC PRIOR:  Can I just

21   clear something up for you?

22             SPECIAL AGENT CARLOS:  Yes, sir.

23             SPECIAL AGENT ERIC PRIOR:  The way the

24   question was asked to you was about your special

25   assignments prior to your assuming a role in

Page 13

1    scene, or can you take me how you found out how

2    this was happening?

3              INVESTIGATOR PAUL DELGADO:  Yeah.  So,

4    I received an automated phone call message on my

5    phone.  I was in Los Angeles at the time, to

6    respond to Flower Street, to a CP near a football

7    stadium in Santa Ana.  Referenced a barricaded

8    individual in a car that was stopped at that

9    intersection, made in Santa Ana.

10             SPECIAL AGENT CARLOS:  Okay.  And then

11   what happened?  You can keep going.

12             INVESTIGATOR PAUL DELGADO:  Okay.

13   Yeah, so, once I arrived on scene, I got kitted

14   up.  I got suited up with all my equipment on,

15   and I went to a briefing in a parking lot with

16   everybody.  While at the briefing, I learned the

17   details of the person involved in this case.  I

18   learned Anaheim Crime Taskforce attempted to

19   arrest him for an outstanding warrant for

20   robbery.  I was informed that he was driving in a

21   stolen car, and that he had led police on a

22   pursuit for quite a while throughout the streets

23   of Anaheim -- I'm sorry, Santa Ana and Irvine.

24             He drove on the wrong side of the

25   roadway.  He was seen ducking his hands into the

                                            Page 15

1    center console and floor-board area.  He was seen

2    -- I learned his name was Brandon Lopez, a gang

3    member of Sixth Street in Santa Ana.  And I

4    learned he had ultimately crashed at that

5    intersection I mentioned earlier, which ended up

6    being like a construction zone area.  And for

7    lack of a better word, he was high-centered on a

8    set of railroad tracks, and he was spinning his

9    wheels, trying to actively get away from the

10   police.  And he was staying inside the vehicle.

11          I was told that announcements by

12   negotiators were ongoing; they were trying to get

13   him out, and that he would not come out.  He said

14   he would not come out, and he was seen smoking

15   what they believed to be narcotics through a

16   pipe, and snorting it through his nose through a

17   piece of foil.

18          SPECIAL AGENT CARLOS:  Okay.  That was

19   as you responded to the scene, or when you got

20   there?  I'm sorry.

21          INVESTIGATOR PAUL DELGADO:  That was

22   when I got there.

23          SPECIAL AGENT CARLOS:  Okay.  Because

24   you mentioned you were briefed.  Do you remember

25   approximately what time that was?

Page 16

```
 1    all fogged up, I'd see him periodically clear the
 2    windows clean with his hands and take specific
 3    note of our location.  He noted our location at
 4    the front of the Bear.  I saw him look to the
 5    rear.  I saw him look at the Terradyne in the --
 6    our Terradyne, off to the passenger's side, as
 7    well, and he continuously did this, as well,
 8    throughout probably the hour that we were out
 9    there on foot, in that position.
10              At some point during that, during the
11    negotiations part of this time, somebody over the
12    radio -- I don't remember who -- broadcasted that
13    family members of the suspect had notified
14    Anaheim PD personnel that they had spoken to
15    Brandon Lopez, and that he indicated to the
16    family members he wanted to commit suicide by
17    means of a cop, which typically means, to me, he
18    wants to force our hand into believing he had a
19    handgun, and we would be forced to shoot him, for
20    our safety.
21              SPECIAL AGENT CARLOS:  I'm going to ask
22    you a question.
23              INVESTIGATOR PAUL DELGADO:  Oh, yeah,
24    I'm probably ready for a follow-up question.
25              SPECIAL AGENT CARLOS:  Yeah, I'll ask
```

Page 21

```
1    but I heard that in my internal headset, being it

2    was our tactical channel, for lack of a better

3    word.  But that's what we used to communicate all

4    our tactics on, throughout the incident.

5              SPECIAL AGENT CARLOS:  And when you

6    were describing the subject's furtive movement,

7    could you describe that a little more?  Because

8    according to you, you have a pretty good view,

9    and he was wiping down the windows, and so on,

10   and so forth.  Can you describe that a little

11   more in detail?

12             INVESTIGATOR PAUL DELGADO:  Sure.  So,

13   one furtive movement was he -- I saw him rocking

14   the driver's seat backwards and forwards, and he

15   ultimately jammed it all the way up forward, so

16   he can lean forward and specifically,

17   deliberately clean the window into a big circle

18   and look directly at me.  He did the same thing.

19   He would look for a period of five to 10 seconds.

20             I would see him look to the right,

21   towards the Bear; I would see him look to the

22   left; then he would disappear, and I saw him

23   deliberately clear the rear window and do the

24   same thing, before disappearing again.  I could

25   only assume he was on the other side doing the
```

Page  24

1   same thing.   I think I heard updates from the

2   Terradyne team saying he's looking at us through

3   the windows, et cetera.

4           I saw his hands placing materials --

5   the floor-board mats onto the windshields, and

6   trying to keep them there.   I just saw his hands

7   deliberately moving in the center console,

8   disappearing, moving his hands to his waist area

9   below the window line, I should say.

10          SPECIAL AGENT CARLOS:   During the

11  negotiations, do you remember what commands were

12  given from the negotiator?

13          INVESTIGATOR PAUL DELGADO:   Yeah, I

14  remember the negotiator calling Brandon Lopez by

15  name, to come out of the car peacefully, show us

16  his hands; that we wanted to resolve the

17  situation without anyone getting harmed.   We

18  wanted to resolve the situation without him being

19  harmed.   And these commands were given out for a

20  period of, well, for an hour that I was there,

21  but more, because I know they were in progress

22  before I showed up.

23          I know the negotiator mentioned members

24  of his family, and trying to entice him to come

25  out, so he can meet up with his family, and they

Page 25

1   can all rest assured that he is safe, and that he

2   is not harmed, and that if he were to comply, he

3   would not be harmed.

4          SPECIAL AGENT CARLOS:   Okay.   Did it

5   appear, with your vantage point and your view of

6   the subject and the stolen vehicle -- did he

7   appear to respond to any kind of commands?   Did

8   he shake his head?   Did he -- I'm assuming not

9   verbalize; you wouldn't have been able to hear

10  him -- but did he appear to understand what was

11  going on?   And then, how many languages, if you

12  remember, were used during the negotiation?

13         INVESTIGATOR PAUL DELGADO:   So, he did

14  not appear to comply whatsoever throughout any of

15  the negotiations, and two languages were used.

16         SPECIAL AGENT CARLOS:   Do you remember

17  the languages?

18         INVESTIGATOR PAUL DELGADO:   English and

19  Spanish.

20         SPECIAL AGENT CARLOS:   Okay.   You said

21  he didn't comply, but did he seem to understand,

22  or at least be able to hear what was going on?   I

23  know it's very close, but --

24         INVESTIGATOR PAUL DELGADO:   Right.   So,

25  earlier, I mentioned I was at that brief, at the

Page 26

```
1    stadium, at the CP.  It was also mentioned that
2    officers had been seeing him shake his head,
3    indicating no when they told him to come out
4    numerous times.  I did not see that personally,
5    but I learned that through the briefing.
6               SPECIAL AGENT CARLOS:  Okay.  So,
7    moving forward, after negotiations appear not to
8    work, or he was not giving up or coming out
9    peacefully, what happened?  Could you move us
10   forward through there?
11              INVESTIGATOR PAUL DELGADO:  So, the
12   game plan was developed to have the suspect
13   finally get out of the vehicle.  Now, our plan
14   was to create discomfort in the vehicle, and by
15   doing that, we insert OC spray.  Because of the
16   nature and potential violence of this scenario,
17   we can't do that at a close range, so we had to
18   deploy it from on the other side of the
19   Terradyne, with the bang pole.  We attached the
20   gas to the bang pole, and we inserted it to the
21   rear window, and we released the gas.
22              Just prior to doing that, the plan was
23   to throw a flash band to the front, to create an
24   additional distractionary measure.  So, once a
25   distractionary measure was placed and the flash
```

Page 27

1    bang went off, then the gas was subsequently

2    inserted to the rear window.

3            Once the gas was released, I saw the

4    rear door open, and I saw Mr. Lopez quickly

5    sprint and run pretty much in our direction.  I

6    noticed he looked to the left, where it appears

7    there's a wide-open space, and there's no cops in

8    that general area.  But as he continued running

9    in the same direction, I saw him specifically

10   look up and take note of our direction, at which

11   time I saw his right-hand duck into his

12   waistband.

13           During this, I had shouted multiple

14   times, "Get your hands up.  Hands up.  Hands up,"

15   and I also heard other cops saying the same

16   thing; "Hands up, hands up, hands up," to which

17   he never complied with any of these commands.

18           SPECIAL AGENT CARLOS:  And were there

19   any other warnings that you heard over the radio

20   at this particular time, of he being armed with

21   anything?

22           INVESTIGATOR PAUL DELGADO:  I remember

23   hearing something about -- I just remember giving

24   him commands to -- "Hands up, hands up" -- and I

25   heard somebody else saying it.

                                            Page 28

```
 1              SPECIAL AGENT CARLOS:  Okay.  So, you
 2   mentioned that he looked, I'm assuming, to his
 3   left; then, he looked right.
 4              INVESTIGATOR PAUL DELGADO:  Yeah, he's
 5   getting the lay of the land.
 6              SPECIAL AGENT CARLOS:  Okay.  But
 7   according to the way it happened, or the way
 8   you're describing it, he didn't run this way --
 9   and then, for the sake of the recording, I'm
10   pointing between the Santa Ana patrol vehicle and
11   then just the citizen's vehicle here.  So, there
12   was an opportunity for him to escape.
13              INVESTIGATOR PAUL DELGADO:  There was a
14   lot of opportunity in that direction to flee
15   freely, if he chose to.
16              SPECIAL AGENT CARLOS:  When the
17   decedent changed direction, what did you believe
18   was going to happen, after that?
19              INVESTIGATOR PAUL DELGADO:  I believed
20   he was going to pull out a handgun and shoot
21   myself or my partners.
22              SPECIAL AGENT CARLOS:  If you didn't --
23   what did you do when he changed direction and he
24   came towards you guys?
25              INVESTIGATOR PAUL DELGADO:  I purposely
```

Page 29

1    took my weapon off of safe, and deliberately
2    fired three rounds from my rifle in his
3    direction, at him, center mass.   I felt my
4    partners lives were in danger, my life was in
5    danger, and I needed to stop the imminent threat.
6              SPECIAL AGENT CARLOS:  You felt that
7    based on this scenario and this particular time,
8    within the timeframe that you had, that it was
9    absolutely necessary to do that?
10             INVESTIGATOR PAUL DELGADO:  Yes, I do.
11             SPECIAL AGENT CARLOS:  Do you know if
12    the decedent had any issues with mental health or
13    drugs, or anything like that?
14             INVESTIGATOR PAUL DELGADO:  I'm sorry,
15    can you repeat that?
16             SPECIAL AGENT CARLOS:  I'm sorry.  The
17    --
18             INVESTIGATOR PAUL DELGADO:  The
19    decedent?
20             SPECIAL AGENT CARLOS:  The suspect.
21             INVESTIGATOR PAUL DELGADO:  Yes.
22             SPECIAL AGENT CARLOS:  Did you remember
23    him, or have you known him to have any issues
24    with mental health or any use of drugs, or
25    anything like that?

                                           Page 30

1    describe the lighting at the time of the incident

2    when this happened?

3                INVESTIGATOR PAUL DELGADO:  The

4    lighting was street lighting along with lights

5    given from the SWAT vehicles.  It was light

6    enough to see what was going on in the car, which

7    is why we saw what we saw, and we were able to

8    see that it was a construction zone, and there

9    was rebar, et cetera.

10                SPECIAL AGENT CARLOS:  Okay.  And I'm

11    almost done here.  So, after the subject was

12    shot, what happened after that?  Can you take me

13    through that?

14                INVESTIGATOR PAUL DELGADO:  When the

15    subject was shot, he fell on top the right hand

16    at his waist, which is where we thought he was

17    grabbing a gun from.  We brought our team back to

18    safety, because he was in a different position.

19    In case he wanted to ambush us with the handgun,

20    we pulled back a little bit behind armor, before

21    deciding to check for his alertness level and his

22    awokenness by hitting him with the 40-millimeter

23    impact weapon (indiscernible).

24                SPECIAL AGENT CARLOS:  And after you

25    hit him with the -- well, not you, but after the

Page 40

1    team hit him with the 40-millimeter on his leg,

2    what happened after that?

3              INVESTIGATOR PAUL DELGADO:  We saw no

4    reaction, so we took it upon ourselves to

5    approach him and arrest him.  Assignments were

6    made.  One person had his left arm, right arm, et

7    cetera.  Brian went out and handcuffed him.

8              SPECIAL AGENT CARLOS:  Okay, and then

9    was there any medical aid rendered at the time?

10             INVESTIGATOR PAUL DELGADO:  Yes, there

11   was.  Tactical medics were on scene, inside the

12   bear, and they were called to render aid.

13             SPECIAL AGENT CARLOS:  Okay.  I have no

14   other questions, sir.  Do you have anything else?

15             SPECIAL AGENT ERIC PRIOR:  I do.  And

16   maybe I'm wrong, and maybe I just didn't catch

17   it.  I know we got into the details on the

18   secondary weapon system.  But the primary -- I

19   know we got make and model on that, but just to

20   confirm, that's an AR -- a piston-driven like AR-

21   15.  Is it select fire?

22             INVESTIGATOR PAUL DELGADO:  It's

23   select-fire with semi, and full auto

24   capabilities.

25             SPECIAL AGENT ERIC PRIOR:  And which

                                        Page 41

```
 1    think -- do you have anything?
 2              DETECTIVE MARK GALE:  Yes.
 3              SPECIAL AGENT ERIC PRIOR:  Go ahead.
 4              DETECTIVE MARK GALE:  I'm not sure if
 5    you mentioned -- maybe I missed it -- as far as
 6    the day -- I know you talked about the pursuit;
 7    CTF was chasing and stuff like that.  Do you know
 8    what he was wanted for?  Or did you mention that?
 9              INVESTIGATOR PAUL DELGADO:  Yeah, he
10    was wanted for a robbery warrant.  That was a
11    $250,000.00 warrant for a robbery case.
12              DETECTIVE MARK GALE:  Okay.  Do you
13    know if that was an armed robbery, or --
14              INVESTIGATOR PAUL DELGADO:  I believe
15    it was armed robbery, yes.
16              DETECTIVE MARK GALE:  Okay, and at the
17    time that you arrived at the scene, from the time
18    you first received the call to the time that you
19    went to the briefing, from the time you got out
20    there, did you ever hear any information about
21    another officer observing Lopez with a gun that
22    day?
23              INVESTIGATOR PAUL DELGADO:  Yes.
24              DETECTIVE MARK GALE:  Okay, can you
25    tell me about that?
```

1          INVESTIGATOR PAUL DELGADO:  Yes.  While

2    we were getting debriefed, we were told that

3    officers on scene at the conclusion, termination

4    of the pursuit, had looked in -- had been

5    watching him, and they specifically saw a

6    handgun, a weapon in his hands.

7          DETECTIVE MARK GALE:  Okay, so, you had

8    that information before you deployed out there?

9          INVESTIGATOR PAUL DELGADO:  Yes.

10          DETECTIVE MARK GALE:  Okay.  I've got a

11    couple I'm just going to go back down through.

12    As far as you described your job, your assignment

13    that day was lethal cover, can you explain to me

14    what that entails, what your specific job was for

15    this incident?

16          INVESTIGATOR PAUL DELGADO:  Right.  For

17    this incident, because of the totality of

18    everything that we knew, he was most likely armed

19    with a handgun, seen with a handgun, and he was

20    uncooperative.  He had made threats of suicide by

21    cop.  (indiscernible) lethal cover is needed to

22    the very front of the stack in the event he were

23    to begin firing at us, and we were supposed to

24    stop that threat.  That was my assignment, along

25    with Bret's.

Page 45

1          DETECTIVE MARK GALE:   Okay.   When you

2    talked about him covering up the window, I don't

3    know if you said something about floor mats or

4    whatever he was using to cover up the windows.

5    What do you think the purpose of that was, and

6    what were you feeling as a result of that?

7          INVESTIGATOR PAUL DELGADO:   He was

8    developing his own game plan as to how he was

9    going to either -- what I would suspect, incite

10   us to shoot him or attack us.   He would hide.   He

11   would peak outside of the floor mats.   He would

12   use the fogged-up windows in his advantage, in

13   that he would let them fog out, and then when he

14   wanted to see where we were at, after certain

15   periods of time, he would use his hand to wipe it

16   away and peak, and look.   So, I'm my mind, he was

17   developing -- he was keeping track of our

18   whereabouts, so he could do, what I only

19   suspected was, to develop his own plan of how he

20   wanted to commit his assault on us.

21          DETECTIVE MARK GALE:   Okay, and is it

22   safe to say that if he was to fire rounds at you

23   guys from the car, with those obstacles in the

24   window, that you wouldn't be able to tell exactly

25   where he was in the car?

Page 46

1            INVESTIGATOR PAUL DELGADO:  That would

2   be very difficult, yes.

3            DETECTIVE MARK GALE:  Okay.  I know you

4   talked about -- I think you said you and some

5   others gave commands about getting his hands up.

6   I think that you said that that was while he was

7   inside the car.  After he exited the car, after

8   the gas plan was deployed and he exited the car,

9   did you hear or did you give him any commands?

10            INVESTIGATOR PAUL DELGADO:  Yes.

11   "Hands up, hands up, hands up, hands up."

12            DETECTIVE MARK GALE:  Okay, so that was

13   then.

14            INVESTIGATOR PAUL DELGADO:  Yes.

15            DETECTIVE MARK GALE:  Okay.  Did you

16   hear any other officer say anything else about

17   weapons or anything other than getting hands up?

18            INVESTIGATOR PAUL DELGADO:  No.

19            DETECTIVE MARK GALE:  Okay.  And then,

20   specifically, as far as you said that he went to

21   his waistband, did you see anything in his

22   waistband other than like his shirt, his short,

23   his belt?  Could you actually see any additional

24   items in his waistband?

25            INVESTIGATOR PAUL DELGADO:  I saw his

                                          Page 47

```
 1              DETECTIVE MARK GALE:  Okay.  As far as

 2    alcohol, had you consumed any alcohol 24 hours

 3    before this incident?

 4              INVESTIGATOR PAUL DELGADO:  No, sir.

 5              DETECTIVE MARK GALE:  Okay.  Let me

 6    just confirm.  And I just want to confirm, during

 7    the incident, as he exits the car until the time

 8    that he's ended up in handcuffs, did you ever see

 9    any items in his hand?

10              INVESTIGATOR PAUL DELGADO:  I saw

11    something dark.  I just couldn't tell what it

12    was.

13              DETECTIVE MARK GALE:  Okay.

14              INVESTIGATOR PAUL DELGADO:  To me, it

15    looked like he was clutching onto either a gun

16    wrapped in something, or it was his hand, dark,

17    in his waistband.  I just wasn't sure.

18              DETECTIVE MARK GALE:  Okay.  And after

19    the officer-involved shooting occurs, and he goes

20    down on the ground, and there's a 40-millimeter

21    deployment, and then he's ultimately handcuffed,

22    did you ever see any items that could have been

23    similar to what you were seeing?

24              INVESTIGATOR PAUL DELGADO:  Yes, I did.

25    It was lying on the ground next to him.  And it
```

Page 52

1    looked to be like a slender pouch, with a fold-

2    over button-up snap, maybe similar to a miniature

3    size of what your car tire iron would be in, but

4    just smaller.

5              DETECTIVE MARK GALE:  Okay, and that

6    was next to him at the time, or --

7              INVESTIGATOR PAUL DELGADO:  Okay.

8              DETECTIVE MARK GALE:  Okay.  I don't

9    have anything further.

10             SPECIAL AGENT CARLOS:  Gentlemen, do

11   you want to clear anything up?

12             RUSSELL PERRY:  Nope, we're good,

13   thanks.

14             SPECIAL AGENT CARLOS:  Okay. It is

15   12:11, October 6th, and this is going to conclude

16   the interview here.

17

18

19

20

21

22

23

24

25

```
 1
 2                C E R T I F I C A T I O N
 3
 4   I, Sonya Ledanski Hyde, certify that the
 5   foregoing transcript is a true and accurate
 6   record of the proceedings.
 7
 8
 9
10   <%12151,Signature%>
11
12   Veritext Legal Solutions
13   330 Old Country Road
14   Suite 300
15   Mineola, NY 11501
16
17   Date:  November 30, 2021
18
19
20
21
22
23
24
25
```

Page 54

# EXHIBIT 22

1      `

2

3

4

5

6

7

8

9

10

11

12

13      Case Number: BI-RI2021-00030

14      Interview with: Kenneth Weber

15

16

17

18

19

20

21

22

23

24

25

Page 1

1          SPECIAL AGENT ESTRADA:  Okay.  It is
2   October 6th, approximately 9:57 in the morning,
3   2021.  Let's go around and introduce ourselves.
4   My name is Special Agent Patrick Estrada from
5   California DOJ.
6          SPECIAL AGENT CARLOS:  My name is
7   Special Agent Hugo  Carlos, also with Department
8   of Justice.
9          CHRISTOPHER KOHARSKI:  Christopher
10   Koharski, attorney rep.
11          OFFICER KENNETH WEBER:  Kenneth Weber,
12   Anaheim Police Department.
13          RUSSELL PERRY:  Russell Perry, attorney
14   rep.
15          DETECTIVE MARK GALE:  Detective Mark
16   Gale, Anaheim PD.
17          SPECIAL AGENT ESTRADA:  Okay.  We are
18   currently at Anaheim Police Department,
19   conducting an interview in regards to a officer-
20   involved shooting that occurred September 28th,
21   2021 in the City of Anaheim.  I'm sorry, Santa
22   Ana.  And we're speaking with the Officer Kenny
23   Weber, correct?
24          OFFICER KENNETH WEBER:  Yes, sir.
25          SPECIAL AGENT ESTRADA:  How do you

                                        Page 2

```
 1    Do you currently wear any type of contacts or
 2    prescription glasses, or anything like that?
 3              OFFICER KENNETH WEBER:  No, just
 4    readers, when I need to read.
 5              SPECIAL AGENT ESTRADA:  Okay.  Do you
 6    routinely wear sunglasses or any other type of
 7    protection, whether it's for reading or visual,
 8    or anything like that?
 9              OFFICER KENNETH WEBER:  I wear
10    sunglasses when I'm driving, or if I'm out in the
11    sun.
12              SPECIAL AGENT ESTRADA:  Okay.  Are you
13    familiar with the incident that happened on
14    September 28th, 2021, in the City of Santa Ana,
15    the corner of Santa Ana Boulevard and Bristol?
16              OFFICER KENNETH WEBER:  Yes, sir, I am.
17              SPECIAL AGENT ESTRADA:  Okay.  Did you
18    have a chance to review any type of audio or
19    video, or body-worn camera footage in regards to
20    that incident?
21              OFFICER KENNETH WEBER:  Yes.
22              SPECIAL AGENT ESTRADA:  Okay.  Did you
23    have on or were you wearing a body-worn camera at
24    the time of the incident?
25              OFFICER KENNETH WEBER:  Yes.  At the
```

Page 7

1    time of the incident, I was wearing the Axon Flex

2    2 helm and camera.  It fits on the helmet.

3              SPECIAL AGENT ESTRADA:  Okay.  It was

4    on your helmet?

5              OFFICER KENNETH WEBER:  Yes, sir.

6              SPECIAL AGENT ESTRADA:  Okay.

7    Approximately what time did you turn on the body-

8    worn camera?

9              OFFICER KENNETH WEBER:  That was

10   approximately 8:20 p.m., I believe.

11             SPECIAL AGENT ESTRADA:  8:20 p.m.?

12   Okay.  That day of, can you tell me what time you

13   started your shift?

14             OFFICER KENNETH WEBER:  I started my

15   shift at 06:00 in the morning at the training

16   detail at our east station, and was off work at

17   approximately 16:00, 4:00 p.m.

18             SPECIAL AGENT ESTRADA:  Okay.  What

19   time did you get deployed to the incident?

20             OFFICER KENNETH WEBER:  When the call

21   came out, it was an email that came out

22   initially.  I believe it was 7:28 was the time of

23   the call, 7:28 p.m.

24             SPECIAL AGENT ESTRADA:  Okay.  And then

25   how long had it taken you to respond from the

                                              Page 8

1    time that you got the email, to actually be on

2    scene?

3            OFFICER KENNETH WEBER:  Approximately

4    30, 35 minutes.

5            SPECIAL AGENT ESTRADA:  Okay.

6            OFFICER KENNETH WEBER:  I don't recall

7    exactly, but approximately.

8            SPECIAL AGENT ESTRADA:  Okay.  Can you

9    tell me, did you have to go anywhere in between

10   that time, to get equipment or dress out, or

11   anything like that?

12           OFFICER KENNETH WEBER:  No.  So, I'm on

13   a rapid response team.  So, as soon as I received

14   a call, I have a take-home car.  It has all my

15   equipment in it, so, as soon as I received the

16   email, which, like I said, believe was at 7:28

17   p.m., it just took me time to get up.  I got my

18   equipment from the car, my uniform; I got

19   dressed; straight into the car, and then straight

20   down to the command post in Santa Ana.

21           SPECIAL AGENT ESTRADA:  Okay.  What

22   kind of training have you had as far as being a

23   SWAT operator?

24           OFFICER KENNETH WEBER:  So, as far as

25   being a SWAT operator, I went to basic SWAT

Page 9

1    school back in 2002, I think.  Beginning of 2002.

2    I've been to team leader school.  That was just

3    recent, within the last couple years.  I went to

4    team leader school.  I'm one of our assistant

5    team leaders on the team.  I've been to handgun

6    instructor school, rifle instructor school.  I've

7    been to numerous high-risk search-warrant

8    classes, hostage rescue classes, and then

9    hundreds and hundreds of hours of actual SWAT

10   training with the team.

11            SPECIAL AGENT ESTRADA:  Okay.  Had you

12   had any training in defensive tactics, or hand-

13   to-hand tactics or combat?

14            OFFICER KENNETH WEBER:  Yes.  I am one

15   of our department arrest-and-control technique

16   trainers.  So, I've been to a 80-hour school for

17   arrest and control techniques, and I currently

18   teach that at our department now.

19            SPECIAL AGENT ESTRADA:  Okay.  Do you

20   have any prior military experience?

21            OFFICER KENNETH WEBER:  I do.  I spent

22   four years in the United States Marine Corps.

23            SPECIAL AGENT ESTRADA:  Okay.  Have you

24   been trained in de-escalation techniques?

25            OFFICER KENNETH WEBER:  Yes, I have.

                                          Page 10

```
 1              SPECIAL AGENT ESTRADA:  Okay.  Can you
 2    explain that?
 3              OFFICER KENNETH WEBER:  So, I've been
 4    to department training for de-escalation, and
 5    I've also been to a de-escalation instructor
 6    school, and that was probably four years ago,
 7    approximately.
 8              SPECIAL AGENT ESTRADA:  Okay.  Anything
 9    else in relation to de-escalation training that
10    you've taken?  Other than what you just
11    mentioned?
12              OFFICER KENNETH WEBER:  No, just the
13    instructor school, and then what we did here at
14    the department.
15              SPECIAL AGENT ESTRADA:  Okay, got it.
16    Other than SWAT, is it a full-time -- is it a
17    full-time position, or is it part-time?
18              OFFICER KENNETH WEBER:  SWAT is an
19    ancillary assignment, so it's part-time, and my
20    current assignment now, my full-time assignment,
21    is our training unit.
22              SPECIAL AGENT ESTRADA:  Got it, okay.
23    Any other collateral duties in addition to that?
24              OFFICER KENNETH WEBER:  No, no other
25    collateral duties.
```

                                            Page 11

1    right or left-handed?

2              OFFICER KENNETH WEBER:  I'm right-

3    handed.

4              SPECIAL AGENT ESTRADA:  Okay.  Was this

5    the same weapon that was fired during the

6    incident?

7              OFFICER KENNETH WEBER:  The handgun,

8    yes, it was.

9              SPECIAL AGENT ESTRADA:  Okay.  Was that

10   the one that was processed by CSI and given to

11   CSI for processing?

12             OFFICER KENNETH WEBER:  Yes.

13             SPECIAL AGENT ESTRADA:  Okay.  You said

14   you carried some -- like medical pouch and other

15   items on your vest and your duty belt.  Did you

16   have any other items on you, like a knife, taser,

17   anything like that?

18             OFFICER KENNETH WEBER:  No.  No knife,

19   no taser.  The only other item that was in there

20   was I have a -- in one of my magazine pouches I

21   have a flashlight, hand-held flashlight.  That

22   was it.

23             SPECIAL AGENT ESTRADA:  Prior to the

24   incident, and arriving on scene, what information

25   did you have?

                                        Page 17

1          OFFICER KENNETH WEBER:   So, prior to

2    arriving on scene, the information I had was that

3    our crime taskforce investigators had been

4    pursuit of a stolen vehicle.   Inside the stolen

5    vehicle was a subject who was wanted for armed

6    robbery, was barricaded in Santa Ana, inside the

7    vehicle, and refusing to come out.

8          SPECIAL AGENT ESTRADA:  Okay.  Had you

9    heard the name or the identification of the

10   subject --

11         OFFICER KENNETH WEBER:  No.

12         SPECIAL AGENT ESTRADA:  -- prior to

13   going on scene?

14         OFFICER KENNETH WEBER:  Prior to going

15   on scene at the incident, or at the command post?

16         SPECIAL AGENT ESTRADA:  At the command

17   post.

18         OFFICER KENNETH WEBER:  No, not prior

19   to the command post.

20         SPECIAL AGENT ESTRADA:   Okay.  Did you

21   get any type of update or briefing after arriving

22   at the command post?

23         OFFICER KENNETH WEBER:   So, once I

24   arrived at the command post, I put my gear on,

25   and I met up with another assistant team leader,

Page 18

1    Officer Eric Song.   Once I met up with him, he

2    had reiterated -- we just had a quick briefing;

3    it was just the two of us.   He had just come from

4    other staff, at the command post.

5           He walked over, says "Hey, we're taking

6    over for Santa Ana, for a barricaded suspect

7    that's in a car.   CTF, he led CTF on a high-speed

8    pursuit through the city; they had him

9    barricaded; he's got a firearm inside the car;

10   said firearm was seen in his right hand, inside

11   the car; he's wanted for armed robbery and in a

12   stolen vehicle, and we're going to head out to

13   the scene. We're going to kind of get the lay of

14   the land, so we can start taking over, and figure

15   out how we're going to set up our vehicles to go

16   on scene."

17          We also received a picture at that

18   time, of the suspect.

19          SPECIAL AGENT ESTRADA:   Okay.   Was that

20   same subject Brandon Lopez?

21          OFFICER KENNETH WEBER:   Yes.

22          SPECIAL AGENT ESTRADA:   Okay.   What was

23   your rank at the time?   You said he you've been a

24   team leader.   Was that your role in this

25   situation as well?

```
 1    Prior to Anaheim actually taking over?
 2            OFFICER KENNETH WEBER:  Thirty minutes,
 3    maybe; 20 to 30 minutes, approximately, before we
 4    actually took over the scene.
 5            SPECIAL AGENT ESTRADA:  Can you recall
 6    any type of communication that was attempted to
 7    be done with Mr. Lopez?
 8            OFFICER KENNETH WEBER:  Yes.  The
 9    entire time the Santa Ana Police Department --
10    when we were out there, was attempting to
11    negotiate, giving commands over the PA system for
12    Mr. Lopez to exit the vehicle with his hands up,
13    come out peacefully.  Those commands continued
14    until later on.  I'm kind of jumping forward, but
15    later on, we told them to stop negotiations as we
16    did a complete takeover.  That way, we were ready
17    to accept him if he decided to come outright, and
18    give up, that we were actually ready and in the
19    proper positions to do so.
20            SPECIAL AGENT ESTRADA:  Tell me about
21    your position.  Where were you at?
22            OFFICER KENNETH WEBER:  So, my
23    position, initially, I was towards the back of
24    Santa Ana Police Department ARV, their Terradyne.
25    I was looking down.  So, down would be the north
```

Page 25

1  of the vehicle.  And ultimately, we staged right

2  here, off the front corner.  So, on the north

3  side of the Bear, at the front corner, facing

4  back at a pie-shape here, so, kind of at a 45-

5  degree angle here, leaving the Bear to provide

6  cover from Mr. Lopez's vehicle.

7            SPECIAL AGENT ESTRADA:  Okay.  You said

8  you were on the arrest team, right?

9            OFFICER KENNETH WEBER:  I was on the

10  arrest team, yes sir.

11            SPECIAL AGENT ESTRADA:  Who else was on

12  the arrest team with you?

13            OFFICER KENNETH WEBER:  The arrest team

14  was myself, officer Bret Heitman, Officer Paul

15  Delgado, Officer Caitlin Panov, Officer Ricky Ray

16  Nelso, and then our canine handler, Officer

17  Mullins.

18            SPECIAL AGENT ESTRADA:  Okay.  And as

19  the arrest team, was there any type of

20  contingency plan for when he comes out, if for

21  whatever reason he doesn't comply?  What was your

22  --

23            OFFICER KENNETH WEBER:  So, there were

24  many contingency plans, and we continued to

25  discuss contingency plans the entire time we were

Page 31

1  out there.   So, our initial plan, like I said, we
2  ultimately came up, and we staged up here at the
3  front of the Bear -- we ended up putting a shield
4  down here at the bottom of the Bear, to block the
5  feet of Officer Heitman who was standing here at
6  the corner of the Bear.
7          So, Officer Heitman had what we call
8  lethal coverage on the car right here, and the
9  rest of us, we were backed up here, kind of at a
10 45-degree angle, where we could see over the hood
11 of the Bear, and so, we could see the vehicle.
12 However, we were out of the line of fire per se,
13 from the vehicle, to where we were at.   So, our
14 contingency plan's over here.   We let Officer
15 Heitman and Officer Delgado, they remained at the
16 front, with lethal coverage down on the car.
17 Officer Panov and myself, we were designated to
18 be the hands-on team.
19          So, our plan was for -- him and I were
20 the ones who would actually take Mr. Lopez into
21 custody, if he came out, decided to give up, or
22 come out and run.   We had multiple contingencies.
23 I'll go over those.   And then, we had Officer
24 Ricky Ray Nelso back here.   He had a less lethal,
25 40-millimeter multi-launcher.   (indiscernible)

1   less lethal projectiles.  And then, we had

2   Officer Brandon Mullins with his canine partner

3   to the back, as well.  So, our contingency plans

4   at this particular time were -- we discussed

5   several different plans.  We had discussed if Mr.

6   Lopez were to come out of the vehicle here.  You

7   can see the rebar in the streets.

8            So, there's several pieces of rebar as

9   a barrier, to kind of slow him down if he decided

10  to come out and run.  So, our plan was, if he

11  decided to come out and run, we were going to let

12  him get out past the rebar, reason being we

13  didn't want him to get tripped up on the rebar,

14  and we didn't want our canine to get stuck in the

15  rebar as well.  So, our plan was we'll let him

16  get out past the rebar if -- and this is if he's

17  noncompliant, right -- he gets out, he's

18  noncompliant, he starts to run; we would actually

19  have Ricky Ray Nelso with the 40-millimeter

20  launcher, distract him with a couple 40-

21  millimeter rounds, and Officer Brandon Mullins

22  would deploy his canine partner, and attempt to

23  apprehend Mr. Lopez.

24            If he got out and was compliant, our

25  plan was to actually have him step over the

Page 33

1   contingency was that if Mr. Lopez got out and

2   presented a threat, everybody knows that they

3   would have to do what they needed to do,

4   individually, to suppress that.

5           SPECIAL AGENT ESTRADA:   As you guys are

6   all stacked up here on the front, approximately

7   how far away was Mr. Lopez in the vehicle?

8           OFFICER KENNETH WEBER:   Approximately –

9   - in a direct line, 40 feet, maybe.   I'm just

10  guessing at that, approximately.

11          SPECIAL AGENT ESTRADA:   Right.   Had you

12  had any personal or prior knowledge of Mr. Lopez

13  before this incident?

14          OFFICER KENNETH WEBER:   No, me

15  personally, no.

16          SPECIAL AGENT ESTRADA:   Okay, you never

17  dealt with him prior to this incident?

18          OFFICER KENNETH WEBER:   No.

19          SPECIAL AGENT ESTRADA:   Okay.   Was

20  there any communication being attempted with Mr.

21  Lopez during the time that you guys were set up

22  here in the front?

23          OFFICER KENNETH WEBER:   There was.   So,

24  like I said, we had stopped communication while

25  we did the complete takeover.   So, as soon as

```
 1    Anaheim PD did the complete takeover, Santa Ana
 2    Police Department was still out there.  Once we
 3    did the complete takeover, they attempted to
 4    reestablish communication, negotiations, telling
 5    Mr. Lopez to give up.  At one point, I heard him
 6    -- they were talking about his daughter and son,
 7    and "They want to see you"; so, there was some
 8    negotiation going on; "Step out of the vehicle,
 9    and give yourself up so nobody gets injured."
10           Once our TNU, our tactical negotiating
11    unit arrived on scene, they actually took over
12    for Santa Ana Police Department negotiators, and
13    began giving announcements, letting him know,
14    "Hey, come out and surrender.  Nobody will get
15    injured."  They gave a canine announcement as
16    well, that the canine would be used if he doesn't
17    surrender.  So, these negotiations went on for a
18    while.
19           One of our contingency plans up to the
20    front was if Mr. Lopez stepped out of the
21    vehicle, we would let our T&E people to know that
22    once he steps out of the vehicle, to stop
23    negotiations, and that we would resume
24    negotiations in person from the front of the
25    Bear.  Officer Delgado was assigned to go what we
```

Page 36

1   call verbal, so, he would begin attempting to

2   negotiate with Mr. Lopez at that particular time.

3            SPECIAL AGENT ESTRADA:   Could you see

4   Mr. Lopez doing anything inside the vehicle at

5   the time that you took over?

6            OFFICER KENNETH WEBER:   At the time

7   that we took over, so --

8            SPECIAL AGENT ESTRADA:   What did you

9   see him --

10           OFFICER KENNETH WEBER:   I'm going to

11   back up.   Prior to us taking over, Officer

12   Nguyen, who was in the turret of the Terradyne,

13   Santa Ana Police Department Terradyne, said that

14   he had put floor mats up in the windshield.   So,

15   he was unable to see inside the vehicle after

16   that point.

17           When we took over, I could see him

18   going around inside the vehicle.   He was going

19   from the front seat to the back seat.   Windows

20   were fogged, so at that particular time, it was

21   kind of hard to see exactly his positioning in

22   there.   I could see him moving around in the back

23   seat of the vehicle.   A couple times, during the

24   incident, he ended up coming over to the corner

25   of the driver's side window, and he'd wipe the

Veritext Legal Solutions
866 299-5127

1    fog off the window and was looking directly at

2    our position.   He would look around a little bit,

3    and then back to our position again.

4              SPECIAL AGENT ESTRADA:   Okay.   Did it

5    appear that he was understanding what you guys

6    were trying to communicate to him at all?   Like

7    in any way, shape, or form, did you see him have

8    any type of response when you guys were trying to

9    talk to him?

10             OFFICER KENNETH WEBER:   I couldn't see

11   him respond to anything that they were trying to

12   tell him from the PA system, no.

13             SPECIAL AGENT ESTRADA:   Okay.   Tell me

14   about the moments leading up to right before Mr.

15   Lopez came out of the vehicle.

16             OFFICER KENNETH WEBER:   How far back do

17   you want me to go?

18             SPECIAL AGENT ESTRADA:   Who made the

19   decision to try and see if there was any type of

20   ways that you could try to get him to surrender?

21             OFFICER KENNETH WEBER:   So, the ways

22   that you try to get him to surrender was to get

23   him to come out, was verbal, over the PA system.

24   They made several announcements over the PA

25   system for him to come out, and it was

Page 38

1   communicated to us earlier on that he had refused

2   to talk to them at all.  So, there was no

3   negotiations at all going back and forth between

4   Mr. Lopez and our tactical negotiators, or Santa

5   Ana PD tactical negotiators.

6            SPECIAL AGENT ESTRADA:  You said there

7   was a few people that are able to see inside of

8   the vehicle.  Can you tell me if you heard of any

9   of the observations that anybody else is seeing

10  from inside the vehicle about Mr. Lopez, or

11  anything that may have been inside the vehicle?

12           OFFICER KENNETH WEBER:  So, prior to us

13  taking a position over here at this corner, the

14  main observation they saw was somebody from Santa

15  Ana PD had communicated -- and this got

16  communicated to me; I wasn't on the radio at this

17  particular time -- that Mr. Lopez had a gun in

18  his right hand, that he had a handgun in his

19  right hand.  That was communicated over the

20  radio, and then relayed to me.  Like I said, I

21  didn't hear that on the radio.  That was relayed

22  to me when I first went on scene prior to us

23  going out to the incident.

24           Observations that also came over the

25  radio was that Mr. Lopez had been smoking

Page 39

Veritext Legal Solutions
866 299-5127

```
 1    narcotics inside the car; on numerous occasions
 2    had been smoking cigarettes as well; smoking
 3    narcotics.   He had also been writing something
 4    down on a piece of paper, like writing a note or
 5    something.   At one point, they thought he was
 6    doing it to communicate with them.   They realized
 7    that that wasn't the case.
 8              SPECIAL AGENT ESTRADA:   And you're
 9    getting this information how?
10              OFFICER KENNETH WEBER:   This is coming
11    out over the radio.
12              SPECIAL AGENT ESTRADA:  Okay.  Okay.
13              OFFICER KENNETH WEBER:   Something else
14    that came out over the radio, prior to us -- we
15    were already stacked up over here on this side.
16    Our dispatch had put out over the radio that Mr.
17    Lopez had relayed to a family member early on --
18    that their family member had arrived at the
19    command post and told them that Mr. Lopez told
20    them that he's going to die suicide by cop.
21              SPECIAL AGENT ESTRADA:   And you had
22    heard that also --
23              OFFICER KENNETH WEBER:   Yes, that came
24    out over the radio.
25              SPECIAL AGENT ESTRADA:  Over the radio,
```

Page 40

1    a battery pack.  We actually brought that out
2    here to the front, just off to the right side.
3              So, I guess it would be the east side
4    of where Officer Heitman was sitting, and we
5    shined that light down onto the driver's side
6    window of the car.  We actually readjusted that a
7    couple of times, with a couple base plates from
8    these cones that you see out here.  We actually
9    put those underneath, so we could raise up the
10   light a little bit, to kind of get it to shine
11   down on the driver's side of the vehicle.
12             SPECIAL AGENT ESTRADA:  Okay.  Did you
13   feel that all that lighting was adequate, or
14   sufficed?
15             OFFICER KENNETH WEBER:  I did.  It was
16   sufficient, sure.
17             SPECIAL AGENT ESTRADA:  Okay.  When did
18   you deploy your firearm?
19             OFFICER KENNETH WEBER:  Would you like
20   me to lead you up to it, coming from there?
21   Because there was a lot between that whole --
22             SPECIAL AGENT ESTRADA:  Yeah, okay,
23   let's take it from the deployment of the gas in
24   the rear of the vehicle.
25             OFFICER KENNETH WEBER:  Okay.  So,

                                          Page 44

1    prior to them deploying gas, we switched out to

2    put our gas mask on.  So, we have the front two,

3    which was Officer Heitman and Officer Delgado.

4    They actually stepped back.  Officer Panov and I

5    stepped up to the front of the Bear, to take

6    cover on the vehicle while they put their gas

7    masks on.  So, once they put their gas masks on,

8    they came back up, relieved us.  Officer Panov

9    and I stepped back.  With the rest of the arrest

10   team, we all put our gas masks on, made sure our

11   gas masks were seated correctly, put our helmets

12   back on, and we got onto position here.

13           Once everybody, all the surrounding

14   teams, had put their gas masks on, the initial

15   call came out to initiate.  And the initiation

16   was they were going to put a diversionary device

17   onto the hood of the car, and the other team

18   would be over here to the front of our ARV and

19   deploy the gas inside the back window.  That plan

20   got halted, just for a brief minute.  Everybody

21   wasn't ready.

22           So, a couple minutes later, they

23   reinitiated the plan, made sure everybody was

24   ready to go, everybody was in position.  Because

25   what we wanted to do was, when we introduce, we

Page 45

1    want to introduce gas into here.    That's to drive

2    Mr. Lopez out of the vehicle, and we want to be

3    ready to accept him when he comes out, to give up

4    there, for sure.

5              So, everybody's ready.    We're stacked

6    up here, like I said.    We're back here at an

7    angle, kind of at a 45-degree angle, so I can see

8    over the hood of the car, but our goal here is to

9    be out of the line of fire and be back behind

10   cover, which we were.    They said, "Initiate,

11   initiate."    The call comes out.    The flash bang

12   comes up here, lands somewhere on the hood of the

13   car.    The window break team comes up over here.

14   They hit the back window with the bang pole.    The

15   window goes off.

16              At that time, I didn't know if they had

17   deployed gas or not, because immediately, as they

18   smashed the window, a split second later I can

19   see over the top:    The rear driver's side door

20   pops open.    I can see Mr. Lopez.    He exits the

21   vehicle.    He's got both arms out.    He jumps over

22   the rebar.    So, he hops both pieces of rebar

23   extremely fast.    He turns, and his body is now

24   leaning forward, and he's running directly in our

25   direction here.

Page 46

1    So, as he starts to run, his right hand
2  goes down into his waistband.  His left hand
3  comes down into his waistband here.  And like I
4  said, he makes a direct line, coming out, and
5  then turns, and runs directly towards us, as the
6  arrest team over here.
7    So, in my mind, he's mounting an attack
8  on us.  He easily could have stepped out, could
9  have gone any other direction.  He could have
10  gone east.  He could have gone south.  He could
11  have looped back around and went north, in an
12  attempt to get away.  So, he comes out here, and
13  immediately, like I said, he begins to charge
14  directly at us.  As his hands go down to his
15  waistband, I know from my training and
16  experience, right -- I've been doing this a long
17  time -- that suspects obviously keep weapons in
18  their waistband.  A couple different reasons:
19  1), they're easy to deploy from there; and 2),
20  they're easily concealable.  Concealable, right?
21    I also know that from my training and
22  experience, and from teaching our force
23  simulator, that people can draw and fire a
24  firearm from anywhere on their body -- an
25  untrained person, anywhere on their body -- a lot

1    quicker than a trained officer at a high-ready

2    can actually perceive the threat and fire to

3    suppress that threat, right.

4            So, as his hand goes down, in my mind,

5    based on my training and experience, and the

6    information here -- the totality of the

7    circumstances -- that Mr. Lopez was in stolen

8    vehicle; he had -- wanted for armed robbery,

9    propensity for violence already; he had led RCTF

10   investigators on a high-speed pursuit, no regard

11   for citizens and officers in that pursuit; a gun

12   was seen inside that car in his right hand,

13   during this standoff here; refused negotiations;

14   had called his family, said he's going to die

15   tonight, suicide by cop.

16           So, the totality of these

17   circumstances, as he comes out -- and prior to

18   him coming out, wiping the window -- in my mind,

19   he's looking for our position.  And as I see him

20   get out of the vehicle and begin to run, I

21   immediately in my mind know he's made the

22   determination to mount an attack on us, being us

23   officers that are over here in the front.  So,

24   like I said, as he steps out from the vehicle,

25   his right hand goes down into his waistband

Page  48

1    first, and then his left hand comes down.

2            As he starts to come over in this

3    direction here, I see his right hand start to

4    move out.  I immediately believe he definitely

5    mounting an attack on us.  I'm afraid for my

6    safety; I feel that one of our officers over

7    here, myself or officers, are about to get shot

8    or even killed; and I started firing my firearm

9    at that time, center mass, in order to suppress

10   the threat.

11           SPECIAL AGENT ESTRADA:  Approximately

12   how many shots did you fire?

13           OFFICER KENNETH WEBER:  At this

14   particular time, I believed I fired four to five

15   shots.  I know when they did the round count

16   later on, it ended up being five.

17           SPECIAL AGENT ESTRADA:  Okay, out of --

18   which weapon did you use?

19           OFFICER KENNETH WEBER:  My rifle was

20   inside the Bear at the time.  I only had my

21   handgun, so, it was my Glock 17, 9-millimeter

22   handgun.

23           SPECIAL AGENT ESTRADA:  Okay.  Did you

24   have a one-handed grip, two-handed grip?

25           OFFICER KENNETH WEBER:  Two-handed

Page 49

```
 1    grip.
 2                SPECIAL AGENT ESTRADA:   Okay.   Did you
 3    deem it necessary that you need to use anything
 4    for support, for stabilization, as you shot?   Or
 5    were you just standing up, or?
 6                OFFICER KENNETH WEBER:   No, I didn't
 7    need anything for support.   However, there was no
 8    support around here.   Like I said, we were
 9    stacked up here at an angle to avoid any type of
10    confrontation coming from the vehicle.   But due
11    to the speed of Mr. Lopez and the attack that he
12    mounted, he came out, hopped the rebar,
13    immediately turned and sprinted straight at all
14    the officers that were stacked up over here.
15                Had he stayed by the vehicle or ran
16    another direction, we would have never even been
17    close to the line of fire.   We were actually
18    standing out in this direction, with cover from
19    the Bear, until he decided to come out, mount the
20    attack, and sprint straight at us.
21                SPECIAL AGENT ESTRADA:   When he came
22    out this way and sprinted straight at you, what
23    kind of cover did you have?
24                OFFICER KENNETH WEBER:   At that time, I
25    had no cover.   Once he made it over to a certain
```

Page 50

1        OFFICER KENNETH WEBER:  Not talking
2   about the sign, we're talking about actual cover?
3   As soon as he cleared this rebar right here,
4   which was probably a second and a half, maybe;
5   two seconds at the most; once he made it past
6   that rebar, he's already in a clear line of sight
7   with us.
8        SPECIAL AGENT ESTRADA:  Could you
9   describe the difference between cover and
10  concealment?
11       OFFICER KENNETH WEBER:  Yes.  So, cover
12  is something that we would use that's like the
13  Bear, something that would reduce rounds or stop
14  rounds from getting through.  Concealment is
15  something like a wood sign or bush, something
16  that you can use to hide behind, but nothing
17  that's going to stop bullets.
18       SPECIAL AGENT ESTRADA:  Do you know if
19  anybody else fired their weapon?
20       OFFICER KENNETH WEBER:  I do.
21       SPECIAL AGENT ESTRADA:  Okay, do you
22  who else?
23       OFFICER KENNETH WEBER:  I know now.
24  Officer Panov, Officer Heitman, and Officer
25  Delgado.  At the time, I could Officer Panov -- I

                                        Page 52

1    could see his gun moving in my peripheral vision
2    at the time.  So, I knew he had fired as well.  I
3    didn't know about the other two until later on.
4              SPECIAL AGENT ESTRADA:  Where were you
5    -- were you guys all located in the same area?
6              OFFICER KENNETH WEBER:  Yes, we were
7    all stacked up right here, starting from the
8    front of the Bear, at an angle here.  I won't say
9    45, because it wasn't exactly that, but at an
10   angle, kind of coming back here.
11             SPECIAL AGENT ESTRADA:  But you guys
12   weren't shoulder-to-shoulder, anything like that,
13   right?
14             OFFICER KENNETH WEBER:  We were
15   shoulder-to-shoulder.
16             SPECIAL AGENT ESTRADA:  Shoulder-to-
17   shoulder, okay.
18             OFFICER KENNETH WEBER:  As Mr. Lopez
19   came out and began running this way, our focus --
20   we were lined up here.  Our focus was this way,
21   and I ended up turning my body, just blading it,
22   just a little bit, to track where he was coming.
23   So, now, as he made it out to here, it puts us
24   all basically shoulder-to-shoulder, right there
25   along the front of the Bear.

Veritext Legal Solutions
866 299-5127

1        SPECIAL AGENT ESTRADA:   After your

2    shots were fired, then what happened?

3        OFFICER KENNETH WEBER:   Okay.   So,

4    after shots were fired, Mr. Lopez goes down.   I

5    immediately stop firing.   I stayed with my gun

6    trained on Mr. Lopez at that particular time.   He

7    had fallen.   Both hands were underneath him.   I

8    put out to our team in there, "Hey, he's got the

9    gun still underneath him, with both hands

10   underneath him."   Sergeant McGlade, I believe,

11   came up, told us all to come back behind cover,

12   so we did.

13        We stepped back behind the Bear, but

14   now we used the other front side of the Bear

15   here, we used this for cover.   Maintained lethal

16   coverage on Mr. Lopez as he's still -- I believe

17   he still had a gun underneath him, and both hands

18   were underneath him.   At that (indiscernible)

19   time, we came up with a game plan.

20        At first, it was to utilize the canine,

21   to have the canine go up and do a bite, to check

22   to make sure that Mr. Lopez wasn't waiting to

23   mount another attack on us as we approached.   The

24   plan was changed from the canine usage to a 40-

25   millimeter less-lethal projectile, which is what

                                        Page 54

1    we did.   Officer Ricky Ray Nelso came up, fired

2    one round with a 40-millimeter less-lethal.

3    There was no movement from Mr. Lopez.   So, then

4    we formulated our plan to come up and take him

5    into custody.

6              So, our plan was to have a shield

7    officer come up in the front, which is what we

8    did.   Shield officer came up to the front.   I

9    communicated with Officer Panov.   I said I will

10   get the left arm, you get the right arm.   This is

11   what we did, is we came up with a shield in the

12   front.   Shield came over the top of Mr. Lopez.   I

13   pressed down on Mr. Lopez's left shoulder, to pin

14   it to the ground.   And then, we both coordinated,

15   pulling his hands out from underneath him.

16             At one time during that incident,

17   Officer Panov relayed to me, he says, "Hey, just

18   be aware that the guns still underneath him.   As

19   we pull his hands out, be aware if it goes off."

20   That's what it is.   So, we communicated that.   We

21   both slowly pulled his hands out, placed them

22   behind his back, and then placed him in

23   handcuffs.   We ended up using two sets of

24   handcuffs from other officers.   I did not put the

25   handcuffs on him.   I can't remember exactly who

Veritext Legal Solutions
866 299-5127

1    did.   Officer Panov -- somebody else had actually

2    come up with a set of handcuffs to assist in the

3    handcuffing, while I held the left arm.

4              SPECIAL AGENT ESTRADA:   At the time the

5    shots were fired, or just the moment before, had

6    anybody verbalized anything when Mr. Lopez came

7    out of the vehicle?

8              OFFICER KENNETH WEBER:   So, when Mr.

9    Lopez came out of the vehicle, two things got

10   verbalized.   I believe I said, "He's coming out."

11   I remember saying he's coming out of the vehicle.

12   And so, to let everybody know he's coming out,

13   and then -- I don't know who said it, and it

14   could have been me, because I was thinking in my

15   head, and I don't remember saying it out loud,

16   and I couldn't tell -- "Gun, gun, gun."

17             So, I remember saying, "He's coming

18   out."   So, I definitely said that, and then I'm

19   thinking, "Gun, gun," because I could see it in

20   his waistband, but I couldn't tell if it was me

21   who said it, or if somebody else.   So, somebody -

22   - it definitely came out, "Gun, gun, gun."

23             SPECIAL AGENT ESTRADA:   Okay.   And what

24   did that lead you to believe?

25             OFFICER KENNETH WEBER:   Well, based on

Page  56

1    the totality of the circumstances that I've
2    already described, as far as everything leading
3    up to this incident:   The way he came out, the
4    way his hands came into his waistband, and he
5    began to pull up with his right arm:   It led me
6    to believe that he definitely had a gun in his
7    waistband, was mounting an attack, and attempting
8    to kill me and my partners.
9            SPECIAL AGENT ESTRADA:   Were you or
10   anybody else, any other officers, injured?
11           OFFICER KENNETH WEBER:   No, sir.  I was
12   not.
13           SPECIAL AGENT ESTRADA:   Okay.  Tell me
14   about the canine, or the reason that you guys
15   chose not to send the canine in, or that you know
16   of.
17           OFFICER KENNETH WEBER:   There was no
18   time to send the canine.  It happened extremely
19   fast, from the time that rear door popped and Mr.
20   Lopez jumped and began running straight at us.
21   For one, there was absolutely no time to deploy
22   the canine at that particular time.  The canine,
23   he's set up behind us.  He would have had to come
24   around to deploy the dog.  Absolutely no time to
25   do so.  And at that particular time, for me, I

Page 57

1    described.  He could have went in three other
2    directions, multiple directions.  Actually, this
3    whole area here, there was no officers back over
4    here.
5              They were for containment, but there
6    was many avenues of escape, and Mr. Lopez could
7    have run to get away at that particular time, and
8    then we would have had multiple options as far as
9    canine, less-lethal, verbal.  There was no time
10   for any verbal, any 40-millimeter, or any dog,
11   from the amount of time he opened that back door
12   and sprinted straight at us.
13             SPECIAL AGENT ESTRADA:  Okay.  Do you
14   have any questions?
15             SPECIAL AGENT CARLOS:  I have a couple
16   clarifying questions.  You may have answered it,
17   but I took a note, and I was trying to check off
18   stuff.  Since your training was sworn, have you
19   had any updates recently, regarding
20   (indiscernible), anything like that?
21             OFFICER KENNETH WEBER:  I've had
22   numerous updates.  I've just got done with a
23   winter team leader school.  I just got done with
24   a week hostage rescue course.  I'm trying to go
25   back in my memory.

                                        Page 59

1              SPECIAL AGENT CARLOS:   I'm sorry, just

2     recent.   Maybe a month or two prior to the

3     incident.

4              OFFICER KENNETH WEBER:   I just had one

5     a week prior to the incident, yes.

6              SPECIAL AGENT CARLOS:   Okay, and then -

7     - okay, you've answered that.   And then, on your

8     uniform, it has your name.   Does it have any

9     other words anywhere on your uniform?

10              OFFICER KENNETH WEBER:   We have Anaheim

11     police patches on the side, and then Anaheim

12     police officer badge and my name.   And then

13     name's K and then Weber on there.

14              SPECIAL AGENT CARLOS:   Okay.   And

15     approximately, in your 13 years of SWAT

16     experience, how many barricaded subject calls

17     have you had, if you remember?

18              OFFICER KENNETH WEBER:   I don't

19     remember exactly, but dozens throughout that

20     time.

21              SPECIAL AGENT CARLOS:   And in those

22     calls, have canine or deployment of gas, or any

23     amount of lethal uses of force been successful?

24              OFFICER KENNETH WEBER:   Yes.

25              SPECIAL AGENT CARLOS:   Okay.   That's

Page 60

1     were carrying any other less-lethal options.  A

2     taser, were you carrying a taser?

3                OFFICER KENNETH WEBER:  I was not, no.

4                CHRISTOPHER KOHARSKI:  Okay, and why

5     were you not carrying a taser?

6                OFFICER KENNETH WEBER:  So, the reason

7     I'm not carrying a taser is I don't have a holder

8     for it.  We actually just issued tasers,

9     additional tasers, to certain team members, and

10    we were short on holsters for those tasers.

11    Green holsters would actually go on our rig, so,

12    in the near future, 18 members will have -- I'm

13    sorry, 12 team members will actually have tasers

14    assigned and on their person.  I'm the one who

15    actually issued the tasers, and we were short

16    holsters.  So, I gave those out to everybody

17    else, so that's why I didn't have my taser on me

18    at that particular time.

19                CHRISTOPHER KOHARSKI:  Okay.  As far as

20    the body armor, and I think you described what

21    you were wearing already:  When you talked about

22    the time where he exited the car, I think you --

23    I mean, he was mounting an attack on you.  Would

24    you describe it as walking, running, sprinting

25    towards you guys?

Page 65

1              OFFICER KENNETH WEBER:   Yeah, and I

2    described that earlier.   He was sprinting, for

3    sure.   Like I said, he comes out at a sprinter's

4    run, initially; both hands to his waistband; and

5    he's actually leaned forward in a forward running

6    position, in like a dead-sprint position.

7              CHRISTOPHER KOHARSKI:   Okay.   And I

8    know you mentioned one time, you said something

9    about seeing something in his waistband.   Did you

10   physically see anything in his waistband that was

11   different than the clothing, or -- did you see

12   any objects in his waistband?   Could you tell?

13             OFFICER KENNETH WEBER:   No, I couldn't

14   tell the object.   I could just see his hands in

15   his waistband, and began to move an object.   I

16   later on saw an object that was underneath him,

17   as we rolled him over.

18             CHRISTOPHER KOHARSKI:   And as you're

19   telling me that, you're sort of making like a

20   grabbing motion, is that correct?   With your

21   hand?

22             OFFICER KENNETH WEBER:   Yes.

23             CHRISTOPHER KOHARSKI:   Okay.   So, you

24   could see that --

25             OFFICER KENNETH WEBER:   Yes.

Page 66

1           CHRISTOPHER KOHARSKI:   -- when he

2   exited the car?

3           OFFICER KENNETH WEBER:   Exited, hand

4   down here, like so, like grabbing him a firearm.

5           CHRISTOPHER KOHARSKI:   Okay.  So,

6   you're making a fist as if you saw him attempting

7   to grab something from his waistband, correct?

8           OFFICER KENNETH WEBER:   Yes.

9           CHRISTOPHER KOHARSKI:   Okay.  And so,

10  then, you described the body armor that you were

11  wearing, and you said that you had to leave cover

12  here, of the Bear that you had, because you were

13  forced to, with the way he was sprinting towards

14  you.  Is that body armor -- does that protect you

15  from if he was to have pulled a gun and fired

16  rounds at you?

17          OFFICER KENNETH WEBER:   Protection, no.

18  And just to clarify, we didn't leave cover.

19  Cover kind of left us, just by the way he

20  sprinted at us and around.  But no, our body

21  armor – it's there as a barrier, just for the

22  vital organs right here, but as far as

23  protection, definitely not protecting.

24          CHRISTOPHER KOHARSKI:   Okay.  I'm

25  sorry, my question could probably be better.  Is

                                        Page 67

```
 1    there a way that he's able to shoot you with the
 2    body armor that you're wearing, or one of your
 3    partners?
 4              OFFICER KENNETH WEBER:  Absolutely.
 5              CHRISTOPHER KOHARSKI:  Okay.  And I
 6    think you pretty much already answered this, but
 7    what did you think would happen if you didn't use
 8    the force that you used this day?
 9              OFFICER KENNETH WEBER:  If I didn't
10    fire to suppress the threat, I thought for sure
11    that myself and my partner was -- either one of
12    my partners out there would be shot and killed.
13              CHRISTOPHER KOHARSKI:  Okay.  I do have
14    just a couple more here on this page.  Okay, do
15    you remember hearing at some point, in the time
16    that you're at this portion of the Bear, do you
17    remember hearing the canine handler or anybody
18    talking about "I'd rather not send my dog on a
19    suicide mission," or something similar to that?
20              OFFICER KENNETH WEBER:  Yes.
21              CHRISTOPHER KOHARSKI:  Can you describe
22    what you took that to me?
23              OFFICER KENNETH WEBER:  So, what he was
24    saying is that if Mr. Lopez exited the car with a
25    gun in his hand, he had said he would send his
```

Page 68

1              RUSSELL PERRY:  Nothing for us.

2              SPECIAL AGENT ESTRADA:  Okay.  We will

3   go ahead and conclude at 11:02.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 70

```
1              C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certify that the

4     foregoing transcript is a true and accurate

5     record of the proceedings.

6

7

8

9     <%12151,Signature%>

10

11    Veritext Legal Solutions

12    330 Old Country Road

13    Suite 300

14    Mineola, NY 11501

15

16    Date:  November 30, 2021

17

18

19

20

21

22

23

24

25
```

Page 71

# EXHIBIT 23

1

2

3

4

5

6

7

8

9

10

11

12

13    Case Number: BI-RI2021-00030

14    Interview with: Paul Panov

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 1

1           SPECIAL AGENT SPECIAL AGENT ERIC PRIOR:

2    Good morning, gentlemen.  I'm special agent Eric

3    Prior with the California Department of Justice,

4    here to discuss the officer-involved shooting

5    that occurred on September 28th at approximately

6    22:00, in the location of near the intersection

7    of Santa Ana and Bristol in the City of Santa

8    Ana.  It is 8:18 a.m., and go ahead, introduce

9    yourselves.  We can go around the table.

10           SPECIAL AGENT ESTRADA:  Special agent

11   Patrick Estrada from the California DOJ.

12           DETECTIVE MARK GALE:  Detective Mark

13   Gale, Anaheim Police Department.

14           RUSSELL PERRY:  Russell Perry, attorney

15   rep.

16           OFFICER CATALIN PANOV:  Catalin Panov,

17   Anaheim Police Department.

18           CHRISTOPHER KOHARSKI:  Christopher

19   Koharski, attorney rep.

20           SPECIAL AGENT ERIC PRIOR:  Perfect.

21   Sir, can you spell your last name for me?

22           OFFICER CATALIN PANOV:  Yeah.  It's P

23   like Paul, A-N-O-V like Victor.

24           SPECIAL AGENT ERIC PRIOR:  Okay.

25   What's your date of birth, sir?

                                            Page  2

```
 1              SPECIAL AGENT ERIC PRIOR:  Sergeant

 2    McGlade.  And is he -- how many team leaders does

 3    your SWAT team have?

 4              OFFICER CATALIN PANOV:  Four.

 5              SPECIAL AGENT ERIC PRIOR:  Four, and

 6    how many of those team leaders were there?  Can

 7    you just describe to me how your SWAT team is

 8    structured?

 9              OFFICER CATALIN PANOV:  Yeah.  So, it's

10    comprised of four squads.  Each squad has

11    sergeant, that is the team leader, and then one

12    of the operators on each squad is the assistant

13    (indiscernible).

14              SPECIAL AGENT ERIC PRIOR:  Okay.  And

15    how many of the squads were present at this

16    incident?

17              OFFICER CATALIN PANOV:  I can't tell

18    you.  I believe there was a representative from

19    probably each squad.  Not everybody got there at

20    the same time.  Not everybody got deployed at the

21    same time.

22              SPECIAL AGENT ERIC PRIOR:  Okay.  What

23    was your briefing that you got, prior to you guys

24    deploying actually on scene?

25              OFFICER CATALIN PANOV:  So, prior to
```

Page 19

1    the briefing, or to being called out to be

2    briefed, I listened to the entire pursuit and

3    barricade on our (indiscernible).  Once we

4    arrived, we got briefed by a sergeant, Brian

5    Leest, regarding Mr. Lopez being barricaded in

6    the car.  He had been seen on several occasions

7    smoking heroin from foil, verbally and audibly

8    refusing to come out by shaking his head no, and

9    saying no; seen manipulating a handgun by one of

10    the police officers; and he was wanted for auto

11    theft, felony invading, and several armed

12    robberies.

13           In other words, he was a member of a

14    criminal street gang in Santa Ana.  We received a

15    photograph of him with his name, physical height,

16    weight, birthday, address.  At that time, I

17    remembered Mr. Lopez because I was in the crime

18    taskforce at the time, earlier this year, and we

19    had surveilled him for several days because he

20    was doing takeover armed robberies with a handgun

21    at gas stations, and we ultimately arrested him.

22    I spoke to him.  I spoke to his wife about how

23    bad his heroin habit was.  So, I was familiar

24    with him, and also his gang membership.

25           SPECIAL AGENT ERIC PRIOR:  Okay.  After

Page 20

```
 1    tracks.
 2                 SPECIAL AGENT ERIC PRIOR:  Okay.
 3                 OFFICER CATALIN PANOV:  So, him driving
 4    away was not a concern for us, which is a good
 5    thing.  With respect to other contingencies, we
 6    had set up -- the first two individuals at the
 7    front of the Bear, which were Officer Heitman and
 8    Officer Delgado, were assigned for lethal cover,
 9    because Mr. Lopez was -- the information was that
10    he was armed, and later he advised that he was
11    going to commit suicide by cop.  We had the two
12    less lethal individuals in case that was
13    something necessary that had to be done.
14                 After that was Officer Ricky Ray
15    (indiscernible).  He had a 40 millimeter less
16    lethal, which is a less lethal sponge round.
17    After that was Officer Weber and I, and our jobs
18    were -- we had (indiscernible) rifles, because
19    our job was to go hands-on once Mr. Lopez comes
20    out, and hopefully submits.  And behind us was
21    canine officer Mullins, with his canine.  So, we
22    initially had two lethal, two different
23    variations of less lethal, and two individuals
24    assigned to arrest Mr. Lopez.
25                 SPECIAL AGENT ERIC PRIOR:  So, for that
```

Page 26

```
 1    description, there were basically six of you co-
 2    located off of the front of the BearCat, covering
 3    down the driver's side of Mr. Lopez' vehicle?
 4              OFFICER CATALIN PANOV:  Correct.
 5              SPECIAL AGENT ERIC PRIOR:  And I'm sure
 6    that your team leader, or somebody else, popped
 7    in and out to do a task or provide updated
 8    information, but it stayed -- as far as you're
 9    aware -- the six of you who were assigned to that
10    position with those specific roles?
11              OFFICER CATALIN PANOV:  Yes.
12              SPECIAL AGENT ERIC PRIOR:  Okay.  How
13    did the plan evolve?  And I totally understand
14    that you're doing specific tasks, and you're not
15    part of the discussion or development of the
16    plan.  But from your perspective, as you were
17    occupying your position in order to do your
18    assigned task, what were you made aware of in
19    terms of the evolution of the plan and what was
20    going to happen next, to resolve the situation?
21              OFFICER CATALIN PANOV:  So, I knew that
22    we had negotiated with him for over three hours.
23    An additional hour when we got there.  And
24    initially, since we were getting no response from
25    him, it was determined that we would try talking
```

Page 27

1    to him for an additional -- I forgot what it was,

2    15 or 30 minutes.  And after that, it was decided

3    that we would deploy aerosol gas into the car,

4    which would force him to come out, and hopefully

5    submit.

6            SPECIAL AGENT ERIC PRIOR:  Okay.

7    Before we get into that, that's just the updates

8    you were getting over radio communication?

9            OFFICER CATALIN PANOV:  In person.  Not

10   (indiscernible), correct.

11           SPECIAL AGENT ERIC PRIOR:  So, team

12   leader or assistant team leader was coming up and

13   advising your group of six of what the tactical

14   plan is, and how it's going to be implemented.

15           OFFICER CATALIN PANOV:  Correct.

16           SPECIAL AGENT ERIC PRIOR:  I'm not

17   familiar with that specific chemical agent that

18   was used.  Do you know -- are you familiar with

19   it?  I know that you weren't part of the

20   delivery, but are you familiar with the device

21   that was used?

22           OFFICER CATALIN PANOV:  The device, or

23   the actual chemical spray?  So, there's two

24   things --

25           SPECIAL AGENT ERIC PRIOR:  Both.  What

Page 28

1  it looked like to me was the old-school bang

2  stick for a flash bang kind of thing, and it kind

3  of looks like it was an instant delivery of the

4  entire contents of an determined size canister.

5  Do you have any -- can you provide me any

6  information on that?

7           OFFICER CATALIN PANOV:  Yeah.  So, it

8  was deployed using a bang pole, and what that

9  allows us to do is attach a chemical agent to the

10  front of it, telescoping.  Bang pole goes out to

11  20 plus 7 feet, so obviously, we could deploy it

12  from a distance and from behind cover, like it

13  was done that.  The aerosol, it's an OC aerosol,

14  and if you set it correctly, it releases

15  everything at a time.  And the good thing about

16  aerosol is the smoke, it doesn't stick around.

17  It just dissipates, right.  So, our vision is

18  clear, his vision is clear.

19           SPECIAL AGENT ERIC PRIOR:  And did

20  someone from your team or a different part of the

21  element deploy the distraction device at the

22  front of the vehicle, coinciding with the

23  deployment of the gas?

24           OFFICER CATALIN PANOV:  So, nobody on

25  my team, on the front of the Bear, had anything

Page 29

1    to do with deploying anything.  We all had our

2    assigned tasks, so that was all done by other

3    individuals.

4              SPECIAL AGENT ERIC PRIOR:  Okay.  And

5    you were made aware of the deployment of those

6    two apparatuses prior to them actually deploying?

7              OFFICER CATALIN PANOV:  Yes.

8              SPECIAL AGENT ERIC PRIOR:  Okay,

9    perfect.  Was there ongoing communication amongst

10   the six of you who were co-located about what Mr.

11   Lopez' most likely course of action was going to

12   be, and what contingencies you were going to do?

13             OFFICER CATALIN PANOV:  There was

14   nonstop communication and bouncing things off of

15   each other during that whole incident.  Nothing

16   with respect to what he was going to do, because

17   we don't control that, but yeah, with respect to

18   contingencies.

19             SPECIAL AGENT ERIC PRIOR:  I guess I

20   said -- to clarify my question, were there any --

21   for lack of a better term -- what your reaction

22   was going to do to different scenarios he may

23   present?  Does that make sense?

24             OFFICER CATALIN PANOV:  No, I'm sorry.

25             SPECIAL AGENT ERIC PRIOR:  For example,

Page 30

```
 1   irritant.  Just kind of free-flowing it, what
 2   happened?
 3             OFFICER CATALIN PANOV:  Are we talking
 4   from this point, that you want to start all the
 5   way over to the officer-involved shooting?
 6             SPECIAL AGENT ERIC PRIOR:  Yes.
 7             OFFICER CATALIN PANOV:  Okay.  So, a
 8   lot of things went into my mind, if we're going
 9   to discuss that, that we really haven't talked
10   about yet.  Do you mind talking about them?
11             SPECIAL AGENT ERIC PRIOR:  No, I don't
12   mind at all.
13             OFFICER CATALIN PANOV:  Okay.  So, I'm
14   just talking with respect to the information that
15   we had.  So, him being barricaded; him, I
16   believe, saying he wasn't coming out; my prior
17   knowledge of him and his gang membership; the
18   fact that he was doing armed takeover robberies
19   with a handgun; having talked to his wife about
20   how bad his heroin habit was.  At one point, one
21   of the Santa Ana officers saw him with a handgun
22   in his hand, manipulating the handgun, and that
23   information was given out via the radio.
24             He was also seen sometime around -- I
25   want to say, maybe -- I forgot what time it was,
```

Page 33

1   but he was seen in the car reaching underneath

2   the floorboard with one hand and lifting up his

3   shirt, wriggling his waistband with the other,

4   presumably to put something in his waistband.

5            At one point, he had communicated to

6   his family and said that he was going to commit

7   suicide by cop, and all of those were factors or

8   information that we all had prior to deploying

9   the cavalry.

10            SPECIAL AGENT ERIC PRIOR:  Okay.  So,

11   going back to what you said, you mentioned before

12   that you had some knowledge or interaction with

13   him or at least his family.  Were you aware of

14   any mental health issues or anything like that,

15   any kind of 5150 kind of things, or --

16            OFFICER CATALIN PANOV:  Well, I didn't

17   have some interaction with him or his family.  I

18   was part of the surveillance in arresting that

19   arrested him for doing takeover armed robberies

20   at gas station.

21            SPECIAL AGENT ERIC PRIOR:  Oh, okay.

22            OFFICER CATALIN PANOV:  After that, we

23   served search warrants, or a search warrant, on

24   his residence, where I spoke to his wife about

25   his drug habit, and how bad that was.  And there

Page 34

1          SPECIAL AGENT ERIC PRIOR:  What

2   happened next?

3          OFFICER CATALIN PANOV:  So, I could see

4   those things happening from my position.

5   Immediately after the aerosol was dispersed, or

6   maybe a couple of seconds after -- and again, Mr.

7   Lopez was in the back seat of the car, so he

8   would be closest to the rear window on the

9   driver's side. As the aerosol was clearing up, I

10  saw a hole appear in the window where Mr. Lopez

11  was, and it was very consistent with having shot

12  through cars and seen people shoot through cars.

13  It was very consistent to almost porting a hole

14  in a window with a gun.  So, immediately, I

15  thought, 'Is he shooting at us?'  Right after

16  that, the door comes open.  Mr. Lopez comes out

17  with a black object in his hand, which I believe

18  to be a handgun.  And if you look at -- if I may

19  use this picture for reference here --

20          SPECIAL AGENT ERIC PRIOR:  Please.

21          OFFICER CATALIN PANOV: So, this white

22  tent is not here, obviously, because that's where

23  Mr. Lopez's body is, correct?

24          SPECIAL AGENT ERIC PRIOR:  Correct.

25          OFFICER CATALIN PANOV:  When he comes

Page 36

```
 1    out this back door, he has many directions he can
 2    go to escape, and that's what we were hoping that
 3    he would do, but he doesn't do that.  He comes
 4    out with a black object in his hand, and he
 5    starts sprinting, traversing up this hill, right
 6    in our direction.
 7              As he is doing that, I yelled, "Gun.
 8    Gun.  Gun.  Gun.  Gun," approximately seven
 9    times, I believe.  So, Mr. Lopez is initially
10    maybe 30 feet away from us, and he's sprinting at
11    us with this black object.  As he gets within 20
12    feet -- and it's not depicted here, because it's
13    being covered by the tent -- there's a sign here,
14    a construction sign.  I don't know if you guys
15    are familiar, or your saw it.  It's maybe 5 feet
16    tall by five 5 feet wide.  You can't really see
17    through it.
18              As he gets within about 20 feet,
19    sprinting right towards us, he's coming at us
20    from left to right.  He disappears behind the
21    sign, so he's being completely blocked by the
22    sign.  When he reappears at the other end of the
23    sign, he has the black object in his hand.  And I
24    remember seeing his hand by his shirt, and I saw
25    a portion of his stomach.  It's the skin on his
```

Page  37

```
 1    stomach.
 2              At that point in time, he was
 3    approximately 12 feet from us, coming right at us
 4    with this black object, which I believed was a
 5    gun.  I verbalized to my partner that it was a
 6    gun, based on all the information that we had.
 7    At that point in time -- again, a person's
 8    reaction time for pointing and firing a gun is
 9    one quarter of one second, which is nothing,
10    right, from the distance of 10 to 12 feet.  You
11    don't even have to aim.  It's called point
12    shooting.  Like if you and I were to shoot each
13    other right now, we wouldn't even have to aim.
14    We would just point and shoot.  And that's the
15    exact situation that he was in.
16              So, based on all of that, I felt that
17    he was an imminent threat to me, I felt he was an
18    imminent threat to my partners, and I fired my
19    handgun at him.
20              SPECIAL AGENT ESTRADA:  Can you tell me
21    -- you said he uses his hands and he had an
22    object.  Can you tell me which hands, which side
23    were you --
24              OFFICER CATALIN PANOV:  Yeah, so, like
25    I said, the object was in his right hand.
```

Page  38

1          SPECIAL AGENT ESTRADA:   His right hand,

2     okay.

3          OFFICER CATALIN PANOV: His left hand

4     was near -- I don't know if he was holding up his

5     shirt, or near his shirt.  I believed he was

6     holding up his shirt, because I could see a

7     portion of his lower stomach, between his

8     waistband and where his shirt should be was

9     lifted, near his left hand, and that was the very

10    first thing I saw, when he reappeared within 12

11    feet of us, on the other end of that sign.  And

12    his right hand was down, almost like an L shape.

13          Okay.

14          SPECIAL AGENT ERIC PRIOR:   So, based on

15    that description, what did you think that Mr.

16    Lopez was going to do?

17          OFFICER CATALIN PANOV:   I thought he

18    was going to shoot us.  He came charging right at

19    us.  He could have gone anywhere but where the

20    police are.  Anywhere, any direction.  That's not

21    what he chose to do.  So, to me, his intent was

22    clear, and his actions were consistent with what

23    I believed his intent to be.

24          SPECIAL AGENT ERIC PRIOR:   And just to

25    be clear, based on that, were you in fear for

Page 39

1   your physical safety?

2           OFFICER CATALIN PANOV:   My safety and

3   my partner's safety, yes.

4           SPECIAL AGENT ERIC PRIOR:   Basically,

5   the entirety of your team that was assigned to

6   that position with you?

7           OFFICER CATALIN PANOV:   Correct.

8           SPECIAL AGENT ERIC PRIOR:   Okay.   In

9   that moment in time, did you believe that the

10  force that you utilized was necessary, based on

11  what you described?

12          OFFICER CATALIN PANOV:   Absolutely.

13          SPECIAL AGENT ERIC PRIOR:   Any

14  questions on that particular portion of the

15  incident from you?

16          SPECIAL AGENT ESTRADA:   Just the

17  lighting. When he came out, how were you able to

18  see his hands and his shirt?

19          OFFICER CATALIN PANOV:   So --

20          SPECIAL AGENT ERIC PRIOR:   I mean, was

21  it -- you said you had a (indiscernible) attached

22  to your gun.  Were you just using that, or was

23  there other ambient lighting?

24          OFFICER CATALIN PANOV:   So, there's

25  obviously some ambient lighting from the street

1          SPECIAL AGENT ERIC PRIOR:  Okay.  Was

2     your light activated at the time?

3          OFFICER CATALIN PANOV:  I don't recall.

4          SPECIAL AGENT ERIC PRIOR:  Okay.  Did

5     you use anything as basically a support for your

6     firing platform?  Were you off the -- judging

7     from that, the fender that covers the wheel well

8     on the front of the BearCat.

9          OFFICER CATALIN PANOV:  I understood

10    what you're saying.  No.

11         SPECIAL AGENT ERIC PRIOR:  Okay.  And

12    you said two-handed grip, okay.  And you're very

13    confident that you utilized your sighting system?

14         OFFICER CATALIN PANOV:  Very.

15         SPECIAL AGENT ERIC PRIOR:  Okay,

16    perfect.

17         SPECIAL AGENT ESTRADA:  You said that

18    you -- when he emerged from the vehicle and he's

19    (indiscernible) his hand, you believed it was a

20    gun.  You said he (indiscernible) gun, right?

21         OFFICER CATALIN PANOV:  Seven times,

22    yes.

23         SPECIAL AGENT ESTRADA:  About seven

24    times.  Do you remember hearing anybody else

25    saying anything?

                                        Page 43

```
 1    straight through.  It's exactly what that was.

 2    It just was within a second or two, just that

 3    hole appeared in the center.  It didn't make any

 4    sense, other than for me to suspect that since

 5    there was information he was armed right when we

 6    were deploying gas, that he was shooting at us.

 7    The very next thing he does is he comes out of

 8    the car with a black object, that I believe was a

 9    gun.

10           Keep in mind, Mr. Lopez is initially 30

11    feet from us.  I just believe he shot at us.  He

12    said he was armed.  He said he was going to die,

13    suicide by cop.  I know that he carried guns.  I

14    know that he's violent.  I know that he's a gang

15    member.  A policeman saw him with a handgun.  He

16    starts out at 30 feet, going right towards us.

17    We let him get to 20 feet.  In between 20 feet

18    and about 12 or 15 feet, he disappears, as he

19    continued to come at us.  When he reappears,

20    doing the exact same thing he was doing before, I

21    end up shooting at him, and Mr. Lopez expires

22    about 10 feet from us, with what we suspected was

23    a gun and a violent criminal gang member running

24    at us with it.  I can't think of using more

25    restraint than that.
```

Page 46

```
 1    cover.  The angle which Mr. Lopez took forced us
 2    all to not have any cover anymore.  The shooting
 3    occurs; the very first thing we want to do is get
 4    back to cover.  At that point in time, I told
 5    Sergeant McGlade that Mr. Lopez was down.  I saw
 6    him fall with his hands, and what I believed to
 7    be a handgun underneath him, and that was still
 8    underneath him.  In lieu of going and giving Mr.
 9    Lopez medical attention, we had to make sure that
10    he wasn't -- you know, you don't know if you hit
11    a guy when you get in a shooting, right.  We
12    wanted to make sure that he wasn't faking or
13    playing possum.  Initially, they were going to
14    deploy a canine on him, to make sure that he is
15    not in fact faking.
16         The problem with that is if he was
17    faking, and he comes up with a gun and we engage,
18    then there's a dog in the middle, and that can be
19    kind of messy.  So, I suggested the cleaner
20    method to make sure he's okay, so that we can
21    give him medical attention, would be to hit him
22    in the butt with a 40 millimeter, because that's
23    going to tell us if he's faking it or not.  That
24    thing hurts a little bit, and if you're faking,
25    you're not going to be able to just stand there
```

Page 48

```
 1    and keep faking.
 2            So, Officer Ray (indiscernible)
 3    deployed the less lethal; hit him, I believe, in
 4    the right butt cheek; Mr. Lopez didn't move.  We
 5    then made the immediate plan to go up and give
 6    him medical attention.  Officer Weber and I
 7    discussed the plan, and it was basically Officer
 8    Weber was going to go pin down his right arm; I
 9    was going to pin down his left arm; and we were
10    going to slowly pull his arm out and handcuff
11    him, and then start giving him medical attention,
12    and calling (indiscernible) medical for him.
13            As we walked up to do that, I pinned
14    down his left arm; Officer Weber pinned down his
15    right arm; so, Officer Weber and I are basically
16    facing each other, kneeling.  And I remember
17    telling -- I said, "Kenny, watch out dude,
18    because if I pull this arm out, there's a gun
19    attached to it.  It could go off."  There's
20    really nowhere for him to stand.  There's nowhere
21    for me to stand, either.  So, I pulled the arm
22    out.  There was nothing in it.  I saw Officer
23    Weber pulled his arm out, and as we go to
24    handcuff him, there was a black object near his
25    waistband, where Mr. Lopez's arms were.
```

Page 49

1    we're not sure if he's still a threat?  Yeah.

2            SPECIAL AGENT ERIC PRIOR:  Yeah, okay.

3    Perfect.  Just to confirm, based on what you've

4    described, we've pretty well -- you've

5    articulated it pretty well, but just for

6    confirmation:  In your opinion, based on what was

7    presented to you, and keeping in mind that a lot

8    of people in the law enforcement community would

9    consider the entirety of the incident prior to

10   the shooting an attempt at deescalating the

11   actions that Mr. Lopez could take, based on being

12   a barricaded suspect, for lack of a better term:

13   After he exited the vehicle, in your opinion, was

14   there any opportunity to do any further attempts

15   at de-escalation, based on what he presented to

16   you?

17           OFFICER CATALIN PANOV:  Again, so, we

18   did four hour -- and I understand your question.

19   We did four hours of nothing but de-escalation.

20   Everything we did up until the point where we

21   delivered gas in the car was to deescalate the

22   situation and get Mr. Lopez to submit.  That's

23   the ultimate goal.  Even if he wants to come out

24   and run the other way, that's fine.  But with

25   respect to the three-seconds, three, four seconds

Page 51

1  that it took him to come out of the car with what

2  I believed to be a handgun and sprint right

3  towards us, there was no other alternative that

4  found for myself, individually speaking, to do

5  other than to defend myself and my partners,

6  because I believed he was an imminent threat of

7  death or grave bodily injury to me and to the

8  rest of my partners.

9        SPECIAL AGENT ERIC PRIOR:  And was any

10  member -- was you yourself or any member of your

11  team, to your knowledge, injured at all in this

12  incident?

13        OFFICER CATALIN PANOV:  I was not

14  injured, no.  And I don't have any information

15  that anybody else was.

16        SPECIAL AGENT ERIC PRIOR:  Okay.  We've

17  been at this -- do you have any questions?  We've

18  been at this for just shy of an hour.  If we

19  could take a quick break, and we could probably

20  conclude pretty quickly thereafter.

21        OFFICER CATALIN PANOV:  Sure, okay.

22        (Break)

23        SPECIAL AGENT ERIC PRIOR:  This is

24  Special Agent Prior.  It is 9:23 a.m., and we are

25  resuming the interview.  Did you have any

Page 52

```
 1                 OFFICER CATALIN PANOV:  I don't believe
 2      so, no.
 3                 SPECIAL AGENT ESTRADA:  Okay.  So, I
 4      know you explained that you guys' train 18 days
 5      out of the year, the SWAT team.
 6                 OFFICER CATALIN PANOV:  Correct.
 7                 SPECIAL AGENT ESTRADA:  How often --
 8      are you able to put a number to how often during
 9      those 18 days you guys' train, like a gas plan,
10      or a barricaded suspect?  How many times would
11      you do that, likely, in the 18-day period
12      throughout the year?  As far as scenarios that
13      involve those two things specifically.
14                 OFFICER CATALIN PANOV:  Several.  I
15      can't put an exact number on it, but several.  I
16      would estimate maybe 10.
17                 SPECIAL AGENT ESTRADA:  Okay.  So, I
18      know he asked you about outside training, but
19      internally, you guys -- it sounds somewhat
20      regularly, you're saying about 10 times a year,
21      training with scenarios where you guys implement
22      gas, maybe not actually deploy it, but talk about
23      a gas plan and work out barricaded suspect?
24                 OFFICER CATALIN PANOV:  Correct.
25                 SPECIAL AGENT ESTRADA:  Okay.  I
```

Page 54

1              OFFICER CATALIN PANOV:  So long as you

2    are behind it, yes, it does give you cover.

3              SPECIAL AGENT ESTRADA:  Okay, but once

4    you leave these vehicles, they're no longer

5    relevant for cover, is that correct?

6              OFFICER CATALIN PANOV:  Yes.

7              SPECIAL AGENT ESTRADA:  Okay.  You

8    mentioned the information that you had heard

9    about -- he was armed, and an officer had seen

10   him manipulating a handgun.  Do you know where

11   that information came from?  Who actually

12   observed that?

13             OFFICER CATALIN PANOV:  It was when --

14   and again, I listened to this entire pursuit and

15   barricade unfold on red channel before I ever got

16   there.  If I recall, it was a Santa Ana officer

17   that arrived in the BearCat and went head-to-head

18   with Mr. Lopez's vehicle.  And I heard the

19   officer, and I heard the tone and the fear in his

20   voice when he said what he said, and he saw -- he

21   verbalized his observations, and I believe he

22   believed he saw a gun.

23             SPECIAL AGENT ESTRADA:  Okay.  And when

24   you were briefed prior to being deployed on this

25   incident, did they reiterate that information?

                                        Page 58

1          OFFICER CATALIN PANOV:   Correct.

2          SPECIAL AGENT ESTRADA:   I know you

3    dealt with Mr. Lopez in the past.  What's his

4    physical build, that you remember?

5          OFFICER CATALIN PANOV:  He's a large

6    guy, maybe 5'8", 5'9", somewhere north of 200

7    pounds.

8          SPECIAL AGENT ESTRADA:  Okay.  And I

9    know he asked about his mental stability, but as

10   far as physically, does he have any physical

11   defects?  Is he able to walk, run, fight, in your

12   opinion?  All those things?

13         OFFICER CATALIN PANOV:  He was able to

14   do all those things that night, and he was able

15   to walk just fine when we arrested him for the

16   string of takeover armed robberies.

17         SPECIAL AGENT ESTRADA:  Okay.  As far

18   as the takeover armed robberies, you said you'd

19   served a search warrant.  Was there ever a

20   firearm that was recovered during those

21   investigations, or the one that you were involved

22   in?

23         OFFICER CATALIN PANOV:  So, we helped

24   secure his apartment, and there was an

25   investigation done by the robbery detail.  So,

Page 59

```
 1   talked about a couple of actions that you did,
 2   but what actions was he doing in the car that you
 3   could tell?
 4            OFFICER CATALIN PANOV:  That I could
 5   see?
 6            SPECIAL AGENT ESTRADA:  That you could
 7   see, yes.
 8            OFFICER CATALIN PANOV:  So, again,
 9   other than significantly him trying to track our
10   positions, meaning look around to see where we
11   were, which is something that he had done for a
12   majority of his barricade, as was indicated on
13   red channel, it was difficult for me to see
14   inside, because his windows were fogged up.  At
15   one point, he was putting -- I'm sure he was
16   putting -- maybe the floor mats, or some type of
17   carpeting or cardboard, something blocking the
18   windows.  So, it was difficult to see inside the
19   car.
20            SPECIAL AGENT ESTRADA:  Okay.  And what
21   do you think the purpose of that is, with your
22   training and experience?
23            OFFICER CATALIN PANOV:  With respond to
24   him tracking us, or with respect to him blocking
25   the windows?
```

1          SPECIAL AGENT ESTRADA:   Both.

2          OFFICER CATALIN PANOV:   Well, tracking

3    us is trying to figure out where we are and what

4    we're doing, so he can facilitate either his

5    escape or whatever violent plan that he had, that

6    he indicated.   And with respect to blocking the

7    windows, the only reasonable assumption is that

8    he doesn't want us to see what is inside the car,

9    or what he is doing inside the car.   I can't

10   imagine that that's a good thing.   It's

11   ultimately for some type of nefarious purpose,

12   that he doesn't want us seeing what he is doing.

13          SPECIAL AGENT ESTRADA:   Okay.  As far

14   as his action, I know you've been a police

15   officer for 21 years, I believe you said.  With

16   respect to being under the influence, of drugs

17   and/or alcohol or some other type of mind-

18   altering drug, I guess, could you tell his

19   mannerisms at that point in the car?  Did they

20   seem to be normal?  Could you decipher anything

21   from the way he was moving around in the car?

22          OFFICER CATALIN PANOV:  I couldn't

23   normally -- obviously, there's subjective,

24   objective symptoms of being under the influence.

25   In this case, I could not, because the car was

                                              Page 63

```
 1   fogged up.  I could only see maybe like the top
 2   of his head.  But again, you look at his
 3   behavior; he's involved in a four-hour standoff,
 4   where he's using drugs; he appears to be
 5   manipulating a handgun; he's going back and forth
 6   from the front of the car to the back of the car,
 7   front of the car to back of the car, blocking
 8   windows, tracking officer's positions.  So, yeah,
 9   his behavior was indicative to me that he was
10   under the influence of drugs.  And again, knowing
11   his history with drugs, having talked to him,
12   having talked to his wife, I did believe he was
13   under the influence, and that his behavior was
14   both dangerous and unpredictable and bizarre.
15             SPECIAL AGENT ESTRADA:  Okay.  You
16   mentioned that he had talked about -- you
17   mentioned suicide by cop, or something to that
18   effect.  Where did you get that information from,
19   or do you remember when you got that information?
20             OFFICER CATALIN PANOV:  Approximately
21   9:30. It came out via the radio.
22             SPECIAL AGENT ESTRADA:  Okay.
23             OFFICER CATALIN PANOV:  And he had
24   spoken to a family member and advised that he was
25   going to do a suicide by cop scenario.  What I
```

Page 64

1              SPECIAL AGENT ERIC PRIOR:  Okay.  No

2    one has any further?  We're going to go ahead and

3    conclude the interview at 09:44. Thank you,

4    gentlemen.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8

9    <%12151,Signature%>

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date:   November 30, 2021

17

18

19

20

21

22

23

24

25
```

Page 74

# EXHIBIT 24

**Orange County District Attorney**
#:7011
**Bureau of Investigation**

300 North Flower Street, Santa Ana CA 92701
(714) 834-3600

Case No.
21-004162

# TRANSCRIPT

| | |
|---|---|
| SUBJECT: | BRANDON ANTHONY LOPEZ |
| CLASSIFICATION: | OFFICER INVOLVED SHOOTING (FATAL) |
| INTERVIEW OF: | SERGIO MARTINEZ #3267, POLICE OFFICER<br>SANTA ANA POLICE DEPARTMENT |
| DATE & TIME: | AUGUST 29, 2021                    0241 |
| LOCATION: | SANTA ANA POLICE DEPARTMENT |

On August 29, 2021, at approximately 0241 hours, Santa Ana Police Department (SAPD)

Detective ANDY GARCIA and I conducted a digital audio recorded interview of SAPD Officer

SERGIO MARTINEZ regarding the Anaheim Police Department (APD) officer involved shooting of

BRANDON LOPEZ.

The following is a transcript of that interview:

| LEGEND: | … | Denotes pauses between words, phrases, incomplete sentences, stammering etc. (does not indicate missing words) |
|---|---|---|
| | \*\*\* | Denotes unintelligible conversation |
| | (SIC) | Denotes precisely reproduced word |

[BEGINNING OF INTERVIEW]

MELNYK:       Today is Wednesday uh, September 29th, 2021.  It is 0241 hours.  I'm

Investigator DAVE MELNYK with the Orange County District Attorney's

office on a Special Assignment case number 21-004162.  I'm at the Santa

Ana Police department to interview your name, sir?

MARTINEZ:       Uh, SERGIO MARTINEZ.

MELNYK:       And uh, also present is my partner.

because they were going into Irvine.  There is no need for us to respond

to assist.  Uh, eventually the pursuit ended up coming back into the city,

uh, at which point I, I heard some of our officers start asking hey, are they

requesting assistance.  Um, so of course I started driving towards that

direction to see if they do need assistance.  Uh, pursuit comes up to the

city, um, I believe some our units ended up getting involved.  Um, and at

some point, it comes in, it starts circling around me.  Uh, I'm just kind of

waiting for the pur-, pursuit to come by me, to see if I can either A, get in

the pursuit if they need K9 assistance, or uh, if there is anything I can do

block intersection whatever the case was.  Uh, as the pursuit continues

um, they end up putting out that the vehicle was I guess stuck at Santa

Ana, just uh, east of Bristol.  And um, I respond up there to assist at the

960 X-Ray the, the stop of it.  ==And as we push up and we get behind the==

==police units uh, the driver was still in the car still trying to accelerate and==

==you can tell his car was stuck couldn't go anywhere.  And the driver==

==continued to accelerate at which point, he started flinging gravel at us==

==like he, he was still in kicking up all kinds of gravel.  We had uh, kind of==

==duck behind the units uh, to prevent the gravel from hitting us.  Uh, none==

==of us had glasses or anything like that to frag protection.  Um, kept giving==

==the uh, driver commands.  You know, turn off the vehicle.  Put your hands==

==ou-, out the window.  All commands were refused.  It just kept trying to I==

==guess, rock the car from being unstuck and moving the wheel side to side,==

==reverse, forward.  Um, you can hear him just stepping on the accelerator==

==and hear the engine accelerating.==  Um, at which point we started coming

up with a game plan to hey, how are we gonna disable this vehicle and immobilize the vehicle?  Um, Sargent ORPEZA started coordinating with ah, Anaheim's units, 'cause there was some Anaheim units there.  And we were gonna handle the stop, Santa Ana was gonna handle the stop at, so at which point he, he directed me hey, uh, we need the Terradyne, the armored vehicle.  So, bring in the armored vehicle um, uh, let me back track a little bit here.  ==The, what I heard was the Want on the, on the vehicle was it was a stolen vehicle and uh, the driver was supposed to be a, uh, armed 211 suspect.==  Um, so that was the reason for the pursuit and everything else.  I forgot to say that earlier.  Uh, so I was directed to go back to the station, and, and uh, get the Terradyne, the armored vehicle, and bring it to the location so we can start coordinating how were gonna safely block this vehicle from getting away any further if he happens to get it unstuck.  Um, I drive to the station, uh, there was couple other officers already driving the Terradyne uh, coming out of the station so, I jumped in there with them and drove to the scene where the vehicle was.  Uh, we traveled southbound Bristol um, and ended up coming head on with the, with the Charger, it was a, it was a black dark Charger, right?  Um, coming head on and trying to prevent the vehicle from coming out.  ==And at this point, I was in the turret of the armored vehicle and I could see the driver through the windshield.  I could see probably about chest high, see him chest high and he's looking at us and looking, pretty much, he looked paranoid.  Looking left and right, look-, checking all his mirrors trying to see where all the units where.  Still trying to step on the==

accelerator, trying get the car unstuck, you can see him shaking the wheels left and right.  Um, more commands were given telling him to basically surrender, come out with his hands up, or stick his hands out the window.  Uh, he refused.  You can see him when any commands were given, you can see him shaking his head, basically saying, no.  Um, he wasn't gonna comply with any commands.  Um, this continued for a while.  Finally, um, well, not finally, but it continued his movements inside the vehicle.  He was reaching for a lot of different areas inside the vehicle underneath uh, close to like his floorboard, the passenger front, passenger floorboard.  He also reached the back uh, the back seat, the back floorboard area.  A lot of the times he spent kind of hunched forward so I couldn't, I cou-, I could rarely see his hands.  And sometimes he would crouch down where his head would be below the steering wheel so, I wouldn't, I'd lose almost sight of him.  I could only see the top of his head.  Um, uh, and I would just communicate whatever I was seeing, being in the turret and having you know, uh, a visual down into the windshield.  I just continued communicating what I saw.  Um, every once in a while, he would, well quite often actually, he would pull out a pipe and he'd bas-, he would be smoking, or burning something off a tin foil.  He'd be smoking it several times while he was inside the car.  He would smoke cigarette and then he'd go back to smoking his pipe.  Um, he wouldn't, he wouldn't uh, listen to any of the commands that were given to him to, to roll his window down, stick his hands out the window and give up, surrender.  Um, we were there for a long time and the same

behavior kept going kept going.  Um, like I said, he continued reaching
throughout the whole car.  He'd reached over, I'm assuming the glove
box I, I couldn't see where his hands were going.  I'm assuming he was
pulling stuff out of the glove box, he, underneath the front seat, the back
seat.  He just, that same erratic movement, he was doing it over and over
again.  Um, constantly kept checking his mirrors, side mirrors, back mirror
trying to see where officers were positioned.  Um, there was uh, one
point where he took a couple hits from his pipe and he began taking
some deep breaths, and uh, he put his arm on the door.  Uh, I, I don't
know if he was reaching for door handle or what, uh, but he it was almost
to me as if he was gonna make a break for it.  Um, he didn't.  He just kind
of still sat there, would look up to me, look left and right, and then it was
almost as he second thought his decision and went back to moving stuff
around.  Uh, there was some occasion where he kept his right hand uh,
well his right arm kind of tucked down underneath the seat and he would
reach over and uh, mess with the radio, 'cause I could hear the music
turning up louder and h-, he would do all his actions with only his left
arm, and keep his right hand tucked.  He wouldn't move his right hand at
all.  I don't know what the reason was up with that, but he would be
digging, like I said hunching over and digging on his floorboard, his, on
the floor of where he was seated.  Um, his seat was reclined all the way
back but he wouldn't be um, he wouldn't be reclined all the way back.
He was always sort of hunching forward.  Um, until Anaheim SWAT
showed up and relieved me my position.  Then I, I hung out in, I stayed

uh, inside the Terradyne um, because Anaheim only wanted uh, two

operators to stay back with our armored vehicle, since it was our

armored vehicle and then uh, also it was one of our CNT negotiators uh,

stayed back.  (THROAT CLEAR) Uh, we stayed there till Anaheim fully took

over all tactical operations.  Um, we were inside the Terradyne.  We were

told hey, um, time to mask up, 'cause their gonna deploy some gas.  We

mask up, and at which point they start saying hey, prepare for the

initiation. Um, they did, obviously they briefed the plan amongst

themselves but we, we heard what their plan was.  Uh, that they advised

us, 'cause they were gonna use flashbangs and gas to make sure we were

gonna be masked up.  Um, once the flashbangs were deployed and the

gas was deployed uh, the back passenger driver door, the back passenger

back left door, uh, popped open and the uh, suspect immediately exited

the vehicle and ran towards the uh, what is it, southbound towards

where I'm assuming the Anaheim's team was.  I couldn't see out that

side,  like of the Terradyne cause the Bear blocking it.  uh, immediately

ran out in that direction,  Um, as he's running what I could see is um, he

reached down for his waistband, made an overt movement down to his

waistband uh, which point uh, the OIS occurred, and uh, the subject or

the suspect fell on the floor.   That was, that was uh, the extent of it.

MELNYK:            Okay um, I guess I should have asked you earlier.  Um, did you have any

collateral duties, are you on SWAT also?

Case No.
21-004162

MELNYK:              And the suspect's vehicle is on Santa Ana Boulevard?

MARTINEZ:            Yes.

MELNYK:              And where…

MARTINEZ:            It's…

MELNYK:              …where exactly?

MARTINEZ:            …it's at, it was, when it came to a stop it, it pulled into the gravel

                    construction area.

MELNYK:              Um-hmm.

MARTINEZ:            And it ended up onto, um, what is it, the railroad, rail, rails, the actual

                    rails.  It was actually stuck onto those rails.  So underneath these rails is

                    maybe a foot gap between the rails and the gravel underneath.  So

                    somehow the car was able to get up there and it ended up disabling the

                    car or you know it couldn't go anywhere.

MELNYK:              And it's facing which direction?

MARTINEZ:            It's facing, uh, westbound.

MELNYK:              And what's the cross street there?

MARTINEZ:            Bristol.  So, it's just east of Bristol.

MELNYK:              Just east of Bristol and the units are stacked up…

MARTINEZ:            Stacked up…

MELNYK:              …to the east behind…?

MARTINEZ:            No.

MELNYK:             Uh, who, w-, who was with you in the Terradyne?

MARTINEZ:            Initially, when the Terradyne first, uh, moved out there, it was myself, uh,

Corporal GALEANA, uh, Officer PARDO or I'm so-, I'm, um, excuse me.

PARDO d-, did not show up until l-, a while later.  Um, it was Officer

MENENDEZ, um, and Officer AGUILAR.  Those were the, uh, we were the

initial ones that drove the Terradyne out there.  Oh, and I believe there

was a trainee as well, Corporal, uh, GALEANA has a trainee.  I don't know

his name.

MELNYK:             Okay.  And, uh, who was driving?

MARTINEZ:            Uh, Officer GALEANA was driving, or Corporal GALEANA, sorry.

MELNYK:             And where were you at?

MARTINEZ:            I was in the turret.  So, as soon as, as soon we, I jumped in, in the

Terradyne, in the vehicle, I was in the turret.

MELNYK:             Okay.  And you remained there…

MARTINEZ:            I remained there…

MELNYK:             …until you got…?

MARTINEZ:            …until Anaheim, uh, SWAT came and relieved me of my, of that position.

MELNYK:             Okay.  And you said when you were in the turret you were, you had a

view down into the car and could see the suspect moving around and so

Case No.
21-004162

forth?  Are you putting that out over the radio or are you re-, relaying

that to somebody else?

MARTINEZ:        I'm, I'm talking out loud so, the officers inside the Terradyne could hear

me and they would relay some of that information.

MELNYK:          But do you know who, somebody was assigned to put out…

MARTINEZ:        I believe…

MELNYK:          …the information?

MARTINEZ:        …the person that was relaying most of the information was, uh,

MENENDEZ, Officer MENENDEZ.

MELNYK:          Okay.  Did you ever see a gun?

MARTINEZ:        I did not.

MELNYK:          Okay.  Did you hear, uh, there was a gun?

MARTINEZ:        I heard, I heard that that was mentioned.  Um, I did not see a gun at any

point in time.  What I did see in his hands, most of the time he kept his

hands down underneath, and like I said I could only see him chest high.

And the times that I did see his hands is when he brought something up

to his face which is usually a cigarette, the pipe, um, a piece of foil.  Uh, at

one point he did lean back and reach back into the back seat.  Um, I,

that's when I saw his hands but I didn't see him grabbing anything.  Uh,

he did grab a pen from a center console and I could tell when he pulled it

up it was a pen.  Uh, he would occasionally have a lighter, what I believe

was a lighter, um, and a black pipe straw, uh, in his hand.  Um, and he
would do that various times, 'cause he would be digging around, bring it
up and he'd start lighting his foil and lighting his cigarette, whatever he
would light and smoke.

MELNYK:          And that black pipe and the foil, does that indicate anything to you or…?

MARTINEZ:        Yeah, it indicates, uh, he's using, uh, narcotics, opiates.

MELNYK:          I think I asked you this, but I'll ask you again.  Um, had anybody else in
the vehicle with him?

MARTINEZ:        No.  I didn't see…

MELNYK:          That you saw?

MARTINEZ:        …anybody else inside.  No.  (PAUSE).

MELNYK:          So, if I understand you correctly, um, you were initially in on the felony
stop of the vehicle but then you were tasked with going back to get the
Terradyne.  You come out in the Terradyne with those other officers, and
by, uh, correct me if I say anything wrong (LAUGHS) 'cause it's kind of
late.

MARTINEZ:        No, yes.  That's…

MELNYK:          Okay.

MARTINEZ:        …that's…

MELNYK:          Um, so you, you, when you come back out in the Terradyne, GALEANA's
driving and, tell me again how you approached the vehicle.  So…

MELNYK:        Um, so at some point you hear Anaheim SWAT is coming and th-, they
               arrive?

MARTINEZ:      Yes.

MELNYK:        And describe that for me.

MARTINEZ:      So, uh, again I'm, uh, my focus is on the suspect.  So I'm, I'm hearing what
               the other officers are, are saying.  Uh, they're relaying, I couldn't even
               change my radio over to the proper channel.  I was still on our, our Green
               Channel.  Um, so I, I ended up turning the volume down on our Green
               Channel so I wouldn't, it would d-, you know, uh, distract me from what
               the officers were trying to tell me.  And I can hear them relaying the info
               that's being put out in the radio to me because I had told them hey, I
               can't hear.  I can't access my radio.  I can't change my channel.  I'm just,
               I'm focusing on the suspect here.  Um, so I did hear, uh, I believe it was
               Officer MENENDEZ say hey, there's a couple guys coming down the
               street.  I think this is Anaheim SWAT.  And then once we did, once he put
               that on the radio asking hey, is Anaheim SWAT on e-, uh, on scene?  They
               put out saying yes.  They're, I believe they arrived with five operators
               because what I heard, um and then that's when Anaheim decided to
               show up on scene and started assuming responsibilities and, and, and
               taking over tactical control of the scene.

MELNYK:        Okay.  And what did they do?

MARTINEZ:            They were actually, uh, taken back to the Command Post, uh, prior to,

                    um, the OIS happening.

MELNYK:             Okay.  So they weren't present, couldn't see?

MARTINEZ:           Yes, they were not present at, uh, inside the Terradyne.

MELNYK:             And I think you said that there were commands being given to him both

                    at the felony stop over a PA system and then there were commands

                    being given from the Terradyne?

MARTINEZ:           Yes.

MELNYK:             Is that correct?

MARTINEZ:           Yeah, there were, there were, uh, Corporal GALEANA when we initially,

                    uh, placed the Terradyne, Corporal GALEANA was, uh, trying to

                    communicate with him over, through the PA, was trying to talk to him.

                    Uh, we found out what his name was.  We tried calling him, talk or he

                    tried talking to him and, and calling him by his name.  Um, and he, he

                    wouldn't, wouldn't respond.  He, most of the responses we would get

                    from him would be a head shake, um, some gestures, hand gestures,

                    stuff like that.

MELNYK:             And so, did it appear to you that he was understanding the commands…

MARTINEZ:           Uh, i-…

MELNYK:             …from his reactions?

MARTINEZ:        He would hear it yes.  'Cause at times when he, uh, of or Corporal GALEANA would say I, I would hear this, he would ask do you hear me and he would not nod his head up and as, as in saying yes, I can hear you.  So, um, we knew he could hear our commands and uh, at some point like is said he would manipulate the radio, 'cause I could hear the music turn up in his vehicle.  Um, I don't know if he was just trying to drown out the commands, uh, 'cause we were repeatedly trying to establish some sort of communication with him, uh, and he didn't seem to want that.

MELNYK:          Okay.  And can you describe him tome please?

MARTINEZ:        Uh, the suspect?

MELNYK:          Yeah.

MARTINEZ:        Uh, male Hispanic.  Um, mid-thirties.  I'd say I didn't get, I didn't get his height, but weight I'd say maybe 220, 230.  Um, several tattoos on his face.  He had a, uh, I believe it was Rosie across, uh, tattooed on his forehead, above his right eyebrow.  Um, he had red lips on the right side of his neck tattooed.  Uh, just several tattoos.  He had a black t-shirt on.  I believe he had a white undershirt as well.  Uh, bald, no hair.

MELNYK:          Did you know, did you know him, have you ever seen him before?

MARTINEZ:        No, I, I've never seen him before.

MELNYK:          I think you, had, did you have the name, I think?

MARTINEZ:        Yes.  Uh, the name was BRANDON LOPEZ, I believe.

MELNYK:          Okay.  And, um, did that name mean anything to you?

MARTINEZ:        No.

MELNYK:          Okay.

(PAUSE FROM 31:10 TO 31:21).

MELNYK:          So, when the flashbang goes off, you knew gas was being deployed?

MARTINEZ:        Yes.

MELNYK:          Did you say how the gas was deployed?  Did you tell us that or…?

MARTINEZ:        I, I didn't tell you.  No.

MELNYK:          Yeah, how, how was the gas?

MARTINEZ:        So, uh, we, again Anaheim did tell us what their plan was, um, 'cause we were inside the vehicle and they were deploying gas.  So, um, they told us they were gonna do a diversionary device, a flashbang on the front hood of the vehicle and they were gonna, uh, use an aerosol gas, uh, through the rear window of the vehicle.  Um, so it was deployed on a, on a bang pole so, uh, with, the same time that diversionary device was, was placed on the front of the vehicle, the bang pole was, uh, inserted into the vehicle through the back window.

MELNYK:          And, can you describe how the bang pole works?

MARTINEZ:        Yeah.  So, the bang pole is a, uh, extendable, uh, I don't even know what, the aluminum, uh, pole, uh, where you can insert a cannister at the very end of it and it allows you to deploy that cannister, uh, using space so you

can deploy behind cover safely.  Um, the cage, I'd say cage around the, the end of the bang pole has, uh, little tools, glass breaking tools to allow you to, to break the windows, break glass to insert the bang pole to allow the gas to effectively work.

MELNYK:         Okay.  And that was done simultaneously with the…

MARTINEZ:       With the flashbang.

MELNYK:         …with the flashbang?

MARTINEZ:       Yes.

MELNYK:         And which window did they break?

MARTINEZ:       The back windshield.

MELNYK:         Okay.  And then from the time that happened till the time he got out, out of the car about how long do you think that took?

MARTINEZ:       Uh, seconds.

MELNYK:         So, it…

MARTINEZ:       Yeah, it was almost…

MELNYK:         …effective pretty quickly.

MARTINEZ:       Yeah, so it was very effective.

MELNYK:         Um, and… I'm gonna change subjects here just a little bit.  Uh, when you were looking through the window and you saw him moving around, um,

|                | the, i-, you described a number of things that he was, that, you saw him holding, did you ever see him with a cellphone? |
|----------------|---|
| MARTINEZ:      | I never saw him with a cellphone.  Uh, the only things I ever saw him holding in his hand, uh, like I stated earlier was a lighter, cigarette, uh, pipe, the piece of foil. |
| MELNYK:        | Okay. |
| MARTINEZ:      | Um, and at one point he did actually pull out a napkin.  Um, his front windshield started to fog up during this, uh, and he started wiping the windshield with, with a napkin. |
| MELNYK:        | Okay. |
| MARTINEZ:      | Um, and after I was relieved of, uh, from the turret, uh, he, I did notice he, he started to, uh, pull the floor mats and cover the front windshield with the floor mats as to, you know, to prevent us from looking into the car. |
| MELNYK:        | Okay.  And so, at that point, getting back to where I was before… |
| MARTINEZ:      | Um-hmm. |
| MELNYK:        | Uh, flashbang goes off, gas goes into the vehicle and I, if I remember correctly you said that the left rear passenger door opened or but the door behind the driver's side… |
| MARTINEZ:      | Yes. |
| MELNYK:        | …opened so that'd be opening to the south? |

Case No.
21-004162

MARTINEZ:            Um-hmm.

MELNYK:             So, describe it for me in detail there.

MARTINEZ:           Yeah.  So, um, when the flashbang, uh, it was a two banger so it means it,

                    two of them go off.  So the flashbang goes off.  The gas is deployed.  In

                    seconds the rear passenger door opens up and he jumps out.  Um, the

                    terrain all around the, that is a construction area.  It's very, you know, uh,

                    bad terrain.  Um, he jumps out and it almost appeared like he was going

                    to run, uh, eastbound, but he made a quick turn and ran southbound

                    towards the front of that SUV that was left right there.  Um, and as he

                    running towards that area, that's when I did see him grab is right hand,

                    make that overt, uh, movement with his right hand towards his

                    waistband, um, went under his shirt, and the OIS happened.

MELNYK:             And that motion you're motioning with your right hand…

MARTINEZ:           Towards the front of his waistband.

MELNYK:             …so, towards the front of his waistband?

MARTINEZ:           Yes.

MELNYK:             And then, um, is that indicative of anything to you?

MARTINEZ:           Yes.  Based on my training experience is indicative of reaching for a

                    weapon that he is, has concealed.

MELNYK:             But if I'm understanding you correctly you never actually saw a gun?

MARTINEZ:           I did not.

MELNYK:           Okay.  And you heard shots fired or could you see who was shooting?

MARTINEZ:         I heard shots fired.  I could not see where, uh, the team positioned for

that was out of my view off to the right side.

MELNYK:           Did you have an impression of where they were at?

MARTINEZ:         I had an impression that they were behind the front of the Bear, but I

could not see that vehicle, 'cause that was T'd off to the passenger side of

that Terradyne so we had no, we, no visibility to the right.

MELNYK:           I unders-…

MARTINEZ:         Or side of that front windshield area.

MELNYK:           Okay.  And, um, approximately how many shots did you hear fired?

MARTINEZ:         I'd say, maybe 15, 15, 20.

MELNYK:           And you're, um, anyway of knowing what type of weapons they were

firing?  Could you tell the difference between handguns…

MARTINEZ:         I, I, I've, I'd say… (SPEAKING SIMULTANEOUSLY).

MELNYK:           …could you differentiate that?

MARTINEZ:         …I'd say rifle rounds.

MELNYK:           Okay.

MARTINEZ:         Being inside the armored vehicle everything was kinda muffled.

MELNYK:           Sure.  Detective?

MARTINEZ:          Correct.

GARCIA:            Okay, just based on elevation.  Um, and then obviously you're up there,

                   you're armed with whatever weapon system that you have.  Is there, um,

                   optics on whatever weapon system you have, as far as scope or

                   anything?

MARTINEZ:          I, I don't have any, uh, magnified optics.  I have just a, a red dot sight.

GARCIA:            Okay.

MARTINEZ:          Yeah.

GARCIA:            And that's on a handgun?

MARTINEZ:          That's on a rifle.

GARCIA:            That's on your rifle?

MARTINEZ:          Yeah, it's my SWAT issued rifle.

GARCIA:            Okay.  That's all.

MELNYK:            Um, after the shooting occurred, I don't think we covered what, what

                   happened then.

MARTINEZ:          Uh, yes.  So after the shooting occurred, um, they were, I believe they

                   were listening to the radio.  Um, they were trying to see if, uh, 'cause the

                   suspect fell down with his hand, on his hands, uh, underneath him.  They

                   were trying to see if, uh, they could gauge a reaction out of him to see if

                   he was still alive or not.  If he still presented any kind of a threat.  Um, I

                   believe they en-, they engaged him with a less-lethal round, uh, at which

point, um, they called for medics to come push up and they pushed up and, uh, detained the suspect and tried to render aid.

MELNYK:        Could you see that occurring?  Could you see him once he went down?

MARTINEZ:      I, once he went down, uh, after they, uh, I couldn't see them like I said, deploying or shooting anything, 'cause they were behind cover, I could not see anything.

MELNYK:        Right.

MARTINEZ:      I could only see him lying face down, um, and I could not see his hands from where I was.  Um, once they pushed up, the SWAT Team pushed up to detain him, take him into custody, uh, they were surrounding him.  I, I couldn't see at that point anymore.  Uh, but I did see, obviously Fire Department came by with the ambulance.  They, they pushed up and then they began to render aid.  They flipped him onto his back.  They rolled him onto his back.  Um, and, um, I'm not sure if they called it or, or what is was from there.

MELNYK:        Okay.  Anything else?  Anything we didn't ask you about that you think we should've, that you can add?

MARTINEZ:      Um, I mean his, his over all demeanor, um, during, from the start of this to he ending, obviously he was smoking a lot of narcotics, ingesting a lot of narcotics throughout the duration of this standoff.  And just in the time from when I was, when I started looking at him from the turret to when I was relieved, his demeanor, uh, you could see it started to

change.  He began to have more of a blank stare.  Um, was constantly, like I said, checking his mirrors and seeing where the officers were positioned.  Um, began sweating profusely.  Um, and he, he did at several times look up at me trying to see where I was.  Uh, there were spotlights pointed in, into the headlight or into the, uh, windshield, um, and he would somehow try to, you know, block them out to try to see where I was or where we positioned in, inside the armored vehicle.  Um, so, his, his demeanor did change, uh, from the start of it to when I got relieved.

MELNYK:             Okay.  Anything else you can think of?

GARCIA:             Nope.

MELNYK:             Okay.

GARCIA:             Good to go.

MELNYK:             That concludes the interview.  It's now 0325.

[END OF INTERVIEW]

TRANSCRIBED BY:                    MAYRA JARAMILLO
                                   ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                                   OCTOBER 1, 2021


                                   YARESLY SANTANA
                                   ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                                   OCTOBER 1, 2021


                                   JOSE PADILLA
                                   ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                                   OCTOBER 1, 2021

Case No.
**21-004162**

REVISED BY:                    DAVID MELNYK / INVESTIGATOR
                                        (NAME) / (TITLE)
                               ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                               OCTOBER 4, 2021

# EXHIBIT 25

**Orange County District Attorney**
**Bureau of Investigation**
300 North Flower Street, Santa Ana CA 92701
(714) 834-3600

# TRANSCRIPT

| | |
|---|---|
| SUBJECT: | BRANDON ANTHONY LOPEZ |
| CLASSIFICATION: | OFFICER INVOLVED SHOOTING (FATAL) |
| INTERVIEW OF: | LUIS MANUEL GALEANA #2933, CORPORAL<br>SANTA ANA POLICE DEPARTMENT |
| DATE & TIME: | AUGUST 29, 2021                          0145 |
| LOCATION: | SANTA ANA POLICE DEPARTMENT |

On August 29, 2021, at approximately 0145 hours, Santa Ana Police Department (SAPD)

Detective ANDY GARCIA and I conducted a digital audio recorded interview of SAPD Officer

SERGIO MARTINEZ regarding the Anaheim Police Department (APD) officer involved shooting of

BRANDON LOPEZ.

The following is a transcript of that interview:

LEGEND:      …      Denotes pauses between words, phrases, incomplete sentences,
                          stammering etc. (does not indicate missing words)
              ***     Denotes unintelligible conversation
              (SIC)  Denotes precisely reproduced word

[BEGINNING OF INTERVIEW]

MELNYK:            Today is Wednesday, September 29th, 2021.  It is 0145 hours.  I'm

                          Investigator DAVE MELNYK of the Orange County District Attorney's

                          Office on Special Assignment case number 21-004162.  I'm at the Santa

                          Ana Police Department, um, to interview, your name, sir?

GARCIA:            LUIS GALEANA.

MELNYK:            And, uh, also present is my partner…

|  |  |
|---|---|
|  | Red Channel, 'cause, uh, in, in the station we don't know Red Channel. We don't have Red Channel, 'cause we're on Green One. Our own Green One. But somebody had put on the Red Channel. We-, I was listening to it. |
| MELNYK: | So you were here at the station when… |
| GALEANA: | Yes. |
| MELNYK: | …when the-, when you first got involved? |
| GALEANA: | Yes. |
| MELNYK: | Okay. (PAUSE). And describe to me what a Terradyne vehicle is? |
| GALEANA: | A Terradyne vehicle is basically a, uh, a big SUV, but it is fully armored. Uh, protects everyone inside the vehicle. Um, we use it, uh, for a SWAT Team. Um, eh, it's basically a vehicle that can, like a big bullet drop, uh, uh, gets us close to incidents where there's possibly armed sub-, subjects. |
| MELNYK: | And had you heard that this subject might be armed? |
| GARCIA: | I heard on the Red Channel that he was possibly armed. |
| MELNYK: | Okay. Did you ever see a gun at all? |
| GALEANA: | I never saw a gun. No. |
| ==MELNYK:== | ==Okay. And where, would, I think you said you were giving announcements, right?== |

GALEANA:   I was giving announcements, um, to the suspect to just to come out and surrender.  I was just trying to get him to come out and…

MELNYK:   Could you see him?

GALEANA:   I could see him.

MELNYK:   And where was he?

GALEANA:   He was in the front passenger, uh, in the driver's seat.  Um, it was getting warm.  He, he was, uh, moving around a lot inside.  Uh, he, he, I know he was smoking cigarettes and, and, and I think he was even smoking methamphetamine, 'cause he was using a pipe.  Um, he started sweating a lot and windows were up.  I think the only window that I could see was a r-, the front, right passenger window, and it was cracked open about maybe inch, inch and a half.  So the inside of the vehicle started getting, um, fogged up.  And, uh, there was some points that I lost visibility, just 'cause it got, it got so fogged up and then the, the night, the, the sun went down and I can see clearly inside again.  Um, he continued just to perf-, to sweat, to sweat profusely and then he started, uh, getting the floor mats and started putting them in front of the vehicle, in the windshield to, uh, block our view.  So he was able, he succeeded into put, block mats but then again, eh, all the breathing and the hot air inside the vehicle fogged up all the windows, well, the windshield that I could see.  And it was hard for me to actually look inside.

to get and out of there, so, um, I, I think the, the, the Tahoe got stuck.  It

appeared like it got stuck but I couldn't tell you for sure if it did.

MELNYK:            Okay.

GALEANA:          'Cause they were, it looked like it got stuck.  They left it there.  They

exited the vehicle and went to the back.

MELNYK:            Okay, and, uh, once you parked there and you, you're face to face with

him, where are you at in the Teladyne (SIC)?  Do you remain in the

driver's seat or…?

GALEANA:          I, I stayed it the driver's seat the entire time.

MELNYK:            The entire time?

GALEANA:          Entire time.

MELNYK:            And, uh…  So initially did you think it was gonna be a SWAT call out?

GALEANA:          Um, initially I didn't think it would be but, um…  I, I would say maybe

about an hour into it I believed it was going to be a SWAT call out

because he wasn't, he wasn't, uh, trying, he wasn't trying to have any

dialog with us and every time I said ay, do me a favor, please just come

out with your hands up and he, he was doing, just shaking his head like

this (INAUDIBLE), nope, nope.  Um, and the fact that, uh, that I heard on

the radio that he was armed.  I know our, our, uh, that that met pretty

much the criteria of our SWAT Team to get deployed.  A armed,

Case No.
21-004162

barricaded subject refusing to, to, to surrender.  I felt okay, now it's, it's…
This is probably where it's leaning, eh, towards a, a SWAT call out.  Yes.

MELNYK:        And whe-, you, when you say you got information that he was armed,
               that was over the radio?

GALEANA:       Over the radio when they were pursing him that's wha-, when I heard,
               uh, he was armed.

MELNYK:        And how did w-, how did, what was the context of that?  Did somebody
               see him with a gun or was it…?

GALEANA:       I heard it-, eh, I heard possibly, possibly armed.  Um, when I was in the, in
               the Terradyne, um, NELSON, Officer NELSON MENENDEZ was, I had
               designated him to be the radio person.  Um, I heard him say, he's 417,
               meaning he's got a gun.  Um, I next said, confirm you or somebody saw a
               gun before we put that out again.  We need to confirm that somebody
               physically saw it right now.  Not what we heard in the radio, but you saw
               it right now.  Um, never quite got a, a, a good response to that.  And I
               don't know that he, uh, I don't think they repeated that again.  But I, I let
               the guys know inside, if you saw a firearm, confirm it and be positive, be-,
               make sure you saw it before we put that out on the radio again.

MELNYK:        Eh...

GALEANA:       *** (UNINTELLIGIBLE).

MELNYK:        You said that was MENENDEZ that was that was working…?

|  | but then he, he would shake his head like this (INAUDIBLE), no.  Uh, he, he could hear me. |
|---|---|
| MELNYK: | And he was res-, so he was responding to you ***. |
| GALEANA: | I wanted to make sure he was responding to, to tell me that he was, he could hear me.  And he was responding to some things by just shaking his head like this, (INAUDIBLE).  Most of the time I would ask him for stuff he'd just would shake his head. |
| MELNYK: | And was this all in English? |
| GALEANA: | In English and I, I, I said some Spanish announcements but, I could tell he was understanding what I was saying in English.  Um, as the day, as the time went by he was doing more narcotics, eh, what appeared to be doing narcotics and his state of mind just started changing.  He, his, his acknowledgment like this and kinda smirking.  Uh, started kinda sweating more.  To blank stares and to a point where not even, uh, just kinda looking all, he appeared very, he started getting very, very nervous. |
| MELNYK: | Did you ever see him on cellphone? |
| GALEANA: | No.  Um, I asked if he had a cellphone and he went like this (INAUDIBLE), he said no. |
| MELNYK: | Okay. |
| GALEANA: | Um, and, uh, I did, at one point, uh, I think at one point I did see him with a cellphone, 'cause he went from, from the front to the backseat and |

GARCIA:            Yeah.

GALEANA:           FRANCOIS.  Uh, NGUYEN.

GARCIA:            NGUYEN.  Yeah.

GALEANA:           FRANCOIS NGUYEN.  Or N-G-U-Y-E-N.

MELNYK:            He's a Santa Ana guy?

GALEANA:           Yes, sir.

GARCIA:            Yup.

MELNYK:            Detective or…?

GALEANA:           Corporal.

MELNYK:            Corporal?  (PAUSE).  Anything else that you can think of?

GALEANA:           Uh, no.  That's about it.

MELNYK:            Okay.

GALEANA:           Um… that's about it.

MELNYK:            Anything else…

GALEANA:           That's all I can think of.

GARCIA:            Nope.

MELNYK:            Alright.  That's gonna conclude the interview.  It's now 0235.

[END OF INTERVIEW]

Case No.
**21-004162**

TRANSCRIBED BY:         CAROLINA ALBA
                        ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                        OCTOBER 1, 2021


REVISED BY:             DAVID MELNYK / INVESTIGATOR
                        (NAME) / (TITLE)
                        ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
                        OCTOBER 5, 2021

# EXHIBIT 26

1

2

3

4

5

6

7

8

9

10

11

12

13   Case Number: BI-RI2021-00030

14   Interview with: Brett Heitmann

15

16

17

18

19

20

21

22

23

24

25

Page 1

```
1              SPECIAL AGENT ESTRADA:  Good morning.
2    (Inaudible).  It's Wednesday, October 6th,
3    (inaudible), approximately 12:30.  We are at
4    Anaheim PD, conducting an interview with an
5    officer.  Going to go around the table and
6    introduce ourselves.  My name is Patrick Estrada,
7    Special Agent with the California Department of
8    Justice.  To my left is Special Agent supervisor,
9    Craig Black.
10             CHRISTOPHER KOHARSKI:  Christopher
11   Koharski, attorney rep.
12             BRETT HEITMANN:  Brett Heitmann,
13   Anaheim PD.
14             RUSSELL PERRY:  Russell Perry, attorney
15   rep.
16             DETECTIVE MARK GALE:  Detective Mark
17   Gale, Anaheim Police Department.
18             SPECIAL AGENT ESTRADA:  Great, thank
19   you gentlemen.  Officer, can you spell your first
20   name for me, please?
21             OFFICER BRETT HEITMANN:  Yes, it's B-R-
22   E-T-T.
23             SPECIAL AGENT ESTRADA:  And spell your
24   last name, please.
25             OFFICER BRETT HEITMANN:  H-E-I-T-M-A-N-
```

Page 2

```
 1    worked any overtime recently?
 2              OFFICER BRETT HEITMANN:  No.
 3              SPECIAL AGENT ESTRADA:  Okay.  In
 4    regards to the incident that we're discussing,
 5    that happened on September 28th, 2021 in the City
 6    of Santa Ana, at the corner of Santa Ana and
 7    Bristol -- are you familiar with that incident?
 8              OFFICER BRETT HEITMANN:  Yes.
 9              SPECIAL AGENT ESTRADA:  Okay, great.
10    At the time of the incident, can you tell me,
11    were you wearing any type of prescription
12    glasses, sunglasses, or any type of ocular
13    device?
14              OFFICER BRETT HEITMANN:  Just clear
15    safety glasses.
16              SPECIAL AGENT ESTRADA:  Okay.  Do you
17    wear prescription glasses?
18              OFFICER BRETT HEITMANN:  No.
19              SPECIAL AGENT ESTRADA:  Okay.  Do you
20    commonly wear sunglasses?
21              OFFICER BRETT HEITMANN:  No.
22              SPECIAL AGENT ESTRADA:  Okay, no
23    problem.  Were you wearing a body-worn camera at
24    the time of the incident?
25              OFFICER BRETT HEITMANN:  Yes.
```

Page 5

```
 1              SPECIAL AGENT ESTRADA:  Okay.  Have you
 2   had a chance to review the body-worn camera
 3   footage?
 4              OFFICER BRETT HEITMANN:  My camera was
 5   dead, unfortunately, at the time of the incident.
 6              SPECIAL AGENT ESTRADA:  Okay.  So, you
 7   had it on, but it didn't --
 8              OFFICER BRETT HEITMANN:  I had it on.
 9              SPECIAL AGENT ESTRADA:  But it didn't
10   record?
11              OFFICER BRETT HEITMANN:  Correct.  When
12   I went to activate it, it didn't turn on.  After
13   the incident, I looked at it, and it had just
14   been dead.
15              SPECIAL AGENT ESTRADA:  Okay, okay.  No
16   problem.
17              DETECTIVE MARK GALE:  Did you get a
18   chance to look at any of the other camera footage
19   from any of the other officers?
20              OFFICER BRETT HEITMANN:  Yes.
21              SPECIAL AGENT ESTRADA:  About how many
22   different types of footage have you seen?  Was it
23   just one officer, or --
24              OFFICER BRETT HEITMANN:  Just one
25   officer, and then news footage.
```

                                            Page 6

```
 1            SPECIAL AGENT ESTRADA:  Okay, okay.
 2    Which Officer was it, if you don't mind me
 3    asking, the one that you saw?
 4            OFFICER BRETT HEITMANN:  Officer
 5    Delgado.
 6            SPECIAL AGENT ESTRADA:  Okay, got it.
 7    Okay.  Can you describe to me some of your SWAT
 8    training that you've had?
 9            OFFICER BRETT HEITMANN:  Yes.  I got on
10    the SWAT team 11 years ago; started primarily in
11    the long-rifle or sniper position, for many, many
12    years.  I continue to do that.  We reorganized
13    the team a few, probably four years ago, to where
14    I started doing more of the other type of work
15    such as entry work and things like that, like
16    entering buildings, searching, things like that.
17            So, I'd been through basic SWAT school
18    all the way up to team leader course.  Basic
19    sniper school through advanced sniper school.
20    I'm one of the primary firearms instructors for
21    the team.  We have our own firearms cadre that I
22    lead, and that's kind of my main role as far as
23    just training.  And then, I'm also one of the
24    assistant team leaders, which means I'm like the
25    second command of a squad.
```

Page  7

```
 1              SPECIAL AGENT ESTRADA:  Okay, got it.
 2    Okay.  Do you have any prior military experience?
 3              OFFICER BRETT HEITMANN:  Yes.
 4              SPECIAL AGENT ESTRADA:  Okay.  Can you
 5    describe that for me, please?
 6              OFFICER BRETT HEITMANN:  I was in the
 7    Marine Corps starting in 2003, with one
 8    deployment to Iraq in 2005 to early 2006.
 9              SPECIAL AGENT ESTRADA:  Okay, and then
10    when did you get out?
11              OFFICER BRETT HEITMANN:  I got out in
12    2007; stayed in the active reserves until, I
13    believe, it was 2009, at which point I was
14    completely out, at that point.
15              SPECIAL AGENT ESTRADA:  Got it, okay.
16    Thank you for your service.  Have you been
17    trained in de-escalation techniques?
18              OFFICER BRETT HEITMANN:  Yes.
19              SPECIAL AGENT ESTRADA:  Do you have any
20    collateral duties?
21              OFFICER BRETT HEITMANN:  The SWAT team.
22              SPECIAL AGENT ESTRADA:  Just -- okay.
23    Can you tell me your uniform, or how you were
24    dressed the day of the incident?
25              OFFICER BRETT HEITMANN:  Yes.  From
```

Page 8

```
 1   their duty-type line of ammunition, and it is a -
 2   - it's either a 62 or 64-grain bonded bullet.
 3            SPECIAL AGENT ESTRADA:  Okay.  And was
 4   your ammunition department-issued as well?
 5            OFFICER BRETT HEITMANN:  Yes.
 6            SPECIAL AGENT ESTRADA:  Okay.  And the
 7   rounds for your handgun?  Can you just describe
 8   that for me?
 9            OFFICER BRETT HEITMANN:  Those are,
10   again, Winchester Ranger series, 147 (inaudible)
11   points.  Also, department issued.
12            SPECIAL AGENT ESTRADA:  Perfect.  Are
13   you right or left-handed, sir?
14            OFFICER BRETT HEITMANN:  Right.
15            SPECIAL AGENT ESTRADA:  Okay, and did
16   you check both weapon systems before you went
17   out?
18            OFFICER BRETT HEITMANN:  Yes.
19            SPECIAL AGENT ESTRADA:  Okay.  Which
20   weapon did you fire at the time of the OIS?
21            OFFICER BRETT HEITMANN:  The rifle.
22            SPECIAL AGENT ESTRADA:  Okay.  Was that
23   the same weapon that was taken and processed by
24   CSI?
25            OFFICER BRETT HEITMANN:  Yes.
```

Page 14

```
1              SPECIAL AGENT ESTRADA:  Okay, and do
2    you know approximately how long it took you, from
3    the time of notification, to get to the command
4    post?  I'm guessing that's where you went first.
5              OFFICER BRETT HEITMANN:  Yes, I went
6    straight to the command post.  That was somewhere
7    between 30, 45 minutes, tops.
8              SPECIAL AGENT ESTRADA:  Okay, all
9    right.  Had you heard -- (inaudible) the
10   information while -- before arriving to the
11   command post, and (inaudible) around or anything
12   about that, about the situation or subject or
13   anything like that?
14             OFFICER BRETT HEITMANN:  Yes.
15             SPECIAL AGENT ESTRADA:  Can you tell me
16   about that?
17             OFFICER BRETT HEITMANN:  In that call
18   out, it's just an automated voice that reads off
19   whatever somebody puts in there.  And all we had
20   was "Armed 211 suspect barricaded in a vehicle."
21   Those are the two things that stand out.  That's
22   not verbatim, but those were the two.  It's never
23   very long.  It's a very short thing.  I don't
24   think you can put much in there.  So, I knew that
25   it was an armed person barricaded in a vehicle in
```

Page 17

1    the City of Santa Ana, and it had something to do

2    with a robbery.

3              SPECIAL AGENT ESTRADA:   Okay.   When you

4    got to the command post, did you get any type of

5    update or briefing from anybody?

6              OFFICER BRETT HEITMANN:   Yes.

7              SPECIAL AGENT ESTRADA:   Okay.   Can you

8    tell me who?

9              OFFICER BRETT HEITMANN:   I would say

10   the lead person briefing that was Sergeant Leest.

11             SPECIAL AGENT ESTRADA:   Okay, and what

12   were you told?

13             OFFICER BRETT HEITMANN:   Again, that it

14   was a 211 suspect that our CTF, one of our units,

15   had attempted to arrest, which turned into a

16   pursuit, which wound up terminating just right

17   around the corner, obviously, from where our

18   command post was.   Learned the name of the

19   suspect; saw a photo of the suspect; and we were

20   told that he is armed, that a Santa Ana police

21   officer observed the suspect with a firearm in

22   the vehicle, and that Santa Ana had been working

23   on this for a few hours, at this point, and that

24   the suspect is not cooperative, and that we were

25   going to go replace Santa Ana, and continue the

Veritext Legal Solutions
866 299-5127

1    operation.

2              SPECIAL AGENT ESTRADA:  Do you know,

3    during all this time, did you ever hear the name

4    or get the name of the individual?

5              OFFICER BRETT HEITMANN:  Yes.

6              SPECIAL AGENT ESTRADA:  Okay, do you

7    know, in the timeline, around when that was?

8              OFFICER BRETT HEITMANN:  During that

9    briefing.

10             SPECIAL AGENT ESTRADA:  Okay.

11             OFFICER BRETT HEITMANN:  We were given

12   his name, and then we were also shown a photo of

13   the suspect prior to leaving the command post.

14             SPECIAL AGENT ESTRADA:  Okay.  Who all

15   was with you during that briefing?

16             OFFICER BRETT HEITMANN:  I won't be

17   able to name everybody, but I can name off those

18   that I can recall, if you like.

19             SPECIAL AGENT ESTRADA:  Sure.

20             OFFICER BRETT HEITMANN:  Definitely

21   Sergeant Leest was there.  Officer Ungaranu.  I

22   don't know how to spell that.

23             SPECIAL AGENT ESTRADA:  It's okay.

24             OFFICER BRETT HEITMANN:  Officer Song,

25   Officer Panov, Officer Delgado, Officer Weber,

Page 19

```
 1    see as far as the vehicle?
 2              OFFICER BRETT HEITMANN:  I could see
 3    most of the driver's side of the vehicle,
 4    including the driver's window and the window
 5    directly behind it.
 6              SPECIAL AGENT ESTRADA:  Okay.  Did you
 7    see the subject inside?
 8              OFFICER BRETT HEITMANN:  Yes.
 9              SPECIAL AGENT ESTRADA:  Okay.  The
10    subject was Brandon Lopez.  Was that your
11    understanding?
12              OFFICER BRETT HEITMANN:  Yes.
13              SPECIAL AGENT ESTRADA:  Had you had any
14    prior involvement with Mr. Lopez, prior to this
15    incident?
16              OFFICER BRETT HEITMANN:  Not that I
17    know.
18              SPECIAL AGENT ESTRADA:  Okay.  Never
19    came across him in previous calls or service, or
20    anything like that?
21              OFFICER BRETT HEITMANN:  Not that I can
22    recall.
23              SPECIAL AGENT ESTRADA:  Okay.  What
24    kind of communication were you getting in regards
25    to Mr. Lopez?
```

Page 28

1      SPECIAL AGENT ESTRADA:  Were they
2   communicating to people that weren't in this
3   Terradyne, on the passenger's side?  Were they
4   communicating to what they were seeing inside the
5   vehicle?
6      OFFICER BRETT HEITMANN:  Yes.  So, both
7   of us, or people on my arrest team and people in
8   here, we would report any major movement.  It
9   gets to the point where if you put out
10  everything, then obviously the radio's always
11  going to be going off, and nobody could put out
12  something.  So, it's not every movement, but
13  something significant.  He was in the back seat
14  when we got there, but every so often, he would
15  lean between the two front seats and did around
16  under something.  Something like that would be
17  pertinent for everyone to know, because we don't
18  know what he's doing at the point.  But just him
19  doing normal body movements is not put out.
20      SPECIAL AGENT ESTRADA:  Okay.  Did you
21  ever hear the subject, Mr. Lopez, say anything at
22  all?
23      OFFICER BRETT HEITMANN:  No.  He looked
24  directly at me multiple times, but he never
25  seemed to respond to any of the announcements

Page 30

1    from the Santa Ana negotiators or our negotiators
2    at any point.  He seemed to be actively ignoring
3    us, to be honest with you, because there's no way
4    he didn't hear them, and he went out of his way
5    to not do anything he was asked to do.
6            SPECIAL AGENT ESTRADA:  What were your
7    negotiators trying to communicate to him?
8            OFFICER BRETT HEITMANN:  So, they
9    showed up later on and replaced the Santa Ana
10   negotiators, and our negotiators had done more of
11   a background check, and knew that he was a father
12   of I-don't-know-how-many kids.  So, they had
13   mentioned several times, "Hey, think of your
14   kids.  You want to see his next football game.
15   There's no reason that anybody needs to get hurt.
16   You won't be hurt if you just exit."  Things of
17   that nature is what our negotiators were going
18   with.
19           SPECIAL AGENT ESTRADA:  Had anybody
20   communicated to you or your team anything else,
21   either verbally or via radio, about what he may
22   have been doing?
23           OFFICER BRETT HEITMANN:  Yes, a few
24   different things.  We'd been told by both Santa
25   Ana officers that we replaced, and the things

Page 31

1    that we saw, that he appeared to be using

2    narcotics of some sort.  And then, we also were

3    told via radio that family members of Brandon had

4    notified police that Brandon via phone had

5    discussed or told his family members that he was

6    going to go suicide by cop, or he's going to make

7    us shoot him; I forget the exact verbiage, but

8    basically, he's going to force us to use lethal

9    force on him.

10            SPECIAL AGENT ESTRADA:  Okay.  So, tell

11   me about the contingency plans, or what were the

12   plans to try and get him out of the vehicle?

13            OFFICER BRETT HEITMANN:  So, again,

14   just the way we set up is Step 1, control equals

15   safety, for the most part, so that we have less

16   surprises.  So, Step 1, on these vehicle

17   barricades, again, is to set up something similar

18   to this and create our own work space, and

19   literally pen off all these other doorways,

20   windows, things like that, so there's no way

21   anybody can squeeze out.  So, the only direction

22   that they can go is the direction that we want

23   him to go, that we can prepare for.  Again, it

24   leads to everyone's safety that way.  So, that

25   was Step 1.  We had to figure out how to do that

Page 32

```
 1    to crawl up that.  He'd hit a wall.  So, our plan
 2    was, put him down here, crawl up here, crawl him
 3    towards us until we felt we had a good enough
 4    position, and then we would move forward and take
 5    him into custody.  That was our overall goal from
 6    the beginning.
 7              So, then, contingencies:  If he does
 8    get out but he doesn't go with those programs,
 9    then possibly less-than-lethal force, based on
10    exactly what he's doing, right -- we can what-if
11    all kinds of things -- and/or a dog deployment,
12    if it was necessary.
13              SPECIAL AGENT ESTRADA:  Really quick,
14    what less-lethal did you have with you and your
15    team at the front?
16              OFFICER BRETT HEITMANN:  We had a
17    multi-40-millimeter launcher.  It was loaded only
18    with foam rounds.
19              SPECIAL AGENT ESTRADA:  Okay, and you
20    said a canine as well, right?
21              OFFICER BRETT HEITMANN:  Yes, we had a
22    canine as well.
23              SPECIAL AGENT ESTRADA:  Okay.
24              OFFICER BRETT HEITMANN:  And then,
25    further contingency planning:  Now, if he doesn't
```

Page 37

```
 1    from the command post to deploy chemical agents.
 2              SPECIAL AGENT ESTRADA:   Okay.   How did
 3    you know that you were going to deploy a chemical
 4    agent?   And did you know what chemical agents
 5    they were going to use?
 6              OFFICER BRETT HEITMANN:   Yes.   So, on
 7    the -- I carry two radios, all assistant team
 8    leaders and sergeants carry two radios.   So, we
 9    have a separate command channel versus a tactical
10    channel.   And on that command channel was the
11    discussion of how much longer are we going to go
12    before we end up using chemical agents.   And so,
13    I didn't partake in, but I heard that discussion
14    and the plan being made over the radio, of 15
15    more minutes, with a 10-minute mark being the
16    mask-up.   So, I heard that entire plan.
17              And then, on the tactical channel, they
18    advised us that they, being the gas team, that
19    they were going to deploy an NFDD, or a flash
20    bang -- same difference -- at the hood of the
21    vehicle as they used a chemical agent and what we
22    call a bang pole through the rear window.   And
23    they were doing that because we were still
24    worried about him being armed, and didn't want
25    him to see that pole coming, and turn around and
```

Page 40

1    shoot at the officer trying to deploy the gas,

2    because he had to be in slightly precarious spot

3    to deploy that gas for a very short time.  So,

4    the plan was, put the flash bang up front, as a

5    distraction, so he's looking to the front while

6    the officer with the pole is able to hit the back

7    window with the pole.

8           And the type of gas is, a lot of times

9    known as Clear Out.  And what that is, it's an

10   aerosol-only can.  There's no burning or anything

11   like that.  And there's also no smoke or

12   anything.  And we actually transitioned to that

13   from doing this previously, with hot gas, because

14   it's a more potent type of gas that we have.  And

15   we would use that before, but the problem with

16   that is we lose visibility, and now there's a

17   potential that we're making it more confusing for

18   the suspect, and all of that other stuff.

19          So, while it all worked fine in prior

20   times, we're always forward-thinking and trying

21   to see how we can better ourselves, and that's

22   when we saw this Clear Out version, and we

23   decided that would be ideal for this, because now

24   we don't lose visibility, and there's no extra

25   confusion for a suspect who is just trying to

Page 41

1    follow orders, things like that.  So, we all were

2    in agreement that that was going to be the first

3    chemical agent used.

4              SPECIAL AGENT ESTRADA:  Okay.  So, tell

5    me about the deployment of that.

6              OFFICER BRETT HEITMANN:  Okay.  The gas

7    team -- we expected it to be deployed almost

8    right after we got the word from command that we

9    could do it, except for, again, the angles were a

10   little bit different than what we normally do,

11   just based on the circumstances here.  So,

12   Sergeant Hunter, who was over with the gas team,

13   just let us all know, "Hey, stand by, actually.

14   We've got to re-work this for a second," and it

15   was no more than a couple of minutes.

16              And then, he advised everybody, "Okay,

17   we're going to deploy the gas."  At that point,

18   from my angle, I actually observed an officer

19   from the back of our Terradyne armored vehicle

20   place the NFDD on the hood, while at the same

21   time an officer with the pole with the chemical

22   munition in it was actually on the hood of the

23   same vehicle, and was able to get the pole down

24   into the back windshield.  And then, once that

25   pole goes in there, he's able to just pull the

Page 42

1    handle and disperse the gas.

2              SPECIAL AGENT ESTRADA:   Okay.   Did you

3    see the gases burst?

4              OFFICER BRETT HEITMANN:   That one you

5    cannot.   It's invisible.

6              SPECIAL AGENT ESTRADA:   Oh, okay.   What

7    happened after that?

8              OFFICER BRETT HEITMANN:   So, the gas

9    dispersed, and the -- well, not really gas --

10   chemical agent -- as soon as that happened, the

11   rear passenger door, which is where the suspect

12   was, immediately opened up.   I illuminated him

13   with the light of my rifle, and the suspect

14   immediately exited the car, at which point I

15   yelled to him, and I believe others yelled to

16   him, to keep his hands up.

17             Again, normally, I tell people to get

18   on the ground, but based on our planning and the

19   circumstances here with all the metal and things,

20   I just told him to get his hands up.   And then, I

21   stopped giving commands, so that he's not getting

22   multiple commands, and things like that, and let

23   Officer Weber handle the rest.   He was designated

24   a hands-on officer, and typically we like to have

25   them give commands, because they're not right up

Veritext Legal Solutions
866 299-5127

1   front with a lethal weapon in their hand.

2           So, the door flew open, and the suspect

3   got out very quick, and immediately ignored my

4   commands of putting his hands up, and immediately

5   negotiated the metal stuff below him, and refused

6   to stop, and refused to raise his hands at any

7   point.

8           SPECIAL AGENT ESTRADA:  Which door did

9   he get out of, in the vehicle?

10          OFFICER BRETT HEITMANN:  It was the

11  driver's side passenger, rear passenger door.

12  So, the door right behind the driver's seat.

13          SPECIAL AGENT ESTRADA:  Okay.  Tell me

14  about the lighting conditions during that time.

15          OFFICER BRETT HEITMANN:  Lighting was

16  we have white lights all along this side of the

17  Bear that were turned on, along with white light

18  from Santa Ana's armored vehicle here.  During

19  all the negotiations, I actually called for -- we

20  have -- they're stream light brand, but they're

21  just standup lights that can support themselves

22  and are -- I don't know if they're meant for

23  construction sites, or what, but they're very,

24  very bright stand-alone lights that we use for

25  this a lot.

Page 44

1    point on this photo if you like.

2              SPECIAL AGENT ESTRADA:  Okay, yeah.

3              OFFICER BRETT HEITMANN:  So, he exited

4    the vehicle, and immediately continued this way

5    across the dirt.  Well, I take that back.  A

6    little bit of an angle this way across the dirt.

7    He did not come straight at me towards this

8    ledge.  He came up this, basically, natural dirt

9    ramp in this direction.  So, he's coming in our

10   direction, but kind of staying wide.

11             SPECIAL AGENT ESTRADA:  Would you

12   consider that like a turn, or maybe just a

13   gradual veering off?

14             OFFICER BRETT HEITMANN:  So, from what

15   I recall, once he got through this little metal

16   checkerboard, he was coming in this direction

17   first, turned and looked at us, and then came

18   this way at us.

19             SPECIAL AGENT ESTRADA:  Towards your

20   general direction?

21             OFFICER BRETT HEITMANN:  Towards our

22   direction, yes.

23             SPECIAL AGENT ESTRADA:  What did you

24   see him doing, as you got out of the vehicle?

25             OFFICER BRETT HEITMANN:  As soon as he

                                              Page 46

```
 1    got out, I saw one hand start to go toward his
 2    waistband, which is why I started yelling "Get
 3    your hands up."
 4            SPECIAL AGENT ESTRADA:  when you say
 5    one hand, which one?
 6            OFFICER BRETT HEITMANN:  I'm not 100
 7    percent certain.
 8            SPECIAL AGENT ESTRADA:  Okay.  So, you
 9    said one of his hands went towards his --
10            OFFICER BRETT HEITMANN:  One of his
11    hands went right towards his waistband, and then,
12    as he kind of high-stepped through this metal
13    stuff, his hands just kind of naturally flailed
14    around for a second, as one would do when you're
15    running through tires or whatever.  But as soon
16    as he cleared that, both hands then went right
17    back to his waistband, which is when I started
18    being very worried at that point.
19            SPECIAL AGENT ESTRADA:  Why is that?
20            OFFICER BRETT HEITMANN:  So, a number
21    of things.  The totality of circumstances here of
22    at this point I'm aware that he has a firearm in
23    the vehicle, per another officer that saw it; I
24    know that he's made comments to his family
25    members that he is going to force us to shoot
```

Page 47

```
 1    him; I know that he's a gang member, and I know
 2    that he's wanted for serious offences.
 3            All these things, coupled with him
 4    using possible narcotics and drinking alcohol,
 5    and things like that in a vehicle, which -- if we
 6    can pause that for a second:  Right before
 7    deployed the gas, maybe five minutes earlier or
 8    so, I actually did get on the air, on the radio,
 9    to our command, and ask them if we could bump up
10    the timeline of the gas, because I observed the
11    suspect drinking something else.
12            I don't know what it was, but he seemed
13    to be moving around a lot more, and it was my
14    worry that he was possibly going to spring his
15    attack at that point, and that if we could put
16    the gas in there, actually as a de-escalation --
17    and I actually used the words, "To take the fight
18    out of him," my hope was if we have him exposed
19    to the gas, whatever it is that I feel he's
20    planning to do right now might kind of make him
21    change his mind at that point, or at least
22    distract him enough for us to gain time.
23            And basically, everyone agreed, but we
24    had to have everybody finish masking up anyways,
25    so it still happened about right on timeline.
```

Page 48

1          SPECIAL AGENT ESTRADA:  So, you said he

2     came out.

3          OFFICER BRETT HEITMANN:  So, he came

4     out.  And so, based on all of those things I

5     know, I believed 100 percent he had a firearm in

6     his waistband, and he's going to charge us and

7     try to shoot as many of us as he could.  And I

8     believe that, again, based on all the things I

9     just mentioned.  And the angle that he took.

10          If he came straight -- if he had exited

11     and made a direct run right towards me, I would

12     have been the only one that would have been able

13     to see him, which to me -- if I am going to be in

14     a gun fight with somebody, I'd rather be one-on-

15     one.  Instead, he came wide, and exposed himself

16     to the line of officers behind me, that are also

17     all armed.  And it was my fear that he did that

18     on purpose so that he could shoot as many of us

19     as possible, and force us to shoot him.

20          So, when he went wide, the other issue

21     with that was there's a -- you can't see it in

22     this photo -- there's a large construction sign

23     sitting right over here somewhere.  And so, when

24     he went wide, which surprised me.  I actually

25     lost sight of him behind that sign.  So, now I'm

Page 49

1   relief -- I expected to see a firearm, and seeing

2   him shooting at that point -- but both hands were

3   still at his waistband, and I actually saw a

4   tugging motion, as if whatever he's grabbing for

5   got caught up.

6           But he was still actively trying to

7   access what I believed to be a weapon, 100

8   percent, as he continued to get closer to us.

9   And it was at that point that I believe I heard a

10  shot or two to my right, first, and that's right

11  about the time that I again saw him tugging at

12  it.  And in an effort to stop him from getting

13  shots off at me and my partners, I fired as well.

14          SPECIAL AGENT ESTRADA:  Had you heard

15  or did anything happen that led you to believe

16  that maybe he was firing at you?

17          OFFICER BRETT HEITMANN:  At the onset

18  of the gunshots, I wouldn't be able to tell you

19  if it was him or somebody on my team.  All I

20  heard was gunfire, fractions of a second before I

21  fired.  So, until we actually went and placed

22  hands on, if you asked me, I would tell you

23  there's a good possibility he fired at us first.

24          SPECIAL AGENT ESTRADA:  How long would

25  you say -- you said he went out of sight behind a

Page 51

1              SPECIAL AGENT ESTRADA:   Okay.   How did

2     you deploy your rifle?   Like when he came out,

3     you knew (inaudible -- crosstalk) --

4              OFFICER BRETT HEITMANN:   So, I was

5     already initially pointing at him, using my white

6     light to illuminate him.   Since I had my gas mask

7     on, and we're relatively close, that's one of the

8     times that I'll use the visible setting on that

9     Molle laser system.   So, as he had my light on

10    him initially, and once it was very clear to me

11    that he's literally attacking us and coming

12    around that sign, is when I'd moved my thumb

13    back, to activate the green laser.   Just because

14    with a gas mask on, it's very hard to be able to

15    see through optics.

16              So, just like with night vision and so

17    on and so forth, you can shoulder the gun but

18    keep your head upright, and use the laser as an

19    aiming point.   And that's exactly what I did, as

20    he came out of that sign.   I activated the Molle,

21    confirmed I had a good shot at what was center

22    mass available to me, and fired.

23              SPECIAL AGENT ESTRADA:   Okay.

24    Approximately how many shots did you fire?

25              OFFICER BRETT HEITMANN:   Best I could

                                        Page 53

1    tell you is three to six.

2              SPECIAL AGENT ESTRADA:  Okay.  Do you

3    know who else fired?

4              OFFICER BRETT HEITMANN:  I do now.

5              SPECIAL AGENT ESTRADA:  Okay.  You

6    didn't at the time?

7              OFFICER BRETT HEITMANN:  At the time,

8    no.

9              SPECIAL AGENT ESTRADA:  The officers

10   that also fired, were they behind you?

11             OFFICER BRETT HEITMANN:  Yes.

12             SPECIAL AGENT ESTRADA:  Okay.  Not in a

13   straight line, obviously?

14             OFFICER BRETT HEITMANN:  So, we were at

15   an angle, and again, based on his starting angle,

16   they would have been directly behind me.  But the

17   direction that the suspect took, then made it so

18   that he was in front of all of them.

19             SPECIAL AGENT ESTRADA:  Do you happen

20   to know why they fired?

21             OFFICER BRETT HEITMANN:  We were being

22   attacked by an armed suspect.

23             SPECIAL AGENT ESTRADA:  Did you have to

24   reload at all?

25             OFFICER BRETT HEITMANN:  I did not.

Page 54

1          SPECIAL AGENT ESTRADA:   Okay.   After
2     you fired your shots and Mr. Lopez goes down,
3     what happened?
4          OFFICER BRETT HEITMANN:   We were still
5     basically frozen in position, watching the
6     suspect.   Because when he fell to the ground, he
7     fell with both of his hands still at his
8     waistband.   So, everybody was kind of frozen,
9     waiting to see if he was still going to shoot at
10    us or not.   So, a small amount of time went by
11    that we were looking at that, when somebody
12    behind us yelled, "Hey, step back behind cover,"
13    just because again, what was cover from this
14    angle is no longer cover based on the angle he
15    took.
16          So, we all took maybe two steps back to
17    get now on this side of the Bear, and made a
18    quick plan to take the suspect into custody and
19    get medical aid to him as soon as possible.   But
20    the problem with that was that he was still a
21    threat, based on where his arms were.   So, that's
22    what made us take it a little bit more slowly,
23    maybe, than other times.
24          SPECIAL AGENT ESTRADA:   Where were his
25    arms?

Page 55

```
 1            OFFICER BRETT HEITMANN:   Both of them
 2    were completely underneath him, right at his
 3    waistband level.   You could see his elbows kind
 4    of chicken-winging out, directly underneath him,
 5    with him facing down.   So, it was our fear that
 6    if we went just straight up to him, he could
 7    easily -- whether he's hit or not -- now shoot us
 8    from inches away.   So, we wanted to make sure we
 9    had a good plan first.   Again, that only took a
10    minute or two, tops.   And the plan was for the
11    same team to move forward.   We just grabbed a
12    different shield, and the plan was for the person
13    with the shield to come up next to me -- I would
14    still be the lethal cover -- and we would move
15    up.
16            And as we got close enough, the officer
17    with the shield would actually put the shield
18    down directly on top, keeping the suspect in
19    position, which would then allow for our hands
20    team -- which was Officer Panov and Officer Weber
21    -- to then step out and pin each arm to the
22    ground, and then slowly and controlled pull those
23    arms out to make sure that nobody is in danger.
24    And that's exactly how it went down.
25            SPECIAL AGENT ESTRADA:   Okay.   You said
```

Page 56

1          SPECIAL AGENT ESTRADA:   Tell me about
2    the taking into custody.   You said a 40-
3    millimeter was deployed?
4          OFFICER BRETT HEITMANN:   Yes.
5          SPECIAL AGENT ESTRADA:   Okay.   And
6    then?
7          OFFICER BRETT HEITMANN:   So, once that
8    was deployed, we paused again for only a second.
9    Everybody agreed that they didn't see any major
10   movement, or obviously he didn't roll over and
11   start shooting at us, or anything.   So, at that
12   point, that's enough, and let's go ahead and put
13   in our plan to approach with the shield, pin him
14   down with the shield, and then, again, each
15   officer that was designated for each arm went and
16   pinned down each arm, and under control; pulled
17   those arms out from underneath him, and then they
18   -- I don't know for a fact that they placed him
19   in restraints or not.
20          It was at that point, once I know that
21   the hands were out, and we were relatively safe
22   at that point, I turned around and started to
23   walk a couple steps back behind the Bear, where
24   medics that are assigned -- our SWAT medics, who
25   are fire paramedics assigned to our team -- I

Page 59

1   kind of motioned to them, "Hey, they're securing

2   him, so be ready."  And then, they started to

3   walk up, and then seconds after that, other fire

4   personnel that were staged also began to walk up,

5   and I just -- after that, I never went back

6   towards the suspect.

7        SPECIAL AGENT ESTRADA:  Okay.  Do you

8   have any questions?

9        SPECIAL AGENT SUPERVISOR SPECIAL AGENT

10  SUPERVISOR CRAIG BLACK:  Yeah, I just want to

11  clarify a few things with you.  You mentioned

12  that the gas masks and you're wearing a gas mask

13  at this stage, and you mentioned that the rest of

14  your team was kind of cycling in and off of

15  masking up.  Is that something that's part of

16  your normal training protocols, as part of the

17  SWAT team, do you guys normally train live fire

18  wearing gas masks?

19        OFFICER BRETT HEITMANN:  Yes, we do.

20        SPECIAL AGENT SUPERVISOR CRAIG BLACK:

21  With the direction of travel that the suspect

22  took when he came out of the vehicle here, was

23  there anything blocking his escape route,

24  essentially?  Had he continued on that path that

25  he initially started on, was there anything

Page 60

1   blocking him or preventing him from running in

2   that -- continuing on that path?  Or was there

3   anything that forced him to come in your

4   direction?

5            OFFICER BRETT HEITMANN:  There was

6   absolutely nothing that forced him to come in our

7   direction there.  You could see -- I don't

8   remember if this is a block wall, or what, but to

9   answer your questions, if he went straight, he

10  would have to negotiate these things here.  But

11  there was not an armed officer or anything

12  preventing him from coming in this direction.

13           SPECIAL AGENT SUPERVISOR CRAIG BLACK:

14  Okay.  So, based on your observations, what you

15  saw there, he made a deliberate effort to --

16           OFFICER BRETT HEITMANN:  100 percent.

17           SPECIAL AGENT SUPERVISOR CRAIG BLACK: -

18  - come in your direction.

19           OFFICER BRETT HEITMANN:  He had

20  essentially 10 directions to go and one not to

21  go, and he chose the one not to go on purpose.

22  It did not appear to be a mistake whatsoever.

23           SPECIAL AGENT SUPERVISOR CRAIG BLACK:

24  And based on your training and experience, and

25  what you know about reaction and action times,

Page 61

```
 1    would it have been possible or reasonable -- even

 2    possible to utilize a less-lethal in this

 3    situation?

 4              OFFICER BRETT HEITMANN:   Absolutely

 5    not.

 6              SPECIAL AGENT SUPERVISOR CRAIG BLACK:

 7    Like deploy a 40-millimeter, anything like that.

 8              OFFICER BRETT HEITMANN:   This

 9    particular situation, how fast it went down, and

10    the fact that he went for his waistband, which we

11    believed to be a lethal weapon, at no point are

12    we going to answer a lethal threat with a less-

13    than-lethal option.   It's not trained, it's not

14    what the law says, and it's just flat-out

15    dangerous.   So, would absolutely not do that.

16    With the way this went down, that would not

17    happen.

18              SPECIAL AGENT SUPERVISOR CRAIG BLACK:

19    That's all for me.

20              RUSSELL PERRY:  Okay, I have a few.  It

21    sounded like you guys, as far as the SWAT team

22    goes, trained for barricaded suspects in vehicles

23    quite a bit.  Do you know the actual number of

24    times you've trained per year?

25              OFFICER BRETT HEITMANN:  If you need an
```

Page 62

```
 1                RUSSELL PERRY:  Okay.  That sort of
 2   leads me to my next question.  Have you ever been
 3   involved in a vehicle barricade or a subject
 4   barricade where the suspect that's barricaded
 5   uses force against either police officers, or
 6   anyone else in the community?
 7                OFFICER BRETT HEITMANN:  I can think of
 8   one now, but I was not on it.  None that I've
 9   been on.
10                RUSSELL PERRY:  Okay.  So, now getting
11   more towards the actual officer-involved
12   shooting:  When he exits the car, at some point
13   you say both hands go to his waistband.  Okay.
14   Did you ever see anything other than like his
15   clothing, or his shorts or belt?  What he was
16   wearing, did you ever see any other objects in
17   his waistband?
18                OFFICER BRETT HEITMANN:  Once he passed
19   the sign, I did see a dark object in one of his
20   hands.  I believe his left hand.  Just as he
21   passed the sign.  And that was, again, at the
22   time where I realized that's not where I need to
23   be looking right now, because I need to fire.
24   So, I transitioned my focus to my available
25   center mass.  But I did see for a short time an
```

Page 64

1     actual object in his hand, but still around his

2     waistband area.

3                  RUSSELL PERRY:   Okay, and you described

4     that as black?

5                  OFFICER BRETT HEITMANN:   Yeah, just a

6     dark object.

7                  RUSSELL PERRY:   Okay.   And how was he

8     holding that?

9                  OFFICER BRETT HEITMANN:   It was still

10    at waistband level.   It looked like he was

11    basically mid-draw, if you will.   So, I carry

12    (inaudible).   Criminals commonly carry weapons

13    there.   And so, what I observed was a perfect

14    match of having to take one hand to clear the

15    cover garment, take the next hand, access the

16    weapon for the draw.   It was that to a T.

17                 RUSSELL PERRY:   Okay.   During this

18    incident, did you hear anyone else, police

19    officer-wise or SWAT-officer wise, give any type

20    of commands in regards to weapons, when he exited

21    the vehicle?

22                 OFFICER BRETT HEITMANN:   I heard

23    commands.   I don't know what they were at this

24    point.

25                 RUSSELL PERRY:   Okay.   All right.   So,

                                                Page 65

1    pieces and stuff like that.  In this situation,

2    had he actually shot at you and your partners,

3    could you guys still have been shot?

4              OFFICER BRETT HEITMANN:  Oh,

5    absolutely.  Absolutely.

6              RUSSELL PERRY:  Okay.  So, safe to say

7    that that stuff doesn't protect you 100 percent.

8              OFFICER BRETT HEITMANN: No, not at all.

9    There was plenty of exposed parts, especially the

10   lethal parts; the face and the head.  And the

11   term bulletproof vest is incorrect.  It's more

12   bullet-resistant, and everybody's heard many

13   stories where things go right through things.

14   So, for us to count on what we're wearing to

15   protect us from any projectiles is -- it's more

16   of -- it's like a seatbelt.  It may help you.

17             RUSSELL PERRY:  Okay.  And then, this

18   might have been answered.  I apologize if it was.

19   When he exited this car, once he made the

20   decision to come towards you guys, which I know

21   was split-second:  Would you describe him as

22   walking fast, running, sprinting?  How would you

23   describe it?

24             OFFICER BRETT HEITMANN:  He was

25   running.

1          OFFICER BRETT HEITMANN:  Nothing.

2          RUSSELL PERRY:  Okay, and sort of the

3    same thing with alcohol.  Any alcohol that you

4    had consumed, that 12 to 24 hours --

5          OFFICER BRETT HEITMANN:  Nothing.

6          RUSSELL PERRY:  -- before the incident

7    occurred?  Okay.  That's all I have, sir.

8          SPECIAL AGENT ESTRADA:  You want to

9    take a quick break and (inaudible) convene, or

10   are we good?

11         SPECIAL AGENT ESTRADA:  I'm done with

12   mine.

13         CHRISTOPHER KOHARSKI:  I'm good.

14         DETECTIVE MARK GALE:  I'm good.

15         RUSSELL PERRY:  I'm good.

16         SPECIAL AGENT SUPERVISOR CRAIG BLACK:

17   We're all good.

18         SPECIAL AGENT ESTRADA:  Okay, thank you

19   very much for your time.  We will go ahead and

20   conclude the interview at 1:39 p.m.

21

22

23

24

25

                                    Page 71

```
1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8

9    <%12151,Signature%>

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date:  November 30, 2021

17

18

19

20

21

22

23

24

25
```

Page 72

# EXHIBIT 27

**Orange County District Attorney**

**Bureau of Investigation**

300 North Flower Street, Santa Ana CA 92701

(714) 834-3600

## TRANSCRIPT

|  |  |
|---|---|
| SUBJECT: | LOPEZ, BRANDON |
| CLASSIFICATION: | OFFICER INVOLVED SHOOTING (FATAL) |
| INTERVIEW OF: | OFFICER BRANDON MULLINS<br>ANAHEIM POLICE DEPARTMENT |
| DATE & TIME: | SEPTEMBER 29, 2021 @ 5:56 AM |
| LOCATION: | ANAHEIM POLICE DEPARTMENT |

On Wednesday, September 29, 2021, at approximately 0556 hours, I conducted a digital audio recorded interview of Anaheim Police Officer BRANDON MULLINS.   The interview took place at the Anaheim Police Department, 425 South Harbor Blvd, Anaheim.

The following individuals were present in the interview:

- Investigator CRAIG BROWER        OCDA
- Detective GUS MOROYOQUI        Santa Ana Police Department
- CHRISTOPHER KUCHARSKI        Attorney

The following is a transcript of that interview:

| LEGEND: | … | Denotes pauses between words, phrases, incomplete sentences, stammering etc. (does not indicate missing words) |
|---|---|---|
|  | *** | Denotes unintelligible conversation |
|  | (SIC) | Denotes precisely reproduced word |

[BEGINNING OF INTERVIEW]

HERNANDEZ:        Date is September 29, 2021. The time is 5:56 A.M., the case number is 2-1- dash,

0-0-4-1-6-2. Investigator TROY HERNANDEZ, T-R-O-Y, H-E-R-N-A-N-D-E-Z.

BROWER:        Investigator CRAIG BROWER, Orange County District Attorney's Office. Spelled

C-R-A-I-G. Last name B-R-O-W-E-R.

KUCHARSKI:        CHRISTOPHER KUCHARSKI, attorney rep. K-U-C-H-A-R-S-K-I.

Case No.
21-004162

|  | a, uh, canine handler. Um, obviously certified through our specific academy that we use for canines. And then I also just attended, uh, the Los Angeles County Sheriff's Department's, uh, S-E-B S.W.A.T. school, which was, uh, this past July. |
|---|---|
| HERNANDEZ: | Great. Uh, during the course of your training, have you been trained in like, de-escalation, less lethal use of force, lethal use of force? |
| MULLINS: | Yes, sir. |
| HERNANDEZ: | Great. I wanna take your attention back to, uh, yesterday, being September 28ᵗʰ, the event that led you to being here today. Um, can you tell me exactly what happened? |
| MULLINS: | Yes, sir. It started out as our, uh, crime task force investigators. We were, uh, looking for an occupied stolen vehicle. Um, our helicopter eventually located the vehicle, uh, I believe it was in the City of Santa Ana, Irvine. Um, two of our, uh, my partner canine handlers went in to assist with investigators and a pursuit ensued from there, of the stolen vehicle that they did locate. |
| HERNANDEZ: | Okay. You were one of the pursuing canine handlers? |
| MULLINS: | No, sir. |
| HERNANDEZ: | You were not? |
| MULLINS: | No, sir. |
| HERNANDEZ: | Okay. At what point did you, um, get involved or arrive on the scene of the incident? |
| MULLINS: | I responded to the City of Santa Ana when the pursuit actually ended. And, uh, we received an emergency call out for our S.W.A.T. team. |
| HERNANDEZ: | Okay. |

Case No.
21-004162

MULLINS:          I'm, uh, assigned to our S.W.A.T. team as a canine handler.

HERNANDEZ:        Okay. During the pursuit, were you monitoring radio traffic on your police

                  radio?

MULLINS:          Yes, sir.

HERNANDEZ:        Okay. And what information, if any, was being broadcasted?

MULLINS:          The information that I heard was, um, the subject in the vehicle, uh, was wanted

                  for, uh, numerous warrants referenced an armed robbery, or armed robberies

                  that had occurred. Which has been confirmed through the County website,

                  Visions. Um, and he was actively being pursued for being at a stolen vehicle at

                  the time.

HERNANDEZ:        Did the, um, information that was relayed to you identify who that subject was?

MULLINS:          Yes, sir.

HERNANDEZ:        And do you recall that subject's name?

MULLINS:          BRANDON LOPEZ, sir.

HERNANDEZ:        Okay. Prior to today's-, or prior to yesterday's event, had you had any history

                  with Mister, uh, LOPEZ?

MULLINS:          Not personally, sir.

HERNANDEZ:        Okay. What other intelligence about, um, Mister LOPEZ were you provided as

                  far as outside of the, uh, numerous warrants for armed robbery? Was there

                  anything else that was broadcasted?

MULLINS:          Are you talking about specifically during the pursuit or through the overall

                  event, sir?

Case No.
21-004162

HERNANDEZ:        Overall, that kinda stands out in-, in your mind.

MULLINS:          Um, so during the pursuit, uh, officers relayed over the radio that he was

                  actively reaching underneath the seat towards the floor board. Um, when the

                  pursuit ended, uh, there was officers that broadcasted over the radio that he

                  was smoking something from foil. Um, and at the, uh, the time of the incident

                  when it was all unfolding that a police officer at the time, specifically stated over

                  the police radio that they had witnessed him with a, uh, firearm.

HERNANDEZ:        Hearing this information and based on your, you know, background, training

                  and experience, um, when a subject reaches under a seat, um, what do you

                  believe that subject might be doing or…?

MULLINS:          At this point, it would make me believe that he was attempting to access some

                  sort of weapon. Especially coupled with his-, his background history of, um,

                  (BACKGROUND COUGH) committing robbery with a, uh, firearm at the time.

                  And coup-, also coupled with the fact that a police officer did state that they

                  saw him with a firearm. So it made me feel that he was-, through training and

                  experience, especially with the-, the past knowledge of him already being in

                  possession of firearms in the past that it was, uh, a possibility-, a high possibility

                  he was prob-, probably reach-, reaching for a firearm.

HERNANDEZ:        Have…

MULLINS:          Or some sort of weapon.

HERNANDEZ:        Have you in the past been involved in a vehicle pursuit?

MULLINS:          Yes, sir.

HERNANDEZ:        Have you been involved as a primary and, or, secondary officer?

| | |
|---|---|
| HERNANDEZ: | And where were you in relation to the armored vehicle and the suspect's vehicle? |
| MULLINS: | I was further east. Um, there were actually utilizing an Anaheim Police canine, um, cars where the react team was staged. So when I arrived I-, I got with the, uh, The React Team that was working from that position, away from the armor. |
| HERNANDEZ: | Would you estimate the distance where you were further east? |
| MULLINS: | Uh, I'd say twenty-five, thirty yards. |
| HERNANDEZ: | Okay. And how long were on scene? |
| MULLINS: | I started responding to the City of Santa Ana around 7:30 P.M. and then I was there until the conclusion of the incident when we were taken back to the station, sir. |
| HERNANDEZ: | From responding-, responding to Santa Ana to actual arrival at the intersection of Santa Ana and Bristol, how long were you there on Santa Ana…until the conclusion of the incident? |
| MULLINS: | I'd say from…roughly around 7:45 P.M. until the conclusion of the incident. |
| HERNANDEZ: | Okay. During that time, did you hear or see any law enforcement personnel contact, uh, the suspect? |
| MULLINS: | They were making I-, ultimately hours of attempting verbal communications with him through, uh, a-, the P.A. system, I believe on the armored vehicle. As well as I heard over the police radio that they were attempting to contact him by cell phone as well as other family members to make a *** contact to speak directly to him. |

HERNANDEZ:    Do you recall what they were saying over the, uh, the P.A.? The address system
to him?

MULLINS:    They were saying numerous things. Um, mostly for him to come out with his
hands up. That they wanted the situation to end peacefully. Um, they, you
know, further when more information was gathered regarding his family or
whatnot, they utilized, you know, that his family didn't want him hurt and they
wanted things to end peacefully and everybody to walk away safely from it. But
for mostly for him to exit the vehicle with his hands up and nothing in his hands.

HERNANDEZ:    Did he comply at any point during that-, the commands?

MULLINS:    No, sir.

HERNANDEZ:    Okay. At some point did he come out of the vehicle?

MULLINS:    Ultimately he did.

HERNANDEZ:    And how did that come about?

MULLINS:    Uh, he ultimately exited the vehicle when, um, chemical agents in a noise
flashed diversionary device, or flash bang, was utilized.

HERNANDEZ:    Okay. Did you see him exit the vehicle?

MULLINS:    I did not specifically see him exit the vehicle. No.

HERNANDEZ:    Okay. Um, when he came out of the vehicle, did you see or did you hear
anything?

MULLINS:    So where I was positioned, I was originally the last-, one of the last people on
the stack because I do have my-, my dog. Um, at that point I don't have any sort
of, you know, firearm in my hand. I'm worried about handling my dog, so I was
allowing the-, the first couple guys in the stack to address whatever needed to

be addressed. Um, after the flash bang and the chemical agent were-, was introduced, this is at the time that he exited the vehicle, I didn't see it personally. Um, I believe hearing an officer or numerous officers on scene yell something in the fact of, gun. Um, barrage of gun fire went out. And that-, at that time I brought the-, my canine around to see if at some point he needed to be introduced into the situation. Um, at that-, it's at that time I saw him fall to the front of us. The suspect, I should say. Not anybody else, to be specific.

HERNANDEZ:     When the suspect fell, did you see how he landed?

MULLINS:       Face down, sir.

HERNANDEZ:     Did you see where his hands and arms were?

MULLINS:       Yes, sir. Underneath his body.

HERNANDEZ:     So they weren't exposed? For example, his arms weren't out like a-, like an airplane or like a cross?

MULLINS:       No, sir.

HERNANDEZ:     Okay. And then what happened once he fell to the ground?

MULLINS:       After he fell to the ground, um, the react team, or the-, the group officers for the arrest team, for simpler terms, pulled further back to the armor. Um, to assess the threat and to, um, devise a plan to see how best we could handle getting him into custody as quick as we can so we can reder-, render medically to him and render the situation safe.

HERNANDEZ:     So why do you believe the react team kind of went back and devise a plan…at that point once he fell?

| MULLINS: | I believe at that point there was some sort of deadly threat that had presented itself to the officers that were in front of me or at the side of the armor that saw the initial exiting of the suspect. To where we needed to pull back, make sure we were safe, formulate a-, a good device plan to make sure we do it as safely and as quickly as possible to keep us safe and as well as render the medically needed to him. |
|---|---|
| HERNANDEZ: | Uh-huh. |
| MULLINS: | And prevent any other further deadly force encounter. |
| HERNANDEZ: | So once they devised their plan, did you see them approach the suspect? |
| MULLINS: | Yes, sir. |
| ==HERNANDEZ:== | ==And then what happened after that?== |
| ==MULLINS:== | ==So originally a, uh, as the suspect was on the ground, a .40 millimeter or less than lethal ammunition was deployed, uh, to see if it would invoke some sort of reaction out of him. Which, uh, did not have the desired effect. Um, at that point we approached with a-, a shield and, uh, numerous hands guys that as we went in handcuffed him and that was basically how we took him into custody.== |
| HERNANDEZ: | And were you part of the stack that actually went up to the suspect? |
| MULLINS: | I was still in the back of it because I still had my dog. Just in case something did present itself and I needed to utilize another less lethal force option, he was still there. Um, but I was a few guys back, as we-, as we went up. |
| HERNANDEZ: | As you approached him, could you estimate the distance from where he was at in relation to where the S.W.A.T. personnel were at or the officers? |
| MULLINS: | From the original time of the shooting, sir? Or where we backed up to… |

MOROYOQUI:             And that's where you saw everything after that? Everything at the scene?

HERNANDEZ:             Correct, sir.

MOROYOQUI:             Okay.

HERNANDEZ:             End of interview. 6:12 A.M.

TRANSCRIBED BY:                    CYNTHIA QUINTANA

                                   ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                                   OCTOBER 4, 2021


REVISED BY:                        TROY HERNANDEZ, INVESTIGATOR

                                   ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                                   OCTOBER 5, 2021

**EXHIBIT 28**

**Orange County District Attorney**

**Bureau of Investigation**

300 North Flower Street, Santa Ana CA 92701
(714) 834-3600

# TRANSCRIPT

| | |
|---|---|
| SUBJECT: | LOPEZ, BRANDON |
| CLASSIFICATION: | OFFICER INVOLVED SHOOTING (FATAL) |
| INTERVIEW OF: | OFFICER NELSON MENENDEZ
ANAHEIM POLICE DEPARTMENT |
| DATE & TIME: | SEPTEMBER 29, 2021 @ 4:02 PM |
| LOCATION: | ANAHEIM POLICE DEPARTMENT |

On Wednesday, September 29, 2021, at approximately 1602 hours, I conducted a digital audio recorded interview of Santa Ana Police Officer NELSON MENENDEZ.   The interview took place at the Santa Ana Police Department, 60 Civic Center Plaza, Santa Ana.

The following individuals were present in the interview:

- Investigator CRAIG BROWER        OCDA
- Detective GUS MOROYOQUI        Santa Ana Police Department

The following is a transcript of that interview:

LEGEND:    …    Denotes pauses between words, phrases, incomplete sentences, stammering etc. (does not indicate missing words)
            ***    Denotes unintelligible conversation
            **(SIC)**    Denotes precisely reproduced word

[BEGINNING OF INTERVIEW]

HERNANDEZ:        Date of September 29th, 2021. Time is 4:02 PM. Case number is 21-004162. It's investigator, TROY HERNANDEZ. T-R-O-Y, H-E-R-N-A-N-D-E-Z.

BROWER:        Investigator CRAIG BROWER, Orange County District Attorney's Office, last name is spelled B-R-O-W-E-R.

MOROYOQUI:        Detective GUS MOROYOQUI, Santa Ana Police Department. M-O-R-O-Y-O-Q-U-I.

MENENDEZ:        And Officer MENENDEZ, NELSON. N-E-L-S-O-N M-E-N-E-N-D-E-Z. A police officer for the city of Santa Ana.

Case No.
21-004162

| MENENDEZ: | Correct. |
|---|---|
| HERNANDEZ: | Okay. At some point, um did you hear an officer um in the vehicle um make a comment regarding a gun or observing a gun. |
| MENENDEZ: | Yes. |
| HERNANDEZ: | Okay, what happened then *** |
| MENENDEZ: | So, I wanted to say this was. It had to be within the first hour. Huh, maybe within, maybe within the first thirty minutes. I want to say um so it's still daylight outside. The officers are looking inside and I can clearly hear um, huh, I can definitely hear Officer AGUILAR and I can hear *** SERGIO MARTINEZ is out in the turret so isn't like clearly, but I can hear him so, I lis, I'm listening to all this communication. But, they're saying huh four-seventeen, it has a four-seventeen right, right hand. He has four-seventeen, right hand, right hand four-seventeen. So, I-I can't think of the exact words that they used. But, whatever, so whatever that he said, like four-seventeen or firearm, I just repeated it. Hey guys, guys here's a four-seventeen. The reason why I said it immediately is because from their vantage point, if they see a firearm, I'm obviously gonna not gonna just be like oh he has a firearm, right. No. I'm the communication's officer at that point. And my, and it wasn't I want to say, it was maybe and not even a second that I press I'm, I'm holding my police radio my hand the whole time. I just pressed on the mike and I'm sure you gonna hear in the recording that we're all kind of like talking at the same time. They're, they're viewing they're whatever they're saying, I'm relaying to the officers why because if they're saying hey this guy's armed. I think he has, oh shoot he's about to get into a gun battle with these guys. So, when they're saying firearm or gun of four-seventeen, it might have been a cop term or or whatever um, I relay that |

information directly to the officers. I look over when they say four-seventeen, I look over huh Officer AGUILAR's um shoulder and I can just see the suspect just moving about to the right. But, I can't see what he has in his hands. If, if you guys can visualize that. So, I can see his body movements uh doing this. I can hear at the same time uh Corporal GALIANA on the P.A. right he's talking on the P.A. 'Hey put down, put down whatever you had down, put it down, put it down'. He's saying something to that effect. 'Put it down, put it down, put it down' so, I-I figure if he's saying that, he has visual of or whatever he's seeing him with, right a firearm. So, I'm, I'm trying to get on the air, putting out that information, but I'm sure outside the officers also hear him um Corporal GALIANA telling the suspect to put down whatever he has. So, that was pretty much the only time I remember during this whole two and half hour to three hours that I'm in the, in the tactical vehicle. If they mention a firearm, right? Uh, it pretty much goes on throughout huh the whole incident. He's just, he's doing the typical, he's using drugs, he's huh a smoking from a pipe, he's using tin foil, uh he's smoking cigarettes. I can see that he's monitoring the center mirror, I can see him look at the driver mirror, I can see him look at the pass-through mirror. I can see him you know multiple times throughout the whole incident grabbing onto the steering wheel.  After, he's using drugs, taking deep breaths. It's kinda of like he's, he's preparing himself. I can see him taking deep breaths, kinda of like he's counting. He's looking back and so I'm kind of like, 'Hey guys stand by, this guy's taking deep breaths, he's using drugs and, and-and you can see him move his, his arm towards the door jamb, like he's going to open it. But, obviously he doesn't, right? So, we get all that throughout this whole time. And I don't know like twenty times he's doing that, he's smoking drugs, he's looking at

the mirrors, kind of like he's looking for an avenue to escape or you know, it's-it's kind of obvious what he's doing.

HERNANDEZ:    So, at that point, I'm hearing Corporal GALIANO and um MARTINEZ talk about a gun it's your belief that he had a firearm and with him looking in the mirrors and what not, did you believe that he was looking for possibly to flee?

MENENDEZ:    Yes.

HERNANDEZ:    Get out of car?

MENENDEZ:    Absolutely, I mean it was absolutely clear to me that when hearing them say, 'Hey, he has a firearm or four-seventeen', I put that out, I looked over his shoulder, cause now I want to do kind like the play by play, right? I want to go ahead and me visualize what he's doing and seeing if he's going to open the door that way. Um, there's no delay as I'm talking, I don't want there to be no delay that this guy's going be ready to be come out and either flee or confront the officers. He only had two options. Right, confront the officers behind him or run huh unto Bristol and into the community, right. That's what I'm reporting to because we have so many officers on this perimeter. And, I'm sure you can see from the, from the body cam video, helicopter if they're recording and every single corner there, every single corner just hundred yards in each direction they're citizens, citizens, there's kids, there's children, there's taco trucks, so in every which direction you can see that there's huh, there's huh citizens. Um as much as we try to manage it with crime scene tape, there's still standing out there and we wanted to make sure we re-, we relayed that information. I wanted to make sure I relayed that information to the officers that way they have like ABE, get ready this guy's going to come out or also the perimeter officers you never know he's going to run towards you guys and try to escape

==and harm, harm huh you know business owner's residence or any of the officers==

==in the perimeter.==

BROWER:            Did you have a BWC?

MENENDEZ:          Say again.

BROWER:            Were you wearing a BWC?

MENENDEZ:          I was.

BROWER:            Was it updated?

MENENDEZ:          No.

BROWER:            Okay. Was there a reason why it wasn't?

MENENDEZ:          Yes, cause we chose the front one. We agreed hey we're going to turn on this
                   one. Um, and the reason why with the BWC they vibrate or they beep and that's
                   going to get annoying after a while, right? You can hear nothing but five
                   cameras beeping, vibrating, and that's not necessarily something we want in
                   this situation. We're going to try to minimize the noise or repeating, buzzing and
                   it does, it does distract. So, the camera we had in front I don't even think I think
                   it was just plain huh silent. So, we put it right at the dashboard. Hey we're going,
                   we're going hot or as soon as we arrived it was activated and huh I maybe from
                   me to you, a five feet from the camera so like it records anything I'm saying and
                   it records our con, our conversation. Now, if I was to step out of the vehicle then
                   I would obviously activate.

BROWER:            And, whose body worn camera was it?

MENENDEZ:          That was officer, uh AGUILAR.

MOROYOQUI:          And why was that? Was your concern that might happen?

MENENDEZ:           My concern was huh obviously we have huh Swat Officers and I already know

that the type of weaponry they have right, they have rifles those, those rounds

can-can travel a long distance and the last thing I want is like I saw on Fifth

Street, a mom holding two five maybe four-year old's and just watching us and

my concern was A. Either this suspect can uh shoot out the window and clearly

hit them from his distance or the suspect gets out and there's some type of gun

battle and either his round or one of our uh rounds can potentially strike a

citizen. So, that was the whole point of making sure that they don't even have

an eye's view of the suspect vehicle because if they can't see him obviously they

are out of harm's way. But, before I left the actual Terr- the tactical vehicle. You

can clearly see all these citizens out there even two lunch trucks that decided to

set up there, I guess you know watching what was going on.


MOROYOQUI:          Okay.  ***

HERNANDEZ:          End of interview 4:24 P.M.

TRANSCRIBED BY:                     ALMA DAVILA

                                    ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                                    OCTOBER 4TH, 2021


REVISED BY:                         TROY HERNANDEZ, INVESTIGATOR

                                    ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                                    OCTOBER 6TH, 2021

# EXHIBIT 29

OCDA 21-004162.004 Report by Gonzales, Carlos 349                                                      Page 1 of 8



# Orange County District Attorney
## Bureau of Investigation
300 N. Flower Street, Santa Ana CA, 92703
(714) 834-3600

## Special Assignment Supplemental Report

**Case No.**
**21-004162**

**Report No.**
**SPL21-0039**

---

## Incident Activity Summary:

| | |
|---|---|
| **Report Title:** | INTERVIEW |
| **Incident Date/Time:** | 09/29/2021 06:07 |
| **Location Occurred:** | Anaheim Police Department |

---

| **Primary Subject:** | **Brandon Anthony Lopez** |
|---|---|
| Involvement: | **SUSPECT** |
| DOB: | 12/2/1987 |
| Age: | 33 |
| Identification: | Driver License:        B9988914  (CA) |

---

| **Person:** | **Matt Mcleod** |
|---|---|
| Involvement: | **MENTIONED** |
| Employer/School: | Santa Ana Police Department: 60 CIVIC CENTER PLAZA, Santa Ana CA 92701 |
| Employer/School Phone: | Phone: (714) 245-8334 |

---

| **Person:** | **Russell Perry** |
|---|---|
| Involvement: | **MENTIONED** |
| Employer/School: | RLS Rains Lucia Stern: 3401 Centre Lake Drive, Ontario CA 91761 |
| Employer/School Phone: | Phone: (909) 509-5001 |

---

| **Person:** | **James Lopez** |
|---|---|
| Involvement: | **MENTIONED** |
| Employer/School: | Police Officer: Anaheim Police Department: S HARBOR BL, Anaheim CA 92805 |
| Employer/School Phone: | Work: (714) 765-1900 |

---

| **Digital 1)** | **(EVIDENCE)**    Recovered By: Gonzales, Carlos 349 |
|---|---|
| | Qty. 1:  Desc: Audio Interview of Officer James Lopez (Witness Interview) |
| | Related To: James Lopez, WITNESS |
| Item Booked: | Property booked at: Orange County District Attorney - Digital Storage   Hold For: Evidence |

---

## Narrative:

RE:    LOPEZ, BRANDON                              CASE # SA 21-004162

INTERVIEW OF:    OFFICER JAMES LOPEZ

OCDA 21-004162.004 Report by Gonzales, Carlos 349

BY:          CARLOS GONZALES, INVESTIGATOR

             ORANGE COUNTY DISTRICT ATTORNEY


PRESENT (1):   MATT MCLEOD, DETECTIVE

               SANTA ANA POLICE DEPARTMENT


PRESENT (2):   RUSSELL PERRY, ATTORNEY

               RAINS LUCIA STERN ST. PHALLE & SILVER, PC


LOCATION:    INTERVIEW ROOM – ANAHEIM POLICE DEPARTMENT


DATE:    SEPTEMBER 29, 2021


LEGEND:    …    Denotes pauses between words or phrases, incomplete sentences,

                   Stammering, etc. (Does not indicate missing words).

           ***   Denotes unintelligible conversation.

           (SIC)Denotes precisely reproduced word.


[BEGINNING OF INTERVIEW]

GONZALES:    Okay, I am CARLOS GONZALES with the Orange County District Attorney's Office.  I'm here on Special Assignment case 21-004162.  Today is Wednesday September 29, 2021.  It's 06:07 AM.  And, uh, starting on my left if I can have you introduce yourself first and last name for the record.

MCLEOD:    Yes, it's Detective MATTHEW MCLEOD.  Last name spelled M-C-L-E-O-D.  Badge number 2770.  Santa Ana Police Department.

PERRY:    RUSSELL PERRY.  P as in Peter, E-R-R-Y.  Attorney Rep.

GONZALES:    And Officer.

LOPEZ:    Officer JAMES LOPEZ.  L-O-P-E-Z.  Anaheim Police Department.

GONZALES:    And what is your rank and ID number?

LOPEZ:    Officer.  And my ID number is 2262.

GONZALES:    And is this a free and voluntary statement you'll be giving me today?

LOPEZ:    Yes.

GONZALES:    Has anyone from your agency ordered you to give statement?

LOPEZ:              No.

GONZALES:       Do you feel compelled to give a statement because the District Attorney's Office is involved?

LOPEZ:              No.

GONZALES:       Okay.  Sir, how long have you been employed with the Anaheim Police Department?

LOPEZ:               Approximately six years.

GONZALES:       And did you work for another law enforcement agency prior to Anaheim?

LOPEZ:               Yes.

GONZALES:       And where was that?

LOPEZ:               Pasadena Police Department.

GONZALES:       And how long did you work for Pasadena?

LOPEZ:               Approximately 11 years.

GONZALES:       And any other law enforcement agency?

LOPEZ:              No.

GONZALES:       And what is your current assignment here at the Anaheim Police Department?

LOPEZ:               Patrol Officer is my primary assignment.

GONZALES:       Yesterday afternoon there was an incident invo-, that in-, there was an officer involved shooting that occurred in the city of Santa Ana, um, could you tell me how you were directed to that incident or what you witnessed once you went on scene, your planning, your briefing, you know, what you were told?  If you could just give me a whole rundown of how you became involved with the incident.

LOPEZ:               Yes.  So, um, I, my shift starts at 6:00 PM.  So, yesterday I came in at 6:00 PM and was given some information from our Sergeant at the time, Sergeant SMITH that a incident was occurring in Santa Ana Police Department or Santa Ana, city of Santa Ana that involved our officers.  Uh, he explained to our briefing that it was initiated by a pursuit of a wanted subject and the pursuit led to Santa Ana and officers there were working the conclusion of the pursuit.  Being collateral on the SWAT Team, then received information from my Sergeants who are involved on the SWAT Team that there's a possibility we would be, we're gonna be called out and that armored vehicles were gonna be needed and being on duty personnel possibly be one of the ones assigned to retrieving the armor.  Initially then we were turned down that Santa Ana Police Department was gonna handle the incident.  And then sometime later we were informed again no, we're gonna be taking over the incident as a SWAT Team and I was advised to get one of the pieces of armor.

GONZALES:       Okay.  And what happened next?

LOPEZ:               SO, myself and Officer MORRISON, we went to what we call the Annex.  It's just a building that holds our armored vehicles and our equipment.  We went retrieved those vehicles.  I retrieved the Bear and I drove that down to a designated location which we call the CP, the Command Post.

GONZALES:       Okay.  And at the Command Post what, what occurred there?

LOPEZ:               When I arrived at the Command Post I obtained a further briefing of what was going on by Sergeant MCGLADE AND Sergeant LEIST.  They advised me that a named subject by the name of BRANDON LOPEZ was wanted for a series of armed robberies.  They had a warrant out for his arrest.  He was in stolen vehicle.  Led officers, Anaheim and Santa Ana Police Department Officers on a pursuit and during the pursuit he was also seen brandishing a firearm.

| | |
|---|---|
| GONZALES: | Okay.  And was this a, had this pursuit already terminated? |
| LOPEZ: | Yes. |
| GONZALES: | Okay.  And where was the pursuit terminated at? |
| LOPEZ: | I don't remember the, the intersection anymore… |
| GONZALES: | Okay. |
| LOPEZ: | …at this time but in the city of Santa Ana and not too far away from their police station.  So, we started discussing the plan there.  Um, the information that we discussed since several officers were already on scene from the SWAT Team, is we were gonna take our armored vehicles and our personnel that arrived and implement our armored vehicle around the suspect's vehicle and then start pulling off Santa Ana Police Department Officers and take over the scene. |
| GONZALES: | Okay.  And so, you drove over the Bear? |
| LOPEZ: | Yes. |
| GONZALES: | Okay.  And you positioned the Bear, um, at the intersection? |
| LOPEZ: | The Bear is positioned I guess give a little rundown of everything where it was? |
| GONZALES: | Yeah.  I think I have a little bit of a sketch hear… |
| LOPEZ: | Okay. |
| GONZALES: | …how and I'll let you look at this.  Um, this is Bristol and this is Santa Ana Boulevard.  This is just based upon what I was looking at when I went out there today or yesterday evening. |
| LOPEZ: | Uh-huh. |
| GONZALES: | Um, it looks like this X here that I have this number four was the Bear.  It looks like this was the suspect vehicle, this number one.  And it looks like after the switch was taken over, the vehicle that was right in front of it that's a Santa Ana PD SWAT vehicle. |
| LOPEZ: | Correct. |
| GONZALES: | And it looks like you guys put an additional, um, Anaheim PD SWAT vehicle up against that vehicle so he can't open the doors on the passenger side… |
| LOPEZ: | Yes. |
| GONZALES: | …of the suspect vehicle.  To the rear was the Santa Ana Ta-, Tahoe or Explorer. |
| LOPEZ: | Yeah. |
| GONZALES: | Utility vehicle.  So, this X right here was the vehicle that you drove over to the location and set up. |
| LOPEZ: | Yes. |
| GONZALES: | Okay. |
| LOPEZ: | Uh-huh. |
| GONZALES: | What was after you had that vehicle positioned there, what was the planning or what were you to do next? |
| LOPEZ: | So, for me personally I was maintaining the visual on the interior and what I could see of the suspect vehicle which is where BRANDON LOPEZ was and I remained in the driver seat the entire time. |

GONZALES:        Okay.

LOPEZ:           As far as the planning goes, I can't hear everything that's going on the outside or not discussed on the radio but the information that I did hear on the radio and was discussed amongst all personnel was that these were the positions that we were gonna hold the vehicle's in so that we were direct BRANDO LOPEZ out from the driver side of the vehicle so we had some control of his movement.  Um, there was discussions on since Santa Ana PD had already done several hours of negotiations with him was bringing our negotiators and trying to make any type of contact that we could and negotiate over the PA if we could make any cell phone contact or anything else.  Um, during this time I'm giving updates of what I could see.  You can tell that BRANDON had, um, covered up the front windshield.  So, he put mats up.  I could see the car mats that were placed in there and just other items that I couldn't really describe.  Um, at times, um, the windows would fog up just from the heat inside car and condensation would build up so we couldn't get a complete visual.  And there was times where he would actually wipe the windows and then again we could kinda see and what's going on.  So, I would update them on his movement which most of time he remained in the back seat of the car but then at times he would crawl over to the front seat, um, with still part of his body in the back seat, dig around underneath the seats and I would update them hey, this is his movement.  This is what he's doing right now.  Uh, there's a couple times where looked like he lit up a cigarette and then other times I couldn't tell what he was lighting up if he was using some sort of other maybe, um, uh, a container or, um, a pipe or something.

GONZALES:        Uh-huh.

LOPEZ:           So, those were the updates that I would continue to give and would be acknowledge by either the supervision or the, the Command Post personnel as well.  Um, yeah, and once we started getting our tactical negotiators on scene, um, well, I take that back.  Prior to that, um, arrest teams were already discussed on the contingencies of if he comes out, um, prior to us, um, setting up further who is take command of that.  And it was, it was gonna be our personnel.  Uh, we had K9s arrive on scene.  Um, they were briefed on the incident and attached to the arrest teams as well.  Um, officers were assigned less-lethal ammunitions.  So, on a SWAT Team we, we have both, um, shotgun less-lethal and multi-launchers.  I believe a multi-launcher was given to one of the personnel.  And then our negotiator.  Negotiators arrived on scene.  Um, couldn't tell you how long they, they tried to negotiate with him but, uh, for several minutes, uh, probably to about 30 minutes they tried to negotiates with him.

GONZALES:        Did you remain in the driver seat of the Bear?

LOPEZ:           Yes.  I still remained in the driver seat of the Bear.  And then plans were discussed on what was gonna happen next.  The arrest team was already set up.  And the decision was made to go to a distraction device and chemical agent deployment into the vehicle.

GONZALES:        Okay.  And did that take place?

LOPEZ:           Yes.  So, once everybody was set in place, um, distraction device was deployed to the front hood of the suspect's vehicle as chemical agents were, a tool was used to take out the rear window of the suspect vehicle and deploy a chemical agent into the vehicle.

GONZALES:        Okay.  And what happened next?

LOPEZ:           Almost immediately it looked like the effect of the chemical agent worked and like we discussed we wanted him to come out of the driver side whether it be the driver side door or the rear driver side and BRANDON LOPEZ imm-, immediately came out.

GONZALES:        What did he do or what did you observe?

LOPEZ:           So, I, I saw the door open.  I actually called out on the radio to the personnel, he's coming out, he's coming out.  I could see him come out and on the driver side since the street was under construction there was a bunch of rebar.  And I could… When he came out since he crawled out of the back seat, he was actually like hunkered down his legs came out first, his, then his head and I couldn't see his hands at the time.  It looked like he might've tripped over the rebar

OCDA 21-004162.004 Report by Gonzales, Carlos 349                                                    Page 6 of 8

so he was still hunched down. Once he got passed the rebar, his body sprung up and I could see he's holding a handgun in his right hand.

GONZALES: And did you, did you make an announcement to, of what you saw in his hand at that time or?

LOPEZ: I didn't make an announcement over the radio. I called out from the armor 'cause our rear door is open, he has a gun, he has a gun. Or maybe gun, gun.

GONZALES: Okay.

LOPEZ: I don't remember exactly but something to he has a gun, he has a gun. But I, actually my hands were out front of me. I didn't even, I couldn't even get to my radio in time 'cause he, he didn't stop. So, once that motion of coming out he continued. There's like a sh-, very short little embankment from the construction, he ran right up that embankment and straight to the officers who were actually behind cover of the front of my Bear armored vehicle.

GONZALES: And what happened next?

LOPEZ: And then from there officer involved shooting occurred. I can't see and I actually didn't know exactly what personnel were up front right there but since my attention was on him and it was happening very quick I did hear the sounds. I caught like the flash of the muzzles.

GONZALES: So, it was pretty spontaneous him exiting the vehicle, running passed that rebar, you see him remove what you recognized was a gun from his, from his did he come out with it in his hand or did he remove it from his waist?

LOPEZ: I couldn't tell if whether he was already holding it or he moved it 'cause when he came out, he was hunched over.

GONZALES: Okay.

LOPEZ: And as he tripped over that rebar, came passed everyone was front forward, again I couldn't tell if it was in his hand or he retrieved it from his waistband but at that time when his body came upright I could see he had a gun in his right hand.

GONZALES: Okay. And describe that weapon for me.

LOPEZ: It just looked like a black like square semi-automatic handgun.

GONZALES: Okay.

LOPEZ: Uh-huh.

GONZALES: Just all black?

LOPEZ: Yeah, just all, all…

GONZALES: Okay.

LOPEZ: …all black from what I could see and…

GONZALES: And as he came out and these events that you witnessed after he exited the vehicle, how fast was it for this officer involved shooting occurred? Was it like rapid instantaneous?

LOPEZ: Yeah, I mean it was, it was immediate for the most part. I mean 'cause his motion never stopped and he just ran right towards where the front of these officers were.

GONZALES: So, basically by the time you were putting out gun, gun, uh, probably the OIS might've occurred by that time?

LOPEZ: The shots might've already been occurring at that point.

GONZALES: Okay.

LOPEZ:            Uh-huh.

GONZALES:     Did you see any, any way that those officers that were towards the front, the arrest team or whatever had any time to react in any other way shape or form from your vantage point?

LOPEZ:            No.  No.

GONZALES:     Okay.  And prior to that, um, were you able to hear announcements being given, um, by some of the other officers that were around you, toward, um, the suspect in the vehicle?

LOPEZ:            Um, while he as in the vehicle yes.  There's constantly announcements given of especially when they're negotiations of peaceful give up, um, that you know, they're telling him like hey, think about your family.  Like we're not here to hurt you.  This is the plan.  Like go ahead and speak with us if, if you know, acknowledge me by removing the stuff from the front windows that they were trying give compliance.  Um, giving you notice that hey, Anaheim Police Department is here.  Your vehicle is surrounded.  Also that we have a K9 on scene as well too.  We want compliance so we don't want to use a K9.  And that was from, um, Officer SENA.

GONZALES:     Okay.  And had you ever had any prior interaction with this suspect before in the past?

LOPEZ:            No.

GONZALES:     You didn't know him at all?

LOPEZ:            No.

GONZALES:     Detective you have any questions for…

MCLEOD:       Uh, just one.  Um, during the transmissions that are going on when you're on scene and you can see, you had mentioned, um, the windows fogging up and BRANDON clearing them and putting mats on, um, was there any discussion or did you receive any information in regard to his possible state of mind or any kind of activity be it unusual or furtive movements anything like that?

LOPEZ:            Yes.

MCLEOD:       Okay.  What was that?

LOPEZ:            So, at, at one point, um, I believe it was a Santa Ana officer had broadcasted that, uh, BRANDON'S family members have actually contacted the police department and I believe it was Santa Ana Police Department where this was relayed from since it was coming from one of their officers that he had been contacting him over the phone and I don't know if that was over text messages or an actual phone call from inside…

MCLEOD:       Huh.

LOPEZ:            …that, um, he, he was gonna commit suicide by cop.

MCLEOD:       Uh-huh, yeah.  Okay.  That was it.  That was it.

GONZALES:     That was it?

MCLEOD:       (MAKES SOUND).

GONZALES:     Okay.  Um, I don't have any other follow up.

PERRY:           Nothing from me.

GONZALES:     Counselor you have anything?

PERRY:           Nope.

GONZALES:     Okay.  We are gonna conclude this interview.  It is 6:23 AM and thank you officer for your

Page 8 of 8

communication with us.

LOPEZ:              Absolutely.

[END OF INTERVIEW]

TRANSCRIBED BY:            JOSE PADILLA

                          ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                          SEPTEMBER 30, 2021

REVISED BY:               CARLOS GONZALES, INVESTIGATOR

                          ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

                          OCTOBER 4, 2021

---

Narrative By: **Gonzales, Carlos #349**   Audio Recorded

| **OCDA Personnel:** | **Gonzales, Carlos 349** | |
| --- | --- | --- |
| Involvement: | **Reporting** | 10/4/2021 |
| **OCDA Personnel:** | **Berry, Stan 235** | |
| Involvement: | **Approving** | 10/4/2021 |

| ATTACHMENTS | | |
| --- | --- | --- |
| **Date Attached** | **Attachment Description** | **Attached File Name** |
| 10/5/2021 | Scene Sketch | SKM_C754e21100513450 (pdf) |

21-004162

APD DIS

N

B
R
I
S
T
O
L

2

3

1A

SAPD

4

RR TRACKS

SANTA ANA BLVD

SKETCH / NOT TO SCALE

DRAWN BY: C. Gonzales #849

# EXHIBIT 30

Policy
**300**

**Anaheim Police Department**
Anaheim PD Policy Manual

# Use of Force

### 300.1  PURPOSE AND SCOPE

This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner (Government Code § 7286).

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

#### 300.1.1  DEFINITIONS

Definitions related to this policy include:

**Deadly force** - Any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to the discharge of a firearm (Penal Code § 835a).

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person (Government Code § 7286(a)).

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Serious bodily injury** - Means a bodily injury that involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member or organ (Gov't Code §12525.2).

**Totality of the circumstances** - All facts known to the officer at the time, including the conduct of the officer and the subject leading up to the use of force (Penal Code § 835a).

### 300.2  POLICY

The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**            COA 000727

# Anaheim Police Department
Anaheim PD Policy Manual

*Use of Force*

### 300.2.1   DUTY TO INTERCEDE
Any officer present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, shall, when in a position to do so, intercede to prevent the use of unreasonable force.

When observing force used by a law enforcement officer, each officer should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject (Government Code § 7286(b)).

### 300.2.2   FAIR AND UNBIASED USE OF FORCE
Officers are expected to carry out their duties, including the use of force, in a manner that is fair and unbiased (Government Code § 7286(b)). See the Bias-Based Policing Policy for additional guidance.

### 300.2.3   DUTY TO REPORT EXCESSIVE FORCE
Any officer who observes a law enforcement officer or an employee use force that potentially exceeds what the officer reasonably believes to be necessary shall promptly report these observations to a supervisor as soon as feasible (Government Code § 7286(b)).

### 300.3   USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a).

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance (Government Code § 7286(b)).

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the approved tools, weapons, or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**          COA 000728

# Anaheim Police Department
Anaheim PD Policy Manual

*Use of Force*

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

## 300.3.1   ALTERNATIVE TACTICS - DE-ESCALATION
As time and circumstances reasonably permit, and when community and officer safety would not be compromised, officers should consider actions that may increase officer safety and may decrease the need for using force:

(a)   Summoning additional resources that are able to respond in a reasonably timely manner.

(b)   Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c)   Employing other tactics that do not unreasonably increase officer jeopardy.

In addition, when reasonable, officers should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)). Such alternatives may include but are not limited to:

(a)   Attempts to de-escalate a situation.

(b)   If reasonably available, the use of crisis intervention techniques by properly trained personnel.

Officers who use force should describe in their report whether any de-escalation strategies were deployed or attempted prior to the application of force. If not used, explain why de-escalation was not feasible.

## 300.3.2   USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use objectively reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance. Retreat does not mean tactical repositioning or other de-escalation techniques (Penal Code § 835a).

## 300.3.3   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit (Government Code § 7286(b)). These factors include but are not limited to:

(a)   The apparent immediacy and severity of the threat to officers or others (Penal Code § 835a).

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER   COA 000729

## Anaheim Police Department
Anaheim PD Policy Manual

*Use of Force*

(b)   The conduct of the individual being confronted, as reasonably perceived by the officer at the time (Penal Code § 835a).

(c)   Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d)   The conduct of the involved officer leading up to the use of force (Penal Code § 835a).

(e)   The effects of suspected drugs or alcohol.

(f)   The individual's apparent mental state or capacity (Penal Code § 835a).

(g)   The individual's apparent ability to understand and comply with officer commands (Penal Code § 835a).

(h)   Proximity of weapons or dangerous improvised devices.

(i)   The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(j)   The availability of other reasonable and feasible options and their possible effectiveness (Penal Code § 835a).

(k)   Seriousness of the suspected offense or reason for contact with the individual prior to and at the time force is used.

(l)   Training and experience of the officer.

(m)   Potential for injury to officers, suspects, bystanders, and others.

(n)   Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.

(o)   The risk and reasonably foreseeable consequences of escape.

(p)   The apparent need for immediate control of the subject or a prompt resolution of the situation.

(q)   Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(r)   Prior contacts with the subject or awareness of any propensity for violence.

(s)   Any other exigent circumstances.

**300.3.4   RESTRICTIONS ON THE USE OF CAROTID CONTROL HOLD**
Officers of this department are not authorized to use a carotid restraint hold. A carotid restraint means a vascular neck restraint or any similar restraint, hold, or other defensive tactic in which pressure is applied to the sides of a person's neck that involves a substantial risk of restricting blood flow and may render the person unconscious in order to subdue or control the person (Government Code § 7286.5).

**300.3.5   USE OF FORCE TO SEIZE EVIDENCE**
In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

COA 000730

## Anaheim Police Department
Anaheim PD Policy Manual

---

*Use of Force*

---

should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Anaheim Police Department for this specific purpose.

### 300.3.6   RESTRICTIONS ON THE USE OF A CHOKE HOLD
Officers of this department are not authorized to use a choke hold. A choke hold means any defensive tactic or force option in which direct pressure is applied to a person's trachea or windpipe (Government Code § 7286.5).

### 300.4   DEADLY FORCE APPLICATIONS
Where feasible, the officer shall, prior to the use of deadly force, make reasonable efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts (Penal Code 835a).

If an objectively reasonable officer would consider it safe and feasible to do so under the totality of the circumstances, officers shall evaluate and use other reasonably available resources and techniques when determining whether to use deadly force. To the extent that it is reasonably practical, officers should consider their surroundings and any potential risks to bystanders prior to discharging a firearm (Government Code § 7286(b)).

The use of deadly force is only justified when the officer reasonably believes it is necessary in the following circumstances (Penal Code § 835a):

(a)   An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person.

(b)   An officer may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Officers shall not use deadly force against a person based on the danger that person poses to him/herself, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or to another person (Penal Code § 835a).

An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. An officer's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a).

### 300.4.1   SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective and may involve additional considerations and risks. When feasible, officers should take reasonable steps to move out of

---

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

COA 000731

## Anaheim Police Department
Anaheim PD Policy Manual

---

*Use of Force*

---

the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of
its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants
when the officer reasonably believes there are no other reasonable means available to avert the
imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer
or others (Government Code § 7286(b)).

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

300.4.2   DISPLAYING OF FIREARMS
Given that individuals might perceive the display of a firearm as a potential application of force,
officers should carefully evaluate each tactical situation and use sound discretion when drawing
a firearm in public by considering the following guidelines (Government Code § 7286(b)):

    (a)    If the officer does not initially perceive a threat but reasonably believes that the
potential for such threat exists, firearms should generally be kept in the low-ready or
other position not directed toward an individual.

    (b)    If the officer reasonably believes that a threat exists based on the totality of
circumstances presented at the time (e.g., high-risk stop, tactical entry, armed
encounter), firearms may be directed toward such threat until the officer no longer
perceives such threat.

Once it is reasonably safe to do so, officers should carefully secure all firearms. Officers should
refer to the Report Preparation policy for guidance on how to document the display of a firearm.

## 300.5   REPORTING THE USE OF FORCE
Any use of force by a member of this department shall be documented promptly, completely,
and accurately in an appropriate report, depending on the nature of the incident. The officer
should articulate the factors perceived and why he/she believed the use of force was reasonable
under the circumstances. To collect data for purposes of training, resource allocation, analysis,
and related purposes, the Department may require the completion of additional report forms, as
specified in department policy, procedure, or law. See the Report Preparation Policy for additional
circumstances that may require documentation.

300.5.1   NOTIFICATION TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in
any of the following circumstances:

    (a)    Any action beyond non-resisted handcuffing or restraint that does not result in a visible
or physical injury, the act of pointing a firearm at an individual, and the application of
a hobble or other similar device.

    (b)    The application caused a visible injury.

    (c)    The application would lead a reasonable officer to conclude that the individual may
have experienced more than momentary discomfort.

    (d)    The individual subjected to the force complained of injury or continuing pain.

    (e)    The individual indicates intent to pursue litigation.

---

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**           COA 000732

# Anaheim Police Department
Anaheim PD Policy Manual

*Use of Force*

    (f)     Any application of a TASER device or control device.

    (g)    Any application of a restraint device other than handcuffs, shackles, or belly chains.

    (h)    The individual subjected to the force was rendered unconscious.

    (i)    An individual was struck or kicked.

    (j)    An individual alleges unreasonable force was used or that any of the above has occurred.

## 300.5.2   REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE

The Records Manager, MIRT Lieutenant or the authorized designee shall ensure that data required by the Department of Justice (DOJ) regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is collected and forwarded to the DOJ as required by Government Code § 12525.2. See the Records Section Policy.

## 300.6   MEDICAL CONSIDERATION

Once it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident (Government Code § 7286(b)).

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff, or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

COA 000733

## Anaheim Police Department
Anaheim PD Policy Manual

---

*Use of Force*

---

**300.7  SUPERVISOR RESPONSIBILITY**

A supervisor should respond to any reported use of force, if reasonably available. The responding supervisor is expected to (Government Code § 7286(b)):

(a)  Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties;

(b)  Ensure that any injured parties are examined and treated; and

(c)  Conduct a use of force investigation for all use of force incidents via the Force Analysis System (FAS). The investigation should include a review of de-escalation tactics or attempts pursuant to this policy.

(d)  Supervisors shall input initial information into the Force Analysis System before the end of their shift and submit the FAS review within seven days from the date of occurrence.

    1.  There are three level of use of force investigations:

        (a)  Level 1 use of force is defined as:

            1.  Any incident in which a Department member, while performing a law enforcement function, overcomes resistance through physical contact. This This includes any action beyond non-resisted handcuffing or restraint that does not result in a visible or physical injury, the act of pointing a firearm at an individual, and the application of a hobble or other similar restraint device. Level 1 use of force does not include use of a firm grip control while performing routine functions such as searching, handcuffing, or escorting. It does not include reasonable intervention necessitated by the subject's physical incapacity (e.g., lifting an intoxicated or disabled person). However, personnel shall make appropriate notifications in any instance that results in injury, the appearance of injury, or a complaint of pain.

        (b)  Level 2 use of force is defined as:

            1.  Any use of force causing visible or physical injury.

            2.  Any incident where an individual complains of pain resulting from the application of force.

            3.  Any incident where an individual is rendered unconscious.

            4.  The application of a control device, including but not limited to a Taser, chemical spray, baton, OPN, or kinetic energy projectiles.

            5.  Unusual circumstances at the discretion of a Supervisor.

        (c)  Level 3 use of force is defined as:

---

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**       COA 000734

# Anaheim Police Department
#### Anaheim PD Policy Manual

*Use of Force*

1. Serious bodily injury, defined in penal code section 243(f)(4) as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." An injury is defined in penal code section 243(f)(5) as "any physical injury which requires professional medical treatment."

2. Officer-involved shooting.

3. In-custody death.

(e) Level 1 use of force investigations shall be documented via a FAS report. Level 1 investigations require supervisors to review and approve all related reports. Supervisors are not required to review body-worn camera footage for Level 1 investigations.

(f) Level 2 use of force investigations shall be documented via a Force Analysis System report. Supervisors are required to review relevant body-worn camera footage and approve all related reports for Level 2 investigations.

(g) Supervisors shall also conduct an interview of the subject upon whom the force was applied when the following thresholds exist:

1. The suspect requires medical attention at a hospital due to the use of force incident. The sustained injuries are moderate or more significant (Examples: sutures, broken bones, etc.). This does not include Taser dart(s).

2. The suspect alleged a use of excessive force.

3. The suspect was bit by a K-9. (Interview and FAS input will be conducted by K-9 Sergeant).

4. Unusual circumstances at the discretion of a Supervisor.

(h) When possible, Level 2 investigations, conduct a recorded interview of the subject upon whom force was applied. A determination must be made if Miranda rights are applicable. If Miranda rights are not applicable, the following shall apply:

1. The content of the interview shall be summarized or included in any related criminal charges;

2. The fact that a recorded interview was conducted shall be documented in the appropriate report(s);

3. The recording of the interview shall be marked for retention until all potential for civil litigation has expired.

(i) If Miranda rights are applicable, then no interview with the subject upon whom the force was applied shall be conducted unless the subject waives his/her rights;

(j) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of the subject involved. These photographs should be retained until all potential for civil litigation has expired.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

COA 000735

# Anaheim Police Department

Anaheim PD Policy Manual

---

*Use of Force*

---

(k)    Identify any witnesses not already included in related reports.

(l)    Level 3 use of force incidents shall be investigated by the Major Incident Review Team (MIRT) Sergeant. Level 3 investigations shall follow the guidelines outlined in the Major Incident Review Team policy (MIRT).

(m)    With the exception of a display of a firearm, a supervisor who uses or directs the use of force may not complete their review or FAS entry. A separate, uninvolved supervisor shall complete the review of the use of force and FAS entry.

(n)    If a supervisor is not able to obtain an interview of the person upon force was used, they will need to clearly document the extenuating reason, which should also be recorded by the supervisor's body worn camera.

(o)    A supervisor cannot conduct a use of force review if they applied force in the incident or directed the force to be used. When a supervisor uses force or directs force to be applied, another supervisor or lieutenant will be required to complete the use of force review.

If a Supervisor cannot respond to the scene of an incident involving the reported application of force, the Supervisor is still expected to complete as many of the above items as circumstances permit.

Should the supervisor determine that any application of force was not within a policy, a separate internal administrative investigation shall be initiated. The supervisor will immediately notify their supervisor in the Chain of Command, who will inform the Office of the Chief of Police. The Chief of Police or designee will initiate an administrative investigation.

## 300.7.1   MANAGEMENT RESPONSIBILITY

A lieutenant or above shall review each use of force by any member to ensure compliance with this policy and to address any training issues. At the completion of the management review process, the use of force review shall be forwarded to the MIRT Sergeant for final disposition.

## 300.8   USE OF FORCE COMPLAINTS

The receipt, processing, and investigation of civilian complaints involving use of force incidents should be handled in accordance with the Personnel Complaints Policy (Government Code § 7286(b)).

## 300.9   TRAINING

Officers, investigators, and supervisors will receive periodic training on this policy and demonstrate their knowledge and understanding (Government Code § 7286(b)).

Subject to available resources, the Training Sergeant should ensure that officers receive periodic training on de-escalation tactics, including alternatives to force.

Training should also include (Government Code § 7286(b)):

(a)    Guidelines regarding vulnerable populations, including but not limited to children, elderly persons, pregnant individuals, and individuals with physical, mental, and developmental disabilities.

---

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**    COA 000736

## Anaheim Police Department
Anaheim PD Policy Manual

*Use of Force*

---

(b)   Training courses required by and consistent with POST guidelines set forth in Penal Code § 13519.10.

**300.10   USE OF FORCE ANALYSIS**
At least annually, the MIRT Sergeant should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

(a)   The identification of any trends in the use of force by members.

(b)   Training needs recommendations.

(c)   Equipment needs recommendations.

(d)   Policy revision recommendations.

**300.11   POLICY REVIEW**
The Chief of Police or the authorized designee should regularly review and update this policy to reflect developing practices and procedures (Government Code § 7286(b)).

**300.12   POLICY AVAILABILITY**
The Chief of Police or the authorized designee should ensure this policy is accessible to the public (Government Code § 7286(c)).

**300.13   PUBLIC RECORDS REQUESTS**
Requests for public records involving an officer's personnel records shall be processed in accordance with Penal Code § 832.7 and the Personnel Records and Records Maintenance and Release policies (Government Code § 7286(b)).

Copyright Lexipol, LLC 2021/09/22, All Rights Reserved.
Published with permission by Anaheim Police Department

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**              COA 000737

# EXHIBIT 31

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANTONIO LOPEZ, individually; JOHANNA LOPEZ, individually; M.R., by and through his guardian ad litem, April Rodriguez, individually and as successor in interest to Brandon Lopez; B.L. and J.L., by and through their guardian ad litem Rachel Perez, individually and as successor in interest to Brandon Lopez; S.L., by and through his guardian ad litem, Rocio Flores, individually and as successor in interest to Brandon Lopez,<br><br>            Plaintiffs,<br><br>     vs.<br><br>CITY OF ANAHEIM; CITY OF SANTA ANA; DAVID VALENTIN; JORGE CISNEROS; PAUL DELGADO; BRETT HEITMAN; KENNETH WEBER; CAITLIN PANOV; DOES 1-10,<br><br>            Defendants. | Case No.<br>8:22-cv-1351 |

VIDEOTAPED DEPOSITION OF JOHANNA SUZETTE LOPEZ

TAKEN ON

WEDNESDAY, MAY 8, 2024

CRISTINA ROLLER
CSR NO. 10879

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3
     ANTONIO LOPEZ, individually;      )
 4   JOHANNA LOPEZ, individually;      )
     M.R., by and through his          )
 5   guardian ad litem, April          )
     Rodriguez, individually and as    )   Case No.
 6   successor in interest to          )   8:22-cv-1351
     Brandon Lopez; B.L. and J.L.,     )
 7   by and through their guardian     )
     ad litem Rachel Perez,            )
 8   individually and as successor     )
     in interest to Brandon Lopez;     )
 9   S.L., by and through his          )
     guardian ad litem, Rocio          )
10   Flores, individually and as       )
     successor in interest to          )
11   Brandon Lopez,                    )
                                       )
12                   Plaintiffs,       )
                                       )
13          vs.                        )
                                       )
14   CITY OF ANAHEIM; CITY OF SANTA    )
     ANA; DAVID VALENTIN; JORGE        )
15   CISNEROS; PAUL DELGADO; BRETT     )
     HEITMAN; KENNETH WEBER; CAITLIN   )
16   PANOV; DOES 1-10,                 )
                                       )
17                   Defendants.       )
     ──────────────────────────────── )
18

19   VIDEOTAPED DEPOSITION OF JOHANNA SUZETTE LOPEZ, taken by

20   the Defendants, at 650 Town Center Drive, Suite 1400,

21   Costa Mesa, California, commencing at 10:03 a.m.,

22   Wednesday, May 8, 2024, before Cristina Roller, Certified

23   Shorthand Reporter, License No. 10879, for the State of

24   California, pursuant to Notice.

25
```

```
 1    encounter, what do you mean by that?
 2         A.   They were pretty rude.
 3         Q.   How so?
 4         A.   They were being a little bit derogatory, and the
10:44:33AM 5  baby was screaming, and just it seemed to be an
 6    unnecessary stop.
 7         Q.   And was the result of that stop and search just a
 8    citation, or was anyone arrested?
 9         A.   It was a citation.
10:44:53AM10  Q.   Have you personally ever had any encounters with
11    the Anaheim Police Department whether you were arrested by
12    them or pulled over by them or anything else?
13         A.   No.
14         Q.   Have you personally ever had any of those
10:45:05AM15  encounters with the Santa Ana Police Department?
16         A.   No.
17         Q.   Turning to this incident on September 28th of
18    2021, did you personally witness any portion of the
19    incident between Brandon Lopez and the Anaheim Police
10:45:29AM20  Department officers?
21         A.   I was there.  Now, when you say "witness," I mean
22    I was physically there, but I was one block away, so --
23         Q.   When you say --
24         A.   I guess you have to define that a little bit
10:45:58AM25  more.
```

```
 1        Q.   Sure.  When you say you were present one block
 2   away, where were you positioned at the time of this
 3   incident?
 4        A.   I was on the -- the northeast corner of Santa Ana
10:46:11AM 5   Boulevard and Baker.
 6        Q.   And this incident as far as what took place on
 7   September 28th, is it your understanding that it went on
 8   for some hours?
 9        A.   Correct.
10:46:28AM 10        Q.   Okay.  Approximately what time did you get to
11   that northeast corner of Santa Ana Boulevard and Baker?
12        A.   It was somewhere between 4:45 and 5:15.
13        Q.   And what led you to go to that street corner?
14        A.   I actually received a phone call from my
10:46:54AM 15   son-in-law who advised me what was going on, so I just
16   jumped in the car and went over there.
17        Q.   What is your son-in-law's name that you're
18   referring to?
19        A.   Julio Torres.
10:47:08AM 20        Q.   Do you recall what time you spoke with Julio
21   Torres on the phone?
22        A.   4:45, 4:50, somewhere in there.  It was closer to
23   5:00.
24        Q.   And what did you and Julio discuss at that time?
10:47:25AM 25        A.   He just advised me that Brandon was sitting in a
```

1    car on Santa Ana Boulevard and close to Bristol, and he

2    just said, "You better -- you better come," so I -- I went

3    over there as far as I could.

4         Q.   Other than him telling you that Brandon was in a

10:47:49AM 5    car at Santa Ana Boulevard and Bristol and that you should

6    come, did he relay any other details to you?

7         A.   No.  That was pretty much it.  We were on the

8    phone maybe a minute.  It was pretty quick.

9         Q.   Did he relay to you anything about police

10:48:06AM 10   activity?

11        A.   He might have mentioned that the police were

12   behind him.

13        Q.   When you say "behind him," do you mean behind

14   Julio or behind Brandon?

10:48:22AM 15        A.   Behind Brandon.

16        Q.   Okay.  So Julio told you that the police were

17   behind Brandon at that time?

18        A.   Yes.

19        Q.   Do you recall anything else about that

10:48:33AM 20   conversation between you and Julio?

21        A.   No.  He just said, "If you can, come quick."

22        Q.   Did you have any understanding about why Brandon

23   was in that position?

24        A.   No.

10:48:51AM 25        Q.   In response to that phone call, what did you do?

```
 1    lot of construction going on, so there was a lot of
 2    detours where generally there wouldn't be.
 3         Q.   And once you got to that corner, what did you
 4    see?
 5         A.   A lot of cop cars.  Really a lot of cop cars.  I
 6    think it was taped off.
 7         Q.   Other than -- well, strike that.
 8              How many cop cars approximately do you recall
 9    seeing when you first got to the corner of Santa Ana
10    Boulevard and Baker?
11         A.   I can't recall.
12         Q.   Best estimate is fine.
13         A.   Three.
14         Q.   Do you remember if those cop cars were Anaheim
15    Police Department, Santa Ana Police Department or
16    something else?
17         A.   Santa Ana.
18         Q.   When you arrived at that corner at some time
19    between 4:45 and 5:15, do you remember seeing any Anaheim
20    police vehicles?
21         A.   No.
22         Q.   From where you were positioned on that street
23    corner of Santa Ana Boulevard and Baker, could you see
24    Brandon at any point?
25         A.   No.
```

10:50:59AM (line 5)
10:51:27AM (line 10)
10:51:39AM (line 15)
10:51:53AM (line 20)
10:52:06AM (line 25)

1       Q.    Okay.  And approximately how far would you say

2   Baker is from Bristol on Santa Ana?

3       A.    Whatever a block radius is.  I don't know how --

4   I'm terrible with feet, so whatever one block radius is.

11:09:41AM  5       Q.    Do you know -- would it be easier to estimate in

6   how many businesses were in between those two streets

7   or --

8       A.    I would say there's probably about one, two

9   three, four, five, six, seven.  There was probably eight

11:10:01AM 10   buildings, like six residence and two business buildings

11   from where Bristol and Santa Ana are, because it was a --

12   kind of a mixed use.  That whole area is kind of mixed

13   used business and residential mixed in, apartment

14   complexes, single family home.

11:10:26AM 15       Q.    Okay.  And from where you were positioned at that

16   law office building at Santa Ana and Baker, could you

17   physically see the street corner of Bristol and Santa Ana

18   Boulevard?

19       A.    No, I could not.

11:10:45AM 20       Q.    Could you see the train tracks over there at all?

21       A.    No.

22       Q.    At any point when you were positioned at Santa

23   Ana Boulevard and Baker, did you ever see a black Dodge

24   Charger on the train tracks?

11:11:03AM 25       A.    No.

```
 1    blocking my way so I couldn't move, and then they had set

 2    up perimeters so I couldn't move anywhere, and then they

 3    also had a -- at one point in time they brought in an

 4    ambulance, and it was staged there.  So at various times

 5    then the vision got blocked by everything going on in that

 6    area from -- from Baker that way.

 7        Q.    Okay.  And this is still from a city block away;

 8    correct?

 9        A.    Yes.

10        Q.    Any of the police officers that you saw at

11    Bristol and Santa Ana, did you see them with a weapon out

12    of any sort?

13        A.    No.

14        Q.    Okay.  At any point on the date of this incident,

15    did you ever see a police officer with their weapon out at

16    Bristol and Santa Ana?

17        A.    No.

18        Q.    All right.  When you first arrived at Baker and

19    Santa Ana in response that phone call from Julio, I know

20    that you said you saw three police vehicles.  What's the

21    first thing you did upon arriving at that street corner?

22        A.    I just stood there, and my daughters were back

23    and forth, and we were just, you know, trying to find out

24    what was going on.  My son-in-law came.

25        Q.    And how long did you stand at that street corner?
```

11:15:41AM 5
11:15:54AM 10
11:16:09AM 15
11:16:33AM 20
11:16:57AM 25

1          A.    Actually I stood there until 2:30 in the morning

2     the next morning.

3          Q.    Okay.  So you stood at that street corner from

4     about 5:00 o'clock in the evening until 2:00 in the

11:17:16AM  5     morning?

6          A.    Yes.

7          Q.    Did you ever leave that street corner of Santa

8     Ana Boulevard and Baker during that period from 5:00 p.m.

9     to 2:00 a.m.?

11:17:26AM 10          A.    Yes.  I left about 7:00 o'clock to go to the

11     restroom.

12          Q.    Okay.  And when you left at 7:00 o'clock to go to

13     the restroom, where did you go?

14          A.    To the ex-husband's house on Second Street.

11:17:52AM 15          Q.    At any point from when you arrived at that street

16     corner of Santa Ana and Baker until you left at 2:00 a.m.,

17     did you ever have any contact with Antonio Lopez?

18          A.    No.

19          Q.    At any time from when you arrived at the street

11:18:11AM 20     corner of Santa Ana Boulevard and Baker, did you ever have

21     any contact with Brandon Lopez?

22          A.    No.

23          Q.    Did you ever try to contact Brandon Lopez that

24     day?

11:18:17AM 25          A.    Yes.

1   Q.   Okay.  And was that a conversation you overheard,

2   or did a police officer come up --

3   A.   Well, they come up to me.

4   Q.   Hold on.  Let me get my question out.  I know

11:26:52AM 5   sometimes you know where it's going.

6        Did a police -- is that a conversation that you

7   overheard, or did a police officer come you to you and

8   tell you they were going to use flash bangs to get Brandon

9   out of the car?

11:27:05AM 10   A.   They came up to me.

11   Q.   Do you recall if that was a Santa Ana police

12   officer, an Anaheim police officer or something else?

13   A.   I do not.

14   Q.   Was that one officer or multiple?

11:27:16AM 15   A.   It was one.

16   Q.   Do you remember what that officer looked like?

17   A.   It was Hispanic, smaller size.  Smaller in

18   stature, older.

19   Q.   Is that a different officer than the Hispanic

11:27:33AM 20   officer that you described earlier who asked if you were

21   Brandon's mom?

22   A.   Yes.

23   Q.   Okay.  And other than that officer telling you

24   that they were going to use flash bangs to get Brandon out

11:27:43AM 25   of the car, did that officer say anything else to you?

```
 1          A.   No.
 2          Q.   Do you know why that officer came up and informed
 3    you of that?
 4          A.   When he approached me, he asked if I was
 5    Brandon's mom, I believe.  I said yes.
 6          Q.   And I know you've given me the gist of what he
 7    said.  Do you recall verbatim or as close to verbatim of
 8    what he told you?
 9          A.   That was pretty much all he -- what he told me.
10          Q.   Did you respond to him telling you that they were
11    going to use flash bangs to get Brandon out of the car?
12          A.   I believe I started crying.
13          Q.   And did that officer say anything at that point
14    in response?
15          A.   No.
16          Q.   How did that interaction between you and that
17    officer end?
18          A.   I think I just said, "Thank -- you know, "Thank
19    you for letting me know," and that was pretty much it.
20          Q.   Was anyone else present for that conversation
21    other than you and that police officer?
22          A.   My son-in-law, Julio Torres.
23          Q.   After that conversation with the police officer
24    at about 9:50 or 9:55, what's the next thing that
25    happened?
```

11:27:58AM  5
11:28:13AM  10
11:28:27AM  15
11:28:45AM  20
11:29:03AM  25

1      A.   We stood at that same corner, and then I just

2   remember the flash bangs.

3      Q.   When you say you remember the flash bangs, what

4   do you mean?

11:29:21AM 5      A.   I could hear them.

6      Q.   What did you hear?

7      A.   Flash bangs, and immediately after gunfire.

8      Q.   Had you ever heard a flash bang before this

9   incident?

11:29:41AM 10      A.   No.

11      Q.   How is it that you knew that what you were

12   hearing was a flash bang?

13      A.   Because it -- it had kind of a popping -- not a

14   popping sound.  It didn't have a gunfire sound.  It had a

11:30:08AM 15   different tone to it, so I'm assuming that's what the

16   flash bangs were since they had already told me they were

17   going to do it.

18      Q.   Can you describe for me the noise that you heard?

19      A.   Almost sounded like a -- like a firecracker.

11:30:27AM 20      Q.   Okay.  And you said you heard flash bangs.  Was

21   there more than one?

22      A.   There was multiple.  Yes.

23      Q.   How many?

24      A.   Maybe three or four.

11:30:40AM 25      Q.   Okay.  So you heard three or four noises that you

1    assumed were flash bangs?

2         A.    Yes.

3         Q.    And how much time passed between the first flash

4    bang that you assumed you heard and what you assumed to be

11:30:55AM 5  the fourth flash bang?

6         A.    Maybe a matter of a couple seconds.

7         Q.    When you say "a couple," how many do you mean?

8         A.    Maybe two, three seconds.

9         Q.    Okay.  So all four of the three to four noises --

11:31:13AM 10   A.    They were consecutive like one right after the

11   other.

12        Q.    So all three to four of those noises that you

13   assumed to be the noise of a flash bang occurred within

14   two to three seconds?

11:31:23AM 15   A.    Yes.

16        Q.    And then you said you heard gunfire immediately

17   after those three to four noises?

18        A.    Yes.

19        Q.    What did you hear?  Can you describe for me what

11:31:45AM 20  the noise was that you heard that you believed to be

21   gunfire?

22        A.    Gunshots.

23        Q.    Okay.  How many gunshots did you hear?

24        A.    A lot of them, and they were all in succession.

11:32:02AM 25   Q.    Approximately how many?

|   |   |   |
|---|---|---|
| 1 | A. | Probably at least ten. |
| 2 | Q. | So at least ten.  Was it less than 20? |
| 3 | A. | It just seemed to go on.  It could have been 20. |
| 4 |  | It just seemed like it never stopped. |
| 5 | Q. | Okay.  At least ten.  Would it be less than 30? |
| 6 | A. | It could be less than 30. |
| 7 | Q. | Somewhere between ten and 30 sound correct? |
| 8 | A. | Yeah. |
| 9 | Q. | From when you heard the last noise that you |

11:32:25AM 5

11:32:59AM 10  assumed to be a flash bang until you heard the first noise

11  that you assumed to be a gunshot, how much time passed?

12        A.   Seconds.

13        Q.   What's --

14        A.   Maybe three or four seconds.

11:33:18AM 15       Q.   From when you heard the first noise that you

16  assumed to be a gunshot until you heard the last noise

17  that you assumed to be a gunshot, how much time passed?

18        A.   Maybe about a minute, just --

19        Q.   When you heard the ten to 30 sounds that you

11:33:51AM 20  believed to be gunshots, were there any pauses or breaks

21  in between them?

22        A.   No.

23        Q.   So is it correct to say that from when you heard

24  that first noise that you believed to be a flash bang

11:34:12AM 25  until you heard the last noise that you believed to be the

```
 1          Q.    What's the next thing that you remember happening?

 2          A.    Nothing happened.  Nothing happened until about

 3     2:00 o'clock.  Nobody came up to us.  Nobody said

 4     anything.  It was about 2:00 o'clock.  I finally had -- I

11:38:33AM 5   believe it was that same officer that told me about the

 6     flash bangs or what they were going to do.  He finally

 7     came up to me, and I asked him what's going on.

 8          Q.    Did that officer respond to you?

 9          A.    Yes.

11:39:03AM10         Q.    And what did he tell you?

11          A.    He said my son was deceased.

12          Q.    Are those the words that he used, or is that your

13     understanding of what he told you?

14          A.    His exact words were, "Yes.  Your son is dead."

11:39:27AM15         Q.    So if I understand correctly, that conversation

16     between you and that police officer was you went up to

17     him, and you asked him what is going on, and he responded,

18     "Yes.  Your son is dead"?

19          A.    Yes.

11:39:40AM20         Q.    Was there anything else said between the two of

21     you?

22          A.    No.

23          Q.    Do you recall approximately what time it was that

24     you heard that first noise that you believe to be a flash

11:39:57AM25   bang?
```

```
 1        A.   A little bit after 10:00.
 2        Q.   At any point from when you arrived at Baker and
 3   Santa Ana Boulevard until 2:00 a.m. the following morning,
 4   had you ever visually seen Brandon?
11:40:25AM 5   A.   No.
 6        Q.   Did you ever hear Brandon at any point when you
 7   were at that location?
 8        A.   No.
 9        Q.   Is it correct to say that the only basis for you
11:40:50AM10   believing that Brandon was at that street corner of
11   Bristol and Santa Ana was Julio's representation to you
12   that he was?
13        A.   Well, the neighbors -- as I was standing there,
14   the neighbors came up to me and said it was Brandon in the
11:41:29AM15   car.  I mean Julio's not the only one, but people who were
16   there were saying it was Brandon in the car.
17        Q.   Okay.  And who were those individuals that told
18   you that?
19        A.   I would say my daughters knew that -- my
11:41:45AM20   daughters, Michelle, Melissa, knew it was Brandon in the
21   car.
22        Q.   So I don't want you to try and guess what other
23   people knew.  I just want to know if anyone else told you
24   or represented to you that Brandon was at Bristol and
11:41:58AM25   Santa Ana, or if it was just Julio Torres.
```

```
 1            A.   Yes.
 2            Q.   Other than that conversation with the police
 3       officer where he told you that Brandon was in an
 4       unidentified car and asked if you were his mother, and
11:43:41AM 5  then the other police officer who came up to you and
 6       advised you that they were going to use flash bangs, did
 7       you have any other conversations with police officers that
 8       day?
 9            A.   No.  Those were the only two.
11:43:51AM10       Q.   At any point, were you ever interviewed by any
11       detectives or officers following this incident?
12            A.   No.
13            Q.   At the time that you heard what you believed to
14       be the flash bang, could you see anything that was
11:44:08AM15  occurring at Bristol and Santa Ana?
16            A.   No.
17            Q.   At the time that you heard what you believed to
18       be gunfire, could you see anyone with a firearm?
19            A.   No.
11:44:21AM20       Q.   Is it correct to say, then, that when you fell to
21       the floor in response to hearing those things, you didn't
22       know what was occurring at Bristol and Santa Ana other
23       than the noises that you heard?
24            A.   I knew what gunshots meant.
11:44:46AM25       Q.   So you heard what you believed to be gunshots;
```

1    correct?

2         A.    Right.

3         Q.    Okay.  Other than hearing the noise that you

4    believed to be gunshots, is it correct to say that you

11:44:55AM 5    didn't know what was occurring at Bristol and Santa Ana in

6    that moment?

7         A.    Correct.

8         Q.    Okay.  You didn't know who was firing, if anyone;

9    correct?

11:45:05AM 10         A.    Correct.

11         Q.    You didn't know if anyone had been struck;

12    correct?

13         A.    Correct.

14         Q.    Is it correct to say that for the entirety of

11:45:23AM 15    this incident, you never saw any police officer make any

16    contact with Brandon Lopez?

17         A.    Correct.  I couldn't see anything past the point

18    where I was.  Yeah.

19         Q.    Is it correct to say that during this entire

11:45:46AM 20    incident, you never heard any conversation between Brandon

21    and any police officer?

22         A.    Correct.

23         Q.    You said that you had stayed at that street

24    corner of Baker and Santa Ana until about 2:00 in the

11:46:03AM 25    morning?

```
 1   that night?

 2       A.   That's correct.

 3       Q.   Other than what you've told me on the record

 4   today, is there anything else that you recall observing

 5   about this incident that you've not yet told me?

 6       A.   No.

 7            MS. BAKKEN:  All right.  If we can go off the

 8   record and take a quick break.

 9            THE VIDEOGRAPHER:  Off record?

10            MS. QUESADA:  Sure.

11            THE VIDEOGRAPHER:  Off record.  11:53.

12            (Recess taken.)

13            THE VIDEOGRAPHER:  Back on the record.  The time

14   is 12:01.

15   BY MS. BAKKEN:

16       Q.   Ms. Lopez, what is Brandon Lopez's birth date?

17       A.   December 2nd, 1987.

18       Q.   And where was Brandon born?

19       A.   Orange, California.

20       Q.   And Brandon's parents will be yourself and

21   Antonio Lopez; correct?

22       A.   Right.

23       Q.   Did Brandon ever go by any other names in his

24   lifetime?

25       A.   No.
```

11:52:52AM 5
11:53:07AM 10
12:01:09PM 15
12:01:21PM 20
12:01:35PM 25

```
 1   record.

 2              THE VIDEOGRAPHER:  Cristina, do you want to

 3   get --

 4              THE REPORTER:  Yes.  Do you need a copy?

12:33:04PM 5              MS. QUESADA:  Yes, please.  Certified PDF copy

 6   would be great.

 7              THE VIDEOGRAPHER:  Do you need a copy of the

 8   video, Counsel?

 9              MS. QUESADA:  Yes, please, synched.

12:33:12PM 10              THE VIDEOGRAPHER:  Do you want it synched?

11              MS. QUESADA:  Yes, please.

12              THE VIDEOGRAPHER:  Can I take us off record now?

13              MS. BAKKEN:  Yes, please.

14              THE VIDEOGRAPHER:  This concludes the video

12:33:19PM 15   deposition of Johanna Lopez.  We are going off record at

16   12:34 p.m.

17              (The proceedings adjourned at

18              12:34 p.m.)

19                         ---o0o---

20

21

22

23

24

25
```

```
 1    STATE   OF   CALIFORNIA       )
                                    ) ss.
 2    COUNTY OF _____)

 3

 4        I, JOHANNA SUZETTE LOPEZ, say I have read the

 5    foregoing deposition and declare under penalty of perjury

 6    that my answers as indicated are true and correct.

 7

 8

 9    _____
              (Date)
10

11                        _____
12                                 (Signature)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    STATE   OF   CALIFORNIA      )
                                  ) ss.
2    COUNTY OF ORANGE             )

3

4        I, CRISTINA ROLLER, Certified Shorthand Reporter,

5    License No. 10879, for the State of California, do hereby

6    certify:

7        That, prior to being examined, the witness named in

8    the foregoing deposition, to wit, JOHANNA SUZETTE LOPEZ,

9    was by me duly sworn to testify the truth, the whole truth

10   and nothing but the truth;

11       That said deposition was taken down by me in shorthand

12   at the time and place therein named and thereafter reduced

13   to computer-aided transcription under my direction.

14       That the foregoing transcript, as typed, is a true

15   record of the said proceedings.

16       I further certify that I am not interested in the

17   event of the action.

18

19                        WITNESS my hand this 21st day of

20   May, 2024.

21

22

23                        *Cristina Roller*

24                        _____
                          CRISTINA ROLLER, C.S.R. NO. 10879

25

1 <u>APPEARANCES OF COUNSEL</u>:

2

3 For the Plaintiffs:

4  BURRIS, NISENBAUM, CURRY & LACY, LLP
   BY:  JULIA N. QUESADA, ESQ.
5  9701 Wilshire Boulevard
   Suite 1000
6  Beverly Hills, California   90212
   (310) 601-7070
7  julia.quesada@bncllaw.com

8

9 For the Defendants:

  LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
10  BY:  TORI L. N. BAKKEN, ESQ.
   633 West 5th Street
11  Suite 4000
   Los Angeles, California   90071
12  (213) 250-1800
   tori.bakken@lewisbrisbois.com

13

14 Also Present:

15  ADAM ELLISON, VIDEOGRAPHER

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS:

3    JOHANNA SUZETTE LOPEZ

4                                                    PAGE

5         EXAMINATION BY MS. BAKKEN                    6

6         EXAMINATION BY MS. QUESADA                  94

7         FURTHER EXAMINATION BY MS. BAKKEN           96

8

9

10

11                        E X H I B I T S

12
                                                     PAGE
13
     1    Notice of Deposition; Request for           6
14        Production of Documents

15   2    Photograph                                  17

16   3    Google Map                                  45

17

18

19
                   INFORMATION REQUESTED     PAGE    LINE
20
                                              89      24
21

22

23

24

25

COSTA MESA, CALIFORNIA, WEDNESDAY, MAY 8, 2024

AT 10:03 A.M.

---o0o---

10:03:57AM THE VIDEOGRAPHER: Good morning. We are on the record. The time is 10:04. This is the start of Volume 1 for the deposition testimony of Johanna Lopez in the matter of Lopez, et al., versus the City of Anaheim, et al, pending before the United States District Court, 10:04:14AM Central District of California, Case No. 8:22-cv-1351.

Today's date is May 8th, 2024. My name is Adam Ellison representing Best Evidence Video Productions based in Los Angeles, California. Today we are at the Law Office of Lewis Brisbois located at 650 Town Center Drive, 10:04:37AM Suite 1400, Costa Mesa, California, 92626. This deposition is being videotaped at the request of Lewis Brisbois representing the defense.

Counsel, please introduce yourself and state your appearances starting with the noticing party.

10:04:50AM MS. BAKKEN: Good morning. Tori Bakken on behalf of Defendants.

MS. QUESADA: Julia Quesada on behalf of Plaintiffs.

THE VIDEOGRAPHER: Thank you. Our court 10:04:57AM reporter, Cristina, may now swear in the witness.

```
 1                    JOHANNA SUZETTE LOPEZ,
 2     having been first duly administered the oath, was examined
 3     and testified as follows:
 4
 5                         EXAMINATION
 6     BY MS. BAKKEN:
 7          Q.   Good morning, ma'am.
 8          A.   Good morning.
 9          Q.   As I stated, my name is Tori Bakken, and I'll be
10     taking your deposition today.  As an initial matter, if I
11     could attach as Exhibit 1 the deposition notice.
12               (Exhibit 1 was marked by the deposition
13               reporter and is attached hereto.)
14     BY MS. BAKKEN:
15          Q.   Did you receive a copy of this before your
16     deposition today?
17          A.   I did.
18          Q.   Did you have an opportunity to look at it?
19          A.   I did.
20          Q.   Okay.  And in response to the requests for
21     production that were included, did you provide any
22     documents or bring any with you today?
23          A.   I provided a couple to my counsel.
24          Q.   Okay.  And what documents were those?
25          A.   There were a couple of articles that I had made
```

Timestamps: 10:05:09AM (line 5), 10:05:14AM (line 10), 10:05:20AM (line 15), 10:05:26AM (line 20), 10:05:39AM (line 25)